UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
NEW HAVEN. CT

JUL 22 2020 AM9:51
FILED-USDC-CT-NEW.HAVEN

| | | |
|---|---|---|
| MICHAEL LAMOTHE, Derivatively on Behalf of LIFE PARTNERS HOLDINGS, INC | § § § § | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, |
| Plaintiff | § § § | WASTE OF CORPORATE ASSETS, and UNJUST ENRICHMENT, VIOLATION OF CIVIL RIGHTS, |
| Vs. | § § | |
| H. THOMAS MORAN, et al | § § | |
| Defendents | § § | |
| | § | |
| -and- | § § | 3:20CV1028(CSH) |
| | § § | |
| LIFE PARTNERS HOLDINGS, INC., a Texas Corporation | § § § | |
| | § § | |
| Nominal Defendant | § § § | |
| | § § | DEMAND FOR A JURY TRIAL |
| | § § | |

Page **1** of **149**

Plaintiff, as Pro Se, submits this Verified Shareholder Derivative Complaint (the "Complaint") against defendants herein.

1. JESSICA MCGEE, c/o THOMPSON & KNIGHT LLP
   1722 Routh Street, Suite 1500 Dallas, Texas 75201

2. DAVID M. BENNETT, c/o THOMPSON & KNIGHT LLP
   1722 Routh Street, Suite 1500 Dallas, Texas 75201

3. THOMPSON & KNIGHT, LLP
   1722 Routh Street, Suite 1500 Dallas, Texas 75201

4. LISA L. LAMBERT- Assistant United States Trustee
    c/o OFFICE OF THE UNITED STATES TRUSTEE
    1100 Commerce Street, Room 976 Dallas, TX 75242

5. H. THOMAS MORAN, 521 W WILSHIRE BLVD
   Suite 200 Oklahoma City, OK 73116-7784 (County: OKLAHOMA)

6. JANE C. MORAN 521 W WILSHIRE BLVD, Suite 200
   Oklahoma City, OK 73116-7784 (County: OKLAHOMA)

7. ALAN JACOBS -  347 Pepperridge Rd Hewlett, NY 11557-2736

8. EDUARDO ESPINOSA c/o Akerman LLP
   2001 Ross Ave., Ste 3600 Dallas, TX 75201-2938

9. MICHAEL QUILLING - c/o Quilling Selander Lownds Winslett
   2001 Bryan St., Ste 1800 Dallas, TX 75201-3070

10. DENNIS ROOSIEN - c/o MUNSCH HARDT KOPF & HARR, P.C.
    3800 Lincoln Plaza 500 North Akard Street Dallas, TX 75201-6659

11. JAY ONG - c/o Munsch Hardt Kopf & Harr, PC
    401 Congress Ave., Ste 3050 Austin, TX 78701-4506

12. Munsch Hardt Kopf & Harr, P.C.
    401 Congress Ave., Ste 3050 Austin, TX 78701-4506

13. BERT SCALZO - 2917 Elmridge Dr.
    Flower Mound, TX 75022-4490

14. ROBERT TRIMBLE - 8333 Douglas Ave., Ste 1350
    Dallas, TX 75225-5860

15. Nate Evans - c/o Maple Life Analytics, LLC
    4350 East/West Hwy, Ste 900 Bethesda, MD 20814-4491

16. MARK REDUS - 6162 North Brookline Ave
    Oklahoma City, OK 73112-3950

17. GLENDA PIRIE - 128 PR 4831
    Newark, TX 76071

18. ADRIANA ATCHLEY - 235 Zachary Walk
    Murphy, TX 75094-3791

19. PHILIP LOY - 400 Madison Ave., Rm 17C
    New York, NY 10017-8906

## **NATURE OF THE ACTION**

1. Plaintiff is a substantial shareholder of the public shares of Life Partners Holdings, Inc. (LPHI) having acquired said shares through the NASDAQ Exchange after the company filed for Chapter 11 Bankruptcy protection in January 2015.

2. Plaintiff asserts claims for breach of fiduciary duty; aiding and abetting breach of fiduciary duty; abuse of control; unjust enrichment; under numerous laws and codes including: 28 U.S.C. §§ 351-36, 18 U.S. Code § 242,  18 U.S. Code § 1001, 18 USC §3284, 11 U.S.C. § 1102, 11 U.S.C. § 1104(e), 11 U.S.C. §§ 1106, 1107; Fed. R. Bankr. P. 2015(a),  18 U.S. Code § 152, 18 U.S. Code § 153, 18 U.S. Code § 154, 18 U.S. Code § 155, 18 U.S. Code § 157, 11 U.S.C. § 548, 11 U.S. Code § 326, 11 U.S. Code § 704, Bankruptcy Rule 903 and violations of Section 14(a) of the Securities Exchange Act of 1934 as well as other complaints enumerated below *(also see Exhibit 1)* including but not limited to; Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m of the Securities Exchange Act of 1934 which pertains to the filing requirements of the Trustee(s) to file SEC required and FASB compliant financial statements (10k) for years 2015 through 2019 as required by the SEC. In addition, Plaintiff seeks the production of these required documents as further evidence of the theft of over $1 Billion from the estate of the debtor as fully set out bellow.

3. This action has not been filed with any intent of vacating or altering the LPHI Bankruptcy Plan of Reorganization as approved and commenced in December of 2016.

4. Mr. LaMothe assumed LPHI would soon be dismissed from bankruptcy as no fraudulent activities had been discovered at any point during numerous audits and forensic audits as well as on going and in depth financial scrutiny by numerous independent entities.

5. *LPHI had NO debts or executory obligations other than an excessive fine levied by the SEC in January 2015.* Later in 2015 the SEC unilaterally withdrew the fine. After 25 years in operation LPHI built a $3.2 Billion dollar and growing book of business successfully managed by the company.

6. However, once in Chapter 11 management was wrangled away from LPHI and the company was placed in the hands of a Trustee. The trustee, H. Thomas Moran swore in his application under penalty of perjury that he was a disinterested party in his application for appointment. In fact, Mr. Moran, upon being questioned under oath, admitted that he was not a disinterested party and further that he had no experience managing a large public company such as LPHI. Additionally, Mr. Moran admitted that he had no accounting background and had no experience operating a public company.

7. It was this lack of experience,  the intense desire of a member of the SEC, Fort Worth Branch office, and incredible greed that opened Pandora's Box and caused the theft of $1 Billion or more in cash and liquid assets from the estate of LPHI and its approximately 32,000 investor and clients.

## JURISDICTION AND VENUE

8. This Court has Jurisdiction over this Shareholder Derivative lawsuit under *Rule 23.1 [See Ferrara, et al., § 4.02[1] and [2] and cases and statutes cited therein; see also Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1826 and § 1828 and cases cited therein]* as the Plaintiff was a substantial shareholder at the time of filing. In addition, under *The Contemporaneous Ownership Requirement a. In most jurisdictions, a derivative plaintiff must have been a shareholder at the time of the challenged transaction and must remain a shareholder pending the outcome of the litigation. See, e.g., Lewis v. Anderson, 477 A.2d 1040, 1049 (Del. 1984) ("[A] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing" to sue derivatively); see also Brambles USA, Inc., 731 F. Supp. at 648 ("[A] derivative plaintiff [must] be a shareholder of the corporation at the time of the transaction of which he complains.*

9. Although the scheme to force LPHI in to bankruptcy was devised 10 months earlier in a secret meeting at LaQuinta Inn, Waco, TX before LPHI filed Chapter 11, the actual corruption and fraud to the estate did not commence until Trustee H. Thomas Moran was assigned by the court. (See Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984)),   Meyer v. Fleming, 327 U.S. 161, 167 (1946), (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 548 (1949)); Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991) (same); Jones v. H. F. Ahmanson & Co., 1 Cal. 3d 93 (1969)

10. *In addition* United States Officials, including Jessica Mcgee of the Securities and Exchange Commission (SEC), Lisa Lambert of the U.S. Trustees Office,  Trustee H.

Thomas Moran, Trustee Alan Jacobs, Trustee Eduardo Espinosa, Trustee Michael Quilling and their respective counsels operating under the Color of Law and without notice to Shareholders submitted false documentation, false statements and deceptive practices to destroy a Compliant and Successful Publicly Traded Company for their professional and personal gain.

11. During this process they have resisted the production of Required 10Ks and 10Qs including the FASB Unqualified Audits that accompany those reports for years 2015 and 2016 in order to conceal the theft of approximately One Billion Dollars ($1,000,000,000) in addition to the Excessive Expenses from the aforementioned Defendants in order to defraud the Estate of LPHI.

12. This Court has jurisdiction in this case over all causes of action asserted herein pursuant to *28 U.S.C. §1332(a)(2),*(d)(1)(2)because plaintiff although filing Pro-se does so to the extent that it will benefit all similarly situated shareholders through the benefits provided to the corporation and the estate. This Court has supplemental jurisdiction pursuant to *28 U.S.C. §1367(a)* over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13. This Court has jurisdiction over each defendant in connection with LPHI as LPHI has conducted over $100 Million of business within the State of Connecticut. LPHI along with the subsidiary LPI had over 30 licensees (agents) within the State of CT in

addition to the hundreds of shareholders also within the State of CT. LPHI company officials actively supported all these facets of their operations within the State of CT using both their extensive and highly sought after proprietary computerized management technology along with the active presence of LPHI management officials through steady visits to assist with the company's related activities within the State of Connecticut. This qualifies the Plaintiff to bring this case in this court due to clearly exceeding sufficient minimum contacts within this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court pursuant to *28 U.S.C. §1391(b)*(2), (c)(1), (e)(1) because:

    (i)    Life Partners maintains a substantial level of business in this district:

    (ii)    a substantial portion of the transactions and wrongs complained of herein including the defendants' primary participation in the wrongful acts detailed herein, aiding, abetting and conspiracy in violation of fiduciary duties owed to Life Partners occurred in this District; and

    (iii)    defendants have received substantial compensation from this District by doing business here and engaging in numerous activities that had effect in this District.

    (iv)    Numerous defendants are officers or employees of the United States or any agency thereof acting in his/her official capacity or under color of legal authority...may be brought in any judicial district.

**15.** Plaintiff Michael LaMothe is a shareholder of LPHI. Plaintiff purchased 652,479 shares of LPHI on the through Etrade just after the Bankruptcy was declared in 2015. Plaintiff is a citizen of Connecticut.

**16. Defendant Jessica Mcgee -SEC lead attorney:**

According to 1. *18 U.S. Code § 242 - Deprivation of rights under color of law-* *Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

**17.** Ms. Mcgee violated *18 U.S. Code § 242* by utilizing her position and authority with the SEC to organize and coordinate the attack on LPHI by the reckless and intentional release of confidential, inaccurate and inflammatory information to the Wall Street Journal reporter Mark Maremont (which appeared as a front page story) in December of 2010 and again in the business section of the Wall Street Journal in January of 2011 twice.

**18.** Ms. Mcgee further violated this law when she organized a meeting with other co-conspirators at the LaQuinta Inn in Waco Texas early in January of 2014, in order to strategize the plan to dismantle LPHI based on their expectations that LPHI would lose the upcoming trial in Judge Nowlins' court.

**19.** Ms. Mcgees violations of *18 U.S. Code § 242,* specifically her inaccurate and unsubstantiated information release to the WSJ resulted in a catastrophic drop in the LPHI share price. This caused a market loss of over $560,000,000 in LPHI's share value. Ms. Mcgee's actions also brought to an abrupt end the 44 consecutive quarters of dividend payments paid by LPHI. This resulted in a complete loss of income to all shareholders affecting over 6,500 shareholders many of whom were retirees on fixed income. Depriving these thousands of individuals of their rightful property in her efforts to destroy LPHI is a clear violation of the shareholders' Civil Rights.

**20.** According to *18 USC § 157(3),* A person who, having *devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—* (3) - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, *at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title, shall be fined under this title, imprisoned not more than 5 years, or both.*

Also pursuant to *28 U.S.C §§ 351-36,* which states: *A substantive Due Process violation occurs when government conduct violates "fundamental fairness" and is "shocking to the universal sense of Justice." Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 4 L. Ed. 2d 268 , 80 S. Ct. 297 (1960) (citations and internal quotation marks omitted).*

21. Ms. Mcgee's statements and release of inaccurate information to the WSJ along with her assertions of LPHI running a Ponzi -like or Ponzi-ish scheme were not accompanied by any facts supporting such allegations and to the present, no such facts of any credibility have been produced.

22. In addition, Ms. Mcgee along with Ms. Lambert a lawyer with the U.S. Trustees Office had chosen Mr. Moran as the trustee for the upcoming LPHI bankruptcy case with full knowledge of Mr. Moran's numerous inabilities to fullfill the roll of a disinterested Chapter 11 Trustee of a large complex public company. His only experience was that of a Chapter 13 liquidation trustee of several companies that were a small fraction of the size of LPHI. This clearly demonstrates Ms. Mcgee's intent of the "total dismantling of LPHI" was already planned before the Chapter 11 was even filed.

23. The secret meeting at the LaQuinta Inn, unbeknownst to bankruptcy Judge Russell Nelms, accidentally revealed in his court by one of its attendees under oath, shed light on yet another aspect of Ms. Mcgee's devious, well-developed and calculated plan to destroy LPHI at all costs.

24. As a result of Ms. Mcgee's multiple violations under *18 USC § 157(3)* LPHI was unable to continue its lawful operations as a compliant Public Company, nor was LPHI able to adequately manage the $3.4 Billion independently owned asset portfolio as it had done for 25 years.

25. Ms. Mcgee's multiple violations under *18 USC § 157(3)* also resulted in removal of the irrevocable Trustee for the IRA Qualified Investors that resulted in the complete confiscation of ownership of the $1.8 Billion of those investor funds attributed to the "feeding frenzy" that ensued by Trustee Moran, David Bennett, Thompson & Knight LLP and many other co-conspirators. This penalized thousands of investors with instant and enormous tax bills and the return of as little as .13 cents for each invested dollar. This return is optimistic as Trustee Moran as well as his successor trustees have devised a repayment plan of these newly issued notes to the victims that are unlikely to be paid for 15 years.

26. Due to Ms. Mcgee's violations, under *18 USC § 157(3)* investors will lose most if not all their retirement investments, originally valued at $3.4 Billion before her plan that was hatched and put in motion. [*see Exhibit 1- Jury finds against SEC...*]

27. **H. Thomas Moran, Trustee assigned to LPHI Bankruptcy:** Defendant Trustee H. Thomas Moran: Under *18 U.S. Code § 152(1)(2)(3)* A person who—
1 - *knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;*
*knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11; knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;*

Additionally, according to *28 U.S.C. §§ 351-36 A substantive Due Process violation occurs when government conduct violates "fundamental fairness" and is "shocking to the universal sense of Justice." Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 4 L. Ed. 2d 268 , 80 S. Ct. 297 (1960) (citations and internal quotation marks omitted).*

28. Trustee H. Thomas Moran failed to notify the court in his application that he was *not a disinterested party,* in that he was still a longtime registered licensee of LPHI.

29. Trustee Moran also failed to notify the court that he had no experience that would qualify him to effectively serve as the trustee of a large public company in Chapter 11.

30. Trustee Moran failed to notify the court that his only experience was that of a Chapter 13 Trustee and regarding companies considerably smaller and far less complicated than LPHI.

31. Trustee Moran also conceal from the court that his instructions from Ms. Mcgee, Ms. Lambert and Mr. David Bennett were to proceed toward immediate liquidation once he was officially named in court as the Trustee for the LPHI Chapter 11 Bankruptcy.

32. Trustee Moran failed to disclose to the court that he and his wife Jane C. Moran owned a small Life Settlement company that competed in the same market as LPHI.

33. Trustee Moran failed to notify the court that even before his official appointment as trustee, Mr. Moran already began to exercise the authority reserved for his position as trustee beginning at the secret LaQuinta Inn meeting and then by hiring MMS Advisors as LPHI's new company auditors.

34. Trustee Moran's various violations under *18 U.S. Code § 152(1)(2)(3)* had serious and detrimental effects on the conduct of this Bankruptcy under Chapter 11. LPHI was a financially solvent company worth over $20 Million and with sufficient cashflow to sustain operations prior to Trustee Moran's involvement.

35. Through his concealment of facts to the court Trustee Moran has helped to put the entire LPHI Bankruptcy process on a course of massive corruption and theft, and he actively participated in the disgorgement of over $3.4 Billion from independently owned investor assets.

36. His inexperience with a Chapter 11 bankruptcy doomed LPHI from the beginning and immediately defeated the purpose of filing for Chapter 11 to begin with. LPHI should have emerged from the bankruptcy immediately after the SEC unilaterally removed the fine.

37. Under *18 U.S. Code § 157(1)(2)(3) A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*

*1 - files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;*

*2 - files a document in a proceeding under title 11; or*

*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,*

*shall be fined under this title, imprisoned not more than 5 years, or both.*

38. *Under: 18 U.S. Code § 1001(a)(1)(2)(3), Statements or entries generally:*

   a. *Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—*

   *(1)falsifies, conceals, or covers up by any trick, scheme, or device a material fact;*

   *(2)makes any materially false, fictitious, or fraudulent statement or representation; or*

   *(3)makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;*

   *Shall be fined under this title, imprisoned not more than 5 years*

39. Trustee Moran, in conjunction with David Bennett of Thompson and Knight LLP and others *devised a scheme* with the sole purpose to defraud the investors of their assets. He did so by *making fraudulent representations and claims to the Court* in his request to enter LPI, a separate non-public asset management company owned

by LPHI into bankruptcy to the court. The Court complied with this request without allowing challenge or opposition.

40. Once LPI was in bankruptcy, Trustee Moran moved to unilaterally confiscate the investor owned assets by nullifying the long-standing investment contracts between all 30,000 investors and LPI. The investor's asset portfolio contained assets that were managed, and in the case of the Qualified Investors under the Trusteeship of Mr. Pardo according to IRS regulations. Trustee Moran **made additional fraudulent representations and claims** in his request to the court to eliminate Mr. Pardo, the Irrevocable IRA Trustee. Again, this request was granted by the court without allowing challenge or opposition.

41. Trustee Moran devised a scheme and subsequently acted upon his deceptive plan which included the conversion of the portfolio assets from the investors' ownership into the ownership of LPHI. By way of this conversion all investors were stripped of all rights and privileges of ownership in exchange for a near-worthless note.

42. Trustee Moran's series of actions under *18 U.S. Code § 157(1)(2)(3)* directly led to the illegal extinguishment of long-standing legally written investment contracts between Investors and LPI. In the process of this corruption, Trustee Moran cost each investor between 8-12% return on their investments. Most damaging to these investors was the complete loss of their original investment, once secure under the original investment contract, and replaced their assets with a near worthless notes. Under the succeeding trustees, offers and forced note

liquidations put the note market value at between .11 and .18 cents on the investor's original invested dollar. These values were furnished under suspicious and heavy-handed circumstances and without the independent audits or a Fairness Opinion with the clear intent to further defraud the investors.

43. Under 18 U.S. Code § 1001(a)(5)(6)(7)(8)(9) Statements or entries generally(a)

*Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—*

*(5) knowingly and fraudulently receives any material amount of property from*

*a after the filing of a case under title 11, with intent to defeat the provisions of title 11.*

*(6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11.*

*(7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;*

*(8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents,*

*records, and papers) relating to the property or financial affairs of a debtor; or*

**(9)**  after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United_States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor, shall be fined under this title, imprisoned not more than 5 years, or both.

**44.** Also, Under: *18 U.S. Code § 152(1)(3)(5)(7)(8)(9) Concealment of assets; false oaths and claims; bribery*

> *1 - knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;*

> *3 - knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;*

> *5 - knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11.*

> *6 - knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward,*

*advantage, or promise thereof for acting or forbearing to act in any case under title 11.*

*7 - in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;*

*8 - after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or*

*9 - after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor,*

*Shall be fined under this title, imprisoned not more than 5 years, or both.*

*Additionally Trustee Moran* At no time did either Trustee Espinosa or his predecessor Trustee Moran  request their relief of reporting duties to the SEC under *17 CFR § 240.12h-3 - Suspension of duty to file reports under section 15(d)* or; *Section 240.15d-6 -* Suspension of duty to file reports, in his further attempt to conceal

**45.** Also, Under *18 U.S. Code § 153* Embezzlement against estate which states:

*(a)OFFENSE.— A person described in subsection (b) who knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor shall be fined under this title, imprisoned not more than 5 years, or both.*

*(b)PERSON TO WHOM SECTION APPLIES.—*

*A person described in this subsection is one who has access to property or documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, marshal, attorney, or other officer of the court or as an agent, employee, or other person engaged by such an officer to perform a service with respect to the estate.*

**46.** Also, Under: *18 U.S. Code § 154.* Adverse interest and conduct of officers which states:

*A person who, being a custodian, trustee, marshal, or other officer of the court—*

*(1) knowingly purchases, directly or indirectly, any property of the estate   of which the person is such an officer in a case under title 11;*

*(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or*

*(3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge,*
*Shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant.*

47. Additionally, Under *Securities Exchange Act of 1934*- Reporting Requirements - *"... under Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m, companies with registered publicly held securities and companies of a certain size are called "reporting companies," meaning that they must make periodic disclosures by filing annual reports (called a Form 10-K) and quarterly reports (called a Form 10-Q). Reporting companies must also promptly disclose certain important events (called a Form 8-K). Information in these reports includes information about the company's officers and directors, the company's line of business, audited financial statements, and the management discussion and analysis section. The Exchange Act - "...disclosure materials must be filed with the SEC."   Section 20 (codified in 15 U.S.C. § 78t) provides for joint and several liability for people who control or abet violators of the Exchange act, thus increasing the chance that an investor will be able to collect any damages that are awarded.*

48. Trustee Moran knowingly submitted fraudulent information to the court to enable the transfer of portfolio assets to ASG. ASG is owned by Trustee Moran and his wife, Jane C. Moran

49. Trustee Moran's failure to produce any 10Ks, 10Qs or 8Ks is a direct attempt to conceal the actual amount of the assets transfer and for how much, if any consideration

50. Trustee Moran's actions under *18 U.S. Code § 1001(a)(5)(6)(7)(8)(9) and 18 U.S. Code § 152(1)(3)(5)(7)(8)(9)* effectively enabled as much as $100 Million in estate portfolio assets to be transferred from the property of the estate to the new property of Trustee Moran and Jane C. Moran's (wife) via ASG

51. Besides the transfer of those assets now belonging to the estate, the actual amount fraudulently transferred is estimated to be far higher. Failure to produce those required audits is a clear attempt by Trustee Moran to conceal the true nature and value of that fraudulent act of conversion.

52. By failing to provide those 2015 and 2016 10Ks and 10Qs Trustee Moran has actively sought to conceal the actual amount that he has illegally stolen from the estate during his capacity as Trustee and self-appointed Director of LPHI.

53. Under *28 U.S.C. § 1930(a)(6) a trustee is entitled to $325 for any quarter that no disbursements have been made. According to code, between January 1, 2008 through December 31, 2017 a U.S. Trustee is entitled to as much as $30 thousand for disbursements of $30 Million or more.*

54. Also, under: *18 U.S. Code § 155.- Which concerns Fee agreements in cases under title 11 and receiverships- Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

55. During Mr. Moran's eight quarters as U.S. Trustee for LPHI, Mr. Moran was entitled to no more than $ 240,000 yet he was awarded $5.5 Million by the court. The actual extent of the fees paid to Mr. Moran 'in excess' of that $240,000 legal limit is estimated to be well over $50 Million. This amount does not account for the $100 Million in Policy Face Value transferred from the LPHI estate to Trustee Moran and Mrs. Jane Moran's company, ASG located in Oklahoma City, OK.

56. Trustee Moran showed no concern for the preservation of the assets of the Estate that were recklessly squandered amongst the many participants in this bankruptcy fraud. In violation of *18 U.S. Code § 155* no documents have been made public as to the timing, specific purpose and reasonable amounts of any and all fees paid to all attorneys and their firms, consultants (both legal and

financial) and any services that were or were insinuated to have been performed either on behalf and or in any connection to the LPHI estate.

57. At a direct cost to the LPHI estate, Trustee Moran entered into an agreement with MAGNA Services to manage the policy portfolio at a rate 13.25 times that which LPI had charged. In addition, LPI under previous management had provided a verifiably substantially higher level of service for that 80% discounted rate.

58. In December of 2016 Trustee Moran extended a $50 Million loan at 11% when Federal Long-term rates were at 2.24%, to Vida Capital. Trustee Moran entered into an agreement that cost the estate 4.9 times the interest it should have paid. This unreasonable rate cost the estate as much as $5.5 Million per year rather than an amount of roughly $1.2Million per year, an added expense of $4.3 Million in extra interest to further disgorge the estate.

59. Trustee Moran's numerous actions as Trustee of LPHI and Sole Director were key factors in the estate's loss of over $1 Billion and growing.

60. Trustee Moran's blatant disregard for both; *28 U.S.C. § 1930(a)(6)* and *18 U.S. Code § 155* demonstrates his disregard for his responsibilities pertaining to the assets of the estate, the audits from 2015 and 2016 pertaining to those assets and the theft of those assets through various schemes of fraudulent conversion.

61. Trustee Moran is estimated to have profited at the expense of the estate over $150 Million all with the cooperation of the bankruptcy court.

62. Trustee Moran's actions under *28 U.S.C. § 1930(a)(6) and 18 U.S. Code § 155* have resulted in his self-enrichment to an obscene level at the direct expense and severe detriment of the investors and shareholders as well as the massive and illegal enrichment of many other participants at the direct cost to the estate. For evidence of a small portion of this adverse activity towards the estate, [see Exhibit 3]

63. The theft of the assets from the LPHI estate, entirely comprised of the investor's assets has led to the substantial impairment of the remaining assets and has allowed successive trustees to develop further schemes to continue to profit from this LPHI estate well beyond the limitations of existing Federal Laws costing the estate well over $1 Billion and growing.

64. Under *11 U.S. Code § 704. Duties of trustee (a)(8): (a)(2)(4)(5)(7)(8)*, The trustee shall-
    a. (2) be accountable for all property received.
    b. (4) investigate the financial affairs of the debtor.
    c. (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest.
    d. (8) if the business of the debtor is authorized to be operated, file with the court,   with the United States trustee, and with any

governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires;

65. Trustee Moran has failed to comply with existing requirements of multiple government agencies regarding any legitimate financial disclosure of all estate assets starting from his confiscation of the investors' assets.

66. Financial information that has been disclosed by Trustee Moran must be considered incomplete and deceptive for his lack of complete accountability of the massive amount of missing estate assets.

67. Trustee Moran did not submit any legitimate tax returns for LPHI for the 2 years prior the court approval of the Final Plan of Reorganization.

68. Trustee Moran committed tax fraud by using his position as Trustee to avoid providing such returns to the IRS for years 2015 and 2016.

69. Trustee Moran, by sheer failure to produce the SEC required and FASB compliant 10Ks, 10Qs and 8K, was unable to provide to any interested parties governmental agencies or the court any reliable accounting for the assets of the estate, including roughly $1 Billion that has gone completely unaccounted for.

70. Although Trustee Moran hired MMS Advisors to audit LPHI's pre-bankruptcy records, he did not retain their services to audit the company's activities after the commencement of the bankruptcy under his control and after confiscating the $3.2 Billion of assets owned by the investors previous to Trustee Moran's tenure as Trustee of LPHI.

71. Trustee Moran, due to his efforts to obscure the whereabouts of all estate assets, neither produced or furnish any records that are required of all public companies even those in Chapter 11.

72. Trustee Moran's failure to document all estate assets led to his failure to file accurate and timely tax returns as had been done for the previous 25-year history of LPHI; 15 of the last years as a publicly traded company.

73. The result of Trustee Moran's failures under *11 U.S. Code § 704(a)(8): (a)(2)(4)(5)(7)(8)* has left LPHI and its 2 associated Trusts without any financial compliance with either the SEC, FASB or the IRS.

74. To this day, 5 years along in this bankruptcy, LPHI remains non-compliant with the SEC and IRS.

75. Trustee Moran has, without question, stolen and /or contributed to the theft of over $1 Billion of estate assets for purposes of self-enrichment and the

enrichment of other willing participants in this massive government sponsored case of fraud, theft, and collusion.

76. Under code *11 U.S. Code § 704(a)(1)(2)* - which states

(a)The trustee shall— (1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest; (2) be accountable for all property received

Additionally, *Bankruptcy Rule 903* states: The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See *Katchen v. Landy*, 382 U.S. 323, 328 (1966): *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47 (1874): *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). The rule also incorporates the wholesome mandate of the last sentence of Rule 1 of the Federal Rules of Civil Procedure. (2 Moore, *Federal Practice* 1.13 (2d ed. 1980); 4 Wright & Miller, *Federal Practice and Procedure-Civil* §1029 (1969)).

77. Contrary to both *11 U.S. Code § 704(a)(1)(2)* and *Bankruptcy Rule 903 which states*, Trustee Moran has established a system in this LPHI bankruptcy that is designed to avoid any exit from Bankruptcy until all estate assets have been exploited to the fullest.

78. Trustee Moran has actively devised a system that intentionally prolongs the bankruptcy of LPHI even though LPHI *was completely solvent once the SEC dropped the excessive fine against LPHI* soon after Trustee Moran was officially appointed by the Bankruptcy Court.

79. Trustee Moran failed to bring LPHI out of bankruptcy, now solvent from the removal of the SEC fine and flush with the newly confiscated $3.2 Billion at its disposal. This resulted in LPHI, originally worth roughly $20 Million just prior to Bankruptcy, now worth over $3 Billion after the Bankruptcy Fraud and Concealment perpetrated by Trustee Moran

80. Trustee Moran's activities have intentionally and pro-actively suspended the exit from Bankruptcy with the intention of creating a criminal enterprise solely intent on complete theft and exploitation of the Billions of dollars creatively stolen from roughly 30,000 investors in this once successful and compliant publicly traded company.

81. Under *18 U.S. Code § 156.* Knowing disregard of bankruptcy law or rule

   *(a)Definitions.—In this section—*

   *(1)the term "bankruptcy petition preparer" means a person, other than the debtor's attorney or an employee of such an attorney, who prepares for compensation a document for filing;*

   *(2)the term "document for filing" means a petition or any other document prepared for filing by a debtor in a United States*

*bankruptcy court or a United States district court in connection with a case under title 11.*

*(b)Offense.—If a bankruptcy case or related proceeding is dismissed because of a knowing attempt by a bankruptcy petition preparer in any manner to disregard the requirements of title 11, United States Code, or the Federal Rules of Bankruptcy Procedure, the bankruptcy petition preparer shall be fined under this title, imprisoned not more than 1 year, or both.*

82. Trustee Moran filed numerous documents and petitions to the court regarding his efforts to bring the operating arm of LPHI, LPI in to this Bankruptcy in order that he might have direct access to the investor's assets so as to carry out his scheme of defrauding both the investors and later the estate. The court granted these requests without allowing nor providing any challenge to these requests and the information submitted.

83. Such a submission of fraudulent information meant to conceal the true nature of the request to bring LPI into the bankruptcy led directly to the massive exploitation and theft of $3.2 Billion from the owners of the policy portfolio and to the disappearance of the over $1 Billion from the estate.

84. Under 18 U.S. Code § 242 - *Deprivation of rights under color of law- states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities*

*secured or protected by the Constitution or laws of the United States, ...shall*
*be fined under this title or imprisoned not more than ten years, or both;*

85. Trustee Moran knowingly and intentionally, through his numerous violations of Bankruptcy Code, SEC codes, and various Federal Laws has actively and aggressively deprived both shareholders and investors of their rights under the U.S. Constitution. Trustee Moran has, without fear of accountability utilized his position under the color of law to plan, coordinate and carry out such a scheme and on such a massive scale as to defraud through collusion and concealment $3.2 Billion of Investor assets with no accountability and/or financial disclosures as required by law. Further, Trustee Moran has yet to be held accountable for over $1 Billion in portfolio assets that has gone completely missing from all records since his control as Trustee of LPHI appointed by Lisa Lambert of the U.S. Trustee's office in Dallas, TX and confirmed by Judge Russell Nelms of the Bankruptcy Court, Fort Worth, TX.

86. **Lisa L Lambert, Assistant US Trustee, Office of the US Trustee Region 6** is responsible for overseeing the administration of bankruptcy cases and private trustees under *11 U.S.C. § 701(a)(1), (1994) (a)(1) Promptly after the order for relief under this chapter, the United States trustee shall appoint one* disinterested person *that is a member of the panel of private trustees established under section 586(a)(1) of title 28 or that is serving as trustee in the case immediately before the order for relief under this chapter to serve as interim trustee in the case.* Additionally; *28 U.S.C. §§ 351-36* - A substantive Due Process violation occurs when government conduct violates "fundamental fairness" and is "shocking to

the universal sense of Justice." Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 4 L. Ed. 2d 268 , 80 S. Ct. 297 (1960) (citations and internal quotation marks omitted).

87. Assistant US Trustee Lisa L Lambert in concert with SEC lead attorney Jessica Mcgee knowingly and fraudulently selected H. Thomas Moran as trustee for the LPHI Bankruptcy nearly one year before LPHI company leadership filed for relief under Chapter 11 bankruptcy.

88. Assistant US Trustee Lisa L Lambert was aware even before Trustee Moran's confirmation by Judge Russell Nelms in the bankruptcy court, that Moran was *NOT* a disinterested party but was in fact was a long-time registered licensee of LPHI up to his appointment by the court.

89. Assistant US Trustee Lisa L Lambert failed to account for Mr. Moran's conflict of interest

90. Under *18 U.S. Code § 157(3) A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*

   *(3)- makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before*

*or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,*

*shall be fined under this title, imprisoned not more than 5 years, or both.*

91. Assistant US Trustee Lisa L Lambert has worked closely with SEC Lead attorney Jessica Mcgee to devise a scheme to defraud both Shareholders and Investors of their property by numerous false representations and false claims before and during the LPHI bankruptcy.

92. Without any proof of wrongdoing and based entirely on "information and belief" along with the total disregard of many years of compliant company filings as well as numerous sources of fact based information such as recent court rulings and multiple audits and forensic audits of LPHI, Lisa Lambert in her capacity as Assistant US Trustee along with Mcgee of the SEC continued in their goal of eliminating LPHI regardless of the complete absence of reason.

93. Under *11 U.S.C. § 341*. States that "The U.S. trustee and creditors may question the debtor under oath at the section 341 meeting concerning the debtor's acts, conduct, property, and the administration of the case."

94. According to the trustee there was no Section 341 meeting yet, there was such meeting except that it was conducted by Judge Russell Nelms presiding.  At this meeting, which was a defacto - Section 341 meeting, many questions were asked by other parties and testified to. Lisa Lambert was made well aware of the facts the case.  There was no other Section341-type hearing period.

95. Lisa Lambert was not interested in inconvenient facts and answers. Her business was to scramble together a meeting that resulted in some of the necessary components of a Section 341 meeting such as the adoption of a "Creditors Committee" which is when Lisa Lambert learned that LPHI had no creditors other than the SEC.

96. According to *11 U.S.C. § 1102 The Committee is appointed by the U.S. trustee and ordinarily consists of unsecured creditors who hold the seven largest unsecured claims against the debtor.*

97. Since a "Creditors Committee" is a Chapter 11 requirement she assembled one from members of the audience and other attendees. However, the prospect of LPHI emerging from bankruptcy more successful than when they first sought relief would mean there must also be a "Shareholder's Committee". Establishing this Committee would enable this Bankruptcy to be brought to a speedy and successful end. That was not to be.

98. Assistant US Trustee Lisa L Lambert knowingly and without notice eliminated the rights of all shareholders at the pseudo Section 341 meeting even though she was aware that LPHI was a totally solvent company absent the excessive $46 Million fine imposed by the SEC just after it had been forewarned by the court clerk that LPHI was to receive a $75 Thousand bond fine as a result of questionable accounting errors committed by Ernst Young.

99. Assistant US Trustee Lisa L Lambert also knew that this egregious fine was to be dropped by the SEC once the control of LPHI had been removed from the current officers and directors.

100. Lisa Lambert had carried out her portion of the scheme which ultimately caused LPHI to cease its successful and beneficial operations, cost the Shareholders roughly $595 Million in Market Capital and $3.2 Billion of investor's assets.

101. Under *28 U.S.C. § 1930(a)(6)* - *a quarterly fee shall be paid to the United States Trustee System Fund at Treasury in each case under chapter 11 (except small business cases under Subchapter V of chapter 11) for each calendar quarter, or portion thereof, between the date a bankruptcy petition is filed and the date the court enters a final decree closing the case, dismisses the case, or converts the case to another chapter in bankruptcy.*

102. Under **11 U.S. Code § 326.** *Limitation on compensation of trustee(a) In a case under chapter 7 or 11, other than a case under subchapter V of chapter 11, the court may allow* reasonable *compensation under section 330 of this title of the trustee for the trustee's services,* payable after the trustee renders such services, *not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest,*

*excluding the debtor, but including holders of secured claims. (b) In a case under subchapter V of chapter 11 or chapter 12 or 13 of this title, the court may not allow compensation for services or reimbursement of expenses of the United States trustee or of a standing trustee appointed under section 586(b) of title 28, but may allow reasonable compensation under section 330 of this title of a trustee appointed under section 1202(a) or 1302(a) of this title for the trustee's services, payable after the trustee renders such services, not to exceed five percent upon all payments under the plan. (c) If more than one person serves as trustee in the case, the aggregate compensation of such persons for such service may not exceed the maximum compensation prescribed for a single trustee by subsection (a) or (b) of this section, as the case may be.*

*(d) The court may deny allowance of compensation for services or reimbursement of expenses of the trustee if the trustee failed to make diligent inquiry into facts that would permit denial of allowance under section 328(c) of this title or, with knowledge of such facts, employed a professional person under section 327 of this title.*

103.  Assistant US Trustee Lisa Lambert failed to monitor and limit the money extracted from the estate of LPHI both prior to and after the confirmation of the Plan of Reorganization. At no point in the payments to Trustee Moran were these legal limitations adhered to. No holders of security claims were compensated prior to the final approval of the Plan. The only money disbursed during that period was to parties complicit with the overall scheme to defraud the estate. During that same period, Trustee Lambert failed to require adequate

financial reporting standards to be maintained thus assisting in the, yet, still unexplained disappearance of $1Billion from the estate portfolio.

**104.** U.S. Trustee Lambert's failure to require such documentation also enabled the Thompson and Knight law firm through David Bennett it's lead counsel to Trustee Moran, to profit at the expense of the estate to an estimated $150 Million through various schemes.

**105.** U.S. Trustee Lambert in her lack of reasonable oversight of Trustee Moran, failed to protect the estate by not requiring the production and filing of the 2015 and 2016 10ks and 10Qs as required by the SEC.

**106.** Having allowed, such serious lapses in the oversight of all Fees Paid starting with Trustee Moran along with failing to required reporting as in *Securities Exchange Act of 1934- Reporting Requirements - "... under Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m,* has led directly to the loss of over $1 Billion to the estate at the hands of Trustee Moran assigned to the LPHI Chapter 11 Bankruptcy case by U.S. Trustee Lisa Lambert and SEC Jessica Mcgee one year prior to the declaration of the LPHI bankruptcy.

**107.** *According to 11 U.S.C. §§ 1106, 1107; Fed. R. Bankr. P. 2015(a)- These duties, set forth in the Bankruptcy Code and Federal Rules of Bankruptcy Procedure, include accounting for property, examining and objecting to claims, and filing informational reports as required by the court and the U.S. trustee or bankruptcy administrator (discussed below), such as monthly operating reports.*

*Also, as many of the other powers and duties of a trustee, including the right with the court's approval, to employ attorneys, accountants, appraisers, auctioneers, or other professional persons to assist the debtor during its bankruptcy case. Other responsibilities include filing tax returns and reports which are either necessary or ordered by the court after confirmation such as a final accounting. The U.S. trustee is responsible for monitoring the compliance of the debtor in possession with the reporting requirements. As it pertains to this requirement Lisa Lambert made no such filings.*

**108.** Lisa Lambert failed in her fiduciary duties to oversee the Case Trustee Moran especially knowing his many shortcomings as far back as the secret meeting at the LaQuinta Inn held months before the LPHI request for Chapter 11 reorganization.

**109.** Trustee Moran failed to carry out his duties as well as his fiduciary responsibilities. Lisa Lambert allowed this atrocity to continue to the detriment of LPHI, its Shareholders and its investors. Her failure to provide adequate oversight was directly responsible for this bankruptcy failure as well as the corruption, concealment of assets and fraud that has accompanied it.

**110.** These failures also include the failure to comply with the reporting requirements of the U.S. trustee or orders of the bankruptcy court, or fail to take the appropriate steps to bring the case to confirmation, the U.S. trustee may file a motion with the court to have the debtor's chapter 11 case converted to another chapter of the Bankruptcy Code or to have the case dismissed.

111.   According to the *11 U.S.C. § 1104(e)* U.S. trustee is required to move for appointment of a trustee if there are reasonable grounds to believe that any of the parties in control of the debtor "participated in actual fraud, dishonesty or criminal conduct in the management of the debtor or the debtor's financial reporting."

Lisa Lambert made the decision to appoint an inappropriate and unqualified, even by the U.S. Trustee Program's own rules, Trustee H. Thomas Moran to lead a Chapter 11 Bankruptcy before said bankruptcy had yet to be filed.

112.   Lisa Lambert petitioned the court to have the original LPHI management removed based on nothing more than what was agreed upon between Jessica Mcgee of the SEC and herself. No facts or concrete evidence has been presented to the court to substantiate the rumors that forced this company into bankruptcy according to the agenda of their scheme.

113.   Without any actual evidence presented to Lisa Lambert that the parties in control of the debtor "participated in actual fraud, dishonesty or criminal conduct in the management of the debtor or the debtor's financial reporting", Lambert made the decision to replace an experienced, successful and compliant large public company's management with Trustee Moran. Moran was not a disinterested party, who owned a much smaller company in the same business and was now being presented with an opportunity to grow his company many-fold, had no Chapter 11 experience and none with a public company of this size or complexity.

114.   The results were exactly what a reasonable person would expect; total disaster for LPHI, its Shareholders and its investors, and a bonanza for the trustee and his counsel to the extent of $3.2 Billion.

115.   Lisa Lamberts failed to appoint an appropriate case trustee so that she might be able to perform his duties as stated in **11 U.S.C. § 1106(a)(5)** *which states that "The case trustee is responsible for management of the property of the estate, operation of the debtor's business, and, if appropriate, the filing of a plan of reorganization. Section 1106 of the Bankruptcy Code requires the trustee to file a plan "as soon as practicable".*

116.   Because of this clear failure of fiduciary duty to the Debtor, Lisa Lambert knowing carried out her portion of the scheme to dismantle LPHI, it's Shareholders and its investors. Lisa Lambert enabled the case trustee H. Thomas Moran to now orchestrate the massive crimes that were inflicted upon the estate, the shareholders, and the investors.

117.   *18 U.S. Code § 242* addresses the *Deprivation of rights under color of law:* Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States,... shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

118.   Lisa Lambert utilized her position as Assistant US Trustee to plan and execute the pre-planned scheme on a compliant and successful public company operating for 25 years, in order that she might eliminate that company without regard for the company its Shareholders and its investors. Executing her plan under the Color of Law, Assistant U.S. Trustee Lisa Lambert eliminated the value of the shareholders assets, denied them the right to representation in the Bankruptcy court and did so *Without Notice*.

119.   Assistant U.S. Trustee Lisa Lambert willfully through a deceptive scheme deprived Shareholders of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States regarding the taking without due cause and without due process.

120.   Assistant US Trustee Lisa Lambert willfully participated and contributed to the scheme that cost LPHI Shareholders $592,000,000 in market capital and ultimately the entire company.

121.   **David Bennett -** lead counsel to trustee Moran and partner at Thompson & Knight, LLP:

> 18 U.S. Code § 157. **Bankruptcy fraud U.S. Code** *A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*

1- *files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;*

2- *files a document in a proceeding under title 11; or*

3 - *makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title, shall be fined under this title, imprisoned not more than 5 years, or both.*

**122.** David Bennett was selected as the lead attorney for the, yet to have been confirmed by the court, LPHI Bankruptcy Trustee Moran, by SEC's Jessica Mcgee.

**123.** David Bennett attended the secret meeting at the LaQuinta Inn along with Jessica Mcgee and Lisa Lambert and others to participate in the development of the scheme to put LPHI out of business.

**124.** David Bennett, lead counsel for Trustee H. Thomas Moran, executed his portion of the scheme in part by developing various documents comprised of fraudulent representations and claims and false assertions regarding LPHI, LPHI investors and the investor owned asset portfolio for submission to the court by Trustee H. Thomas Moran.

**125.** David Bennett as lead counsel to Trustee H. Thomas Moran and coconspirator in this massive Bankruptcy Fraud advised Trustee Moran throughout the various stages of this scheme regarding subject matter including

but not limited to the nullification of the long standing and legally binding investment contracts between the investors and LPI, the prosecution of the Bankruptcy in the court without any facts or evidence that neither law or a reasonable person would deem adequate, and the submission of legal billing to the trustee for his approval that was bloated and fraudulently padded with the hours of the legal services of numerous attorneys that either did no work regarding the LPHI case or merely showed themselves in the courtroom again, without the performance of any work deemed billable to the estate.

126.  David Bennett as lead counsel to Trustee H. Thomas Moran and as a partner of Thompson and Knight developed an excessively long and complex plan of reorganization for which three separate versions were presented to the court due to the obvious abusive tactics used in its development.

127.  David Bennett's participation in this scheme from its inception and planning at the LaQuinta Inn months before LPHI sought relief by filing Chapter 11 has destroyed LPHI, a successful and compliant public company and cost 30,000 Investors, their rightful owners of the $3.4 Billion asset portfolio.

128.  18 U.S. Code § 152. Concealment of assets; false oaths and claims; bribery
A person who— **1** - knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor; **2** - knowingly and fraudulently makes a false oath or account in or in relation to

any case under title 11; **4** - knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or through an agent, proxy, or attorney; **5** - knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11; *shall be fined under this title, imprisoned not more than 5 years, or both.*

129.   David Bennett's failure to advise Trustee Moran of his reporting obligations regarding the required 10Ks, 10Qs and the FASB compliant audits contained within directly contributed to the concealment by such omission of these required reports of the investor's portfolio assets in order to profit from the theft of those assets from their rightful and contractual owners.

130.   David Bennett's activities as lead counsel to Trustee Moran enabled a complete lack of accountability of the estate assets. The absence of such legally required reporting enabled the concealment of the theft in excess of $1 Billion.

131.   18 U.S. Code § 153. **Embezzlement Against Estate** *(a) Offense -A person described in subsection (b) who knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor shall be fined under this title, imprisoned not more than 5 years, or both. (b)Person to Whom Section Applies.—A person described in this subsection is one who has access to property or*

*documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, marshal, attorney, or other officer of the court or as an agent, employee, or other person engaged by such an officer to perform a service with respect to the estate.*

132.   David Bennett, lead counsel to Trustee H. Thomas Moran and Partner with Thompson & Knight utilized his position as such, along with his relationship with SEC's Jessica Mcgee, to bill the LPHI estate which is comprised of the confiscated investor assets.

133.   David Bennett's participation in this massive fraud and his intentional omission of legal counsel to Trustee Moran regarding the illegality of such practices along with other illegal activities leaves no doubt that Mr. Bennett, acting as lead counsel to Trustee Moran and as a partner for Thompson & Knight, has both contributed and benefitted by the schemed embezzlement of the LPHI estate.

134.   David Bennett's various activities throughout the execution of this scheme to bring LPHI down is estimated to have garnered roughly $150 Million for Thompson & Knight LP.

135.   Plaintiff's request to produce those legally required missing 10Ks and 10Qs from 2015 and 2016 will provide the true extent of the amount of assets embezzled.

136. 18 U.S. Code § 155. *Fee agreements in cases under title 11 and receiverships Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

137. David Bennett, acting in the capacity as lead counsel and representative for LPHI Trustee H. Thomas Moran as well as partner at Thompson & Knight LP,  knowingly and fraudulently fixed his fees and other compensation to any and all attorneys from Thompson & Knight, including himself, those attorneys that actively participated in the LPHI bankruptcy and those attorneys who's hours were billed to the LPHI estate but did not perform duties that would substantiate this billing. Such practices are clear violations of the bankruptcy law as well as aforementioned criminal laws.

138.   By employing such billing practices to the LPHI estate, Mr. Bennett has actively sought to enrich himself and Thompson & Knight at the direct expense to the LPHI estate.

139.   In addition, Mr. Bennett's counsel to Trustee Moran has led to the avoidance of the production of the 2015 & 2016 10Ks and 10Qs in a direct effort to conceal the extend of the money paid to Thompson & Knight LP. for services rendered along with those many hours billed to the estate for services *not rendered*. The amount of this billing is estimated to exceed $150 Million.

140.   Under *18 U.S. Code § 242 - Deprivation of rights under color of law-* *Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

141.   David Bennett, in his capacity as lead counsel to Trustee Moran and as a partner of Thompson & Knight LP, has acted *Under The Color of Law* to willfully subject the Investors and contractually legal owners of their property and their rights to said property without representation and legitimate due process.

142. Mr. Bennett's actions as stated have directly and actively produced fraudulent representations, failed to counsel Trustee Moran to produce the required reporting for the 2015 & 2016 10Ks and 10Qs in an obvious attempt to conceal the true level of theft of LPHI estate assets and extracted over $150 Million for the benefit of himself and Thompson & Knight for which he is a partner.

143. The request to produce the required reporting for 2015 and 2016 will substantiate all claims against the parties listed above. The reluctance by Mr. Moran, Mr. Bennett and all succeeding Trustees is further evidence of this scheme and the continuance of theft from the LPHI estate.

144. **Thompson & Knight,** through Partner David Bennett, was a direct recipient and knowing beneficiary of over $100 Million from the numerous activities within this scheme driven by both Ms. Mcgee and Mr. Bennett. Although the exact total has yet to be determined, the current estimate puts the receipts of Thomson & Knight at nearly $150 Million although that amount could prove far higher based on the production of the 2015 and 2016 audits. Thompson & Knight LLP is guilty of fraudulently billing hundreds of Attorney hours to the LPHI estate for work that had not been performed by many of the attorneys for whom those billed hours can be attributed. **18 U.S. Code § 1001(a)(1)(2)(3)(5)(7)(8)**

145. **Alan Jacobs,** Trustee of the Creditor Holders Trust.

The Creditor Holder's Trust contained the qualified money, as set forth by the IRS regulations, and was created to manage the asset portfolio for those investors who were unable to pay their premiums after the catastrophic losses sustained by the actions taken against them during this bankruptcy. The premiums became unsustainable for investors after Trustee Moran borrowed $200 Million against the value of the policies. This $200 Million taken from the estate has yet to be accounted for.

146.   Under *28 U.S.C. § 1930(a)(6)* a trustee is entitled to $325 for any quarter that no disbursements have been made. According to code, between January 1, 2008 through December 31, 2017 a U.S. Trustee is entitled to as much as $30 thousand for disbursements of $30 Million or more.

147.   During Trustee Jacobs' time as trustee at no point has he provided detailed financial reporting that explicitly states the payments he's extracted from the estate for his fees as Trustee. His reporting thus far has been bare minimum and the current inadequate reporting is a clear attempt to conceal just how excessive his fees are to the court.

148.   *Under   18 U.S. Code § 155.* Fee agreements in cases under title 11 and receiverships *Whoever, being a party in interest, whether as a debtor, creditor, receiver, **trustee** or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, **knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or***

*attorney* for another such party in interest, for the purpose of **fixing the fees or other compensation** to be paid to any party in interest or **to any attorney** for any party in interest for services rendered in connection therewith, **from the assets of the estate**, shall be fined under this title or imprisoned not more than one year, or both.

149.  Trustee Jacobs is currently the recipient of a substantial portion of a $5 Million quarterly fee for which there is no transparency and no accountability. Based on the rules of payment as set forth under *28 U.S.C. § 1930(a)(6)* reasonable fees that could be attributed to him, his attorneys, the Trustee of the Position Holders Trust and his Attorneys along with any minimum accounting fees required to produce such sparse financial reporting could never reach that staggering amount of $5 Million per Quarter.

150.  Neither Trustee Jacobs nor the Trustee of the Position Holder's Trust have provided the missing and required 10K's and 10Qs from 2015 and 2016 just as they continue to neglect to produce a detailed breakdown of the exorbitant $5 Million in Quarterly fees.

151.  Trustee Jacobs' deceptive and deficient reporting continues to deplete the assets of the estate without proper oversight or accountability. Current estimates put this excessive billing at roughly $3.8 Million per Quarter.

152. The submission of a compliant 10Q for each of the quarters during which he has served in that capacity of trustee will undoubtedly substantiate these claims.

153. *Under 18 U.S. Code § 153(a)(b). Embezzlement Against Estate-(a) Offense - A person described in subsection (b) who knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor shall be fined under this title, imprisoned not more than 5 years, or both. (b)Person to Whom Section Applies.—A person described in this subsection is one who has access to property or documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, marshal, attorney, or other officer of the court or as an agent, employee, or other person engaged by such an officer to perform a service with respect to the estate.*

154. Without the details provided in the required and compliant 10Qs and 10Ks Trustee Jacobs knowingly and fraudulently appropriates assets of the LPHI estate. In addition, as a lead participant in the administration of the estate as a trustee he has unabated access to the property of the estate to carry out such fraudulent appropriations of the estate.

155. Trustee Jacobs, without any adequate oversight by the U.S. Trustees office continues to substantially profit, as do his attorneys, at a direct and excessive

cost to assets of the estate. Such Excessive billing is depleting the estate at an untenable and illegal rate.

**156.** According to *18 U.S. Code § 152. Concealment of assets; false oaths and claims; bribery*;

  *1 - knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;*

  *2 - knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;*

  *3 - knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;*

  *4 - knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as through an agent, proxy, or attorney;*

  *5 - knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;*

  *6 - knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11;*

  *8 - after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes*

*a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or;*

*9 - after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor, shall be fined under this title, imprisoned not more than 5 years, or both.*

157. *Additionally, Under **Securities Exchange Act of 1934**, addresses the Reporting Requirements **Section 13(a) of the Exchange Act - codified in 15 U.S.C. § 78m** companies with registered publicly held securities and companies of a certain size are called "reporting companies," meaning that they must make periodic disclosures by filing annual reports (called a Form 10-K) and quarterly reports (called a Form 10-Q). Reporting companies must also promptly disclose certain important events (called a Form 8-K). Information in these reports includes information about the company's officers and directors, the company's line of business, audited financial statements, and the management discussion and analysis section.*

158. *The Exchange Act - "...disclosure materials must be filed with the SEC." Section 20 (codified in 15 U.S.C. § 78t) provides for joint and several liability for people who control or abet violators of the Exchange act, thus increasing the chance that an investor will be able to collect any damages that are awarded.*

*Additionally: At no time did either Trustee Espinosa or his predecessor Trustee Moran request their relief of reporting duties to the SEC under 17 CFR § 240.12h-3 - Suspension of duty to file reports under section 15(d)  or; Section 240.15d-6 - Suspension of duty to file reports.*

**159.** In his failure under the two aforementioned regulations, Trustee Jacobs, by way of his inadequate reporting has enabled himself, in his capacity as Trustee to knowingly and fraudulently conceal from the court the natural and extent there of pertaining to the use of the assets of the estate. His submissions of quarterly reports clearly substantiate his active submission of reports containing both false reporting and false claims against the estate.

**160.** In filing such inadequate and opaque reporting, he continues to fraudulently receive property of the estate with a clear intent in contrast to the rules set forth under Title 11.

**161.** Additionally, his avoidance to produce the missing audits along with the continuing inadequacy of his current financial reporting, further assists in the ongoing efforts  by he and the other Trustees to obscure the whereabouts of the missing $1 Billion and continue to defraud the estate assets.

**162.** The complete lack of reporting compliance and transparency also brings in to question his ability to allow an offer to purchase to be extended to the

investors from a source likely connected to Trustee Jacobs and located in the Cayman Islands with a series highly questionable facts surrounding it.

163.  Under *18 U.S. Code § 157(3)* *A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*

> *3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,*
> *shall be fined under this title, imprisoned not more than 5 years, or both*

164.  *Also Under: 18 U.S. Code § 1001 Statements or entries generally:*

> *(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—*
> *(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;*
> *(2) makes any materially false, fictitious, or fraudulent statement or representation; or*
> *(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;*

*Shall be fined under this title, imprisoned not more than 5 years*

**165.** Although Trustee Jacobs was not involved in the initial planning and execution of the LaQuinta Inn scheme, he continues to defraud the estate by knowingly executing the original scheme and by his avoidance to provide those compliant and required financial statements for 2015 & 2016.

**166.** Trustee Jacobs knowingly and willfully has supported the fraudulent representations of Trustee Espinosa by both; omission of fact in presenting the documents for the Cayman Island "offer to Purchase". This offer, among other deceptions contained within that document, presenting an offer suggesting that said value of the assets to be sold might have been determined by an acceptable financial reporting standards, which it was not.

**167.** Other offers for the portfolio assets were extended by parties outside the scheme. Offers above 80 cents on the invested dollar were presented but the Trustees refused. The acceptance of such an outside offer would have been hugely beneficial to the estate and to the investors whose policies were forced into this program. However, it would have harmed the scheme to defraud the estate as continued by Trustee Jacobs.

**168.** Trustee Jacobs' actions and in some instances, lack of action knowingly continues to defraud the estate. The offer for purchase that was presented under Trustee Espinosa and supported by Trustee Jacobs was so egregiously flawed, his fiduciary duty was audaciously violated.

169.   At 13.3 cents on the invested dollar plus additional undefined expenses to be subtracted from that anemic offer, this was a clear demonstration of Trustee Jacobs' adverse intentions and the ongoing failure his fiduciary duty. A reasonable person could certainly question the possibility that he likely stood to benefit outside his compensation as Trustee from such a offer.

170.   Under: *18 U.S. Code § 154. Adverse interest and conduct of officers* which states    *A person who, being a custodian, trustee, marshal, or other officer of the court—(3)knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge,  Shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant.*

171.   Trustee Jacobs' failure to pursue the production of the 10Ks and 10Qs from 2015 and 2016 comprises a knowing refusal to permit an opportunity for inspection by the U.S. Trustee or any party to the bankruptcy, of the documents and accounts relating to the affairs of an estate.

172.   Trustee Jacobs has demonstrated his disregard for his fiduciary duty to the estate by continuing to conceal vital information for the preservation and care due to the estate by a trustee. His actions provide clear evidence of adverse interest and conduct of this trustee.

173. *Under 11 U.S. Code § 704. Duties of trustee (a)(8): (a)(2)(4)(5)(7)(8),* The trustee shall-

> (2) *be accountable for all property received;*

> (4) *investigate the financial affairs of the debtor;*

> (7) *unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;*

> (8) *if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires;*

174. Trustee Jacobs has failed to provide a full accounting of the total assets received by the estate as well as that portion of those estate assets under his management.

175. Trustee Jacobs has Knowingly failed to investigate the financial affairs of the debtor as such he has failed to provide the results of this investigation to the court.

176. Trustee Jacobs failed in collecting and maintaining such accurate information pertaining to the estate, thus eliminating his ability to file compliant tax returns for the estate and its operations during his tenure.

177.  These various violations by Trustee Jacobs continue to this day. Had he provided his services in accordance with *11 U.S. Code § 704. Duties of trustee (a)(8): (a)(2)(4)(7)(8)* all reporting violations would be remedied, the assets of the estate illegally pilfered by preceding Trustee Moran and his counsel David Bennett and others would have been accounted for and all accurate tax returns would have been filed. His failures under this code are deliberate and egregious. They have cost the estate hundreds of millions.

178.  Under code *11 U.S. Code § 704(a)(2) which states*

   *(a)The trustee shall— (2)  be accountable for all property received*

179.  Additionally, *Bankruptcy Rule 903 states: The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See Katchen v. Landy, 382 U.S. 323, 328 (1966): Bailey v. Glover, 88 U.S. (21 Wall.) 342, 346–47 (1874): Ex parte Christy, 44 U.S. (3 How.) 292, 312–14, 320–22* (1845). The rule also incorporates the wholesome mandate of the last sentence of Rule 1 of the Federal Rules of Civil Procedure. (2 Moore, *Federal Practice* 1.13 (2d ed. 1980); 4 Wright & Miller, *Federal Practice and Procedure-Civil* §1029 (1969)).

180.  LPHI has grown to a company with $2.8 Billion in liquid assets due to this bankruptcy. The SEC imposed the excessive fine that put LPHI in Chapter 11 initially, was dropped just after the CEO Pardo was forced out. This left LPHI in

a perfect position to exit Chapter 11 since it had no other creditors. Futher to pursue such a logical exit was a failure under both *11 U.S. Code § 704(a)(1)(2) and Bankruptcy Rule 903.*

181.   Trustee Jacobs' failure to provide accurate information concerning the estate would have led directly to the expeditious exit from Chapter 11 for LPHI. However, doing so would have eliminated the possibility to cause further damage to the estate by continuing with their ongoing scheme. The exit from chapter 11 from LPHI I adverse to the financial expectations of Jacobs and the other trustees in cost.

182.   Under *18 U.S. Code § 242 - Deprivation of rights under color of law- states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

183.   Trustee Jacobs continues to operate in accordance with the scheme to defraud and conceal the assets of the estate. His failure under the numerous code regulations and laws listed above, continues to deprive the rightful owners of the estate their assets while failing to account for and protect those assets of the estate from the numerous abuses at the hands of Jacobs and all other Trustees assigned to this LPHI Chapter 11 bankruptcy.

184. Trustee Jacobs has, under the Color of Law, willfully subjected the investors to the ongoing deprivation of their rights protected under the 5th Amendment to the Constitution of the United States of America, thus denying Investors their property.

185. **Eduardo Espinosa, Trustee- Position Holder's Trust**

Under *18 U.S. Code § 152(1)(3)(5)(7)(8)(9) Concealment of assets; false oaths and claims; bribery*

*1 - knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;*

*3 -knowingly and fraudulently makes a false declaration, certificate, verification or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;*

*7 - in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;*

*8 - after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books,*

documents, records, and papers) relating to the property or financial affairs of a debtor; or

   *9* - after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor,

      Shall be fined under this title, imprisoned not more than 5 years, or both.

**186.**   Under *18 U.S. Code § 157(1)(2)(3)* - A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—

      *3* - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title;

   shall be fined under this title, imprisoned not more than 5 years, or both.

**187.**   *Under 18 U.S. Code § 1001* Statements or entries generally: Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

   i.  falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

    *ii.  makes any materially false, fictitious, or fraudulent statement or representation; or*

    *iii.  makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; Shall be fined under this title, imprisoned not more than 5 years*

**188.**    Trustee Espinosa immediately succeeded Trustee Moran upon Moran's departure from the Bankruptcy. Trustee Espinosa was keenly aware of the major deficiencies in the reporting of the assets of the estate by Trustee Moran and neither reported it to the court or the SEC, nor did he attempt to rectify those deficiencies.

**189.**    Trustee Espinosa neglected to both report and correct the reporting deficiencies of the previous trustee, *knowingly* and fraudulently concealing the whereabouts of the missing $1 Billion+ from the assets of the estate.

**190.**    Trustee Espinosa *knowingly and fraudulently* filed LPHI's first 10K and 10Q due during his tenure as trustee to the SEC since LPHI's original management filed more than 2 years earlier in an attempt to conceal the missing $1 Billion+ assets stolen by Trustee Moran and his counsel.

**191.**    Trustee Espinosa also failed to mention the excessive fees and expenses paid to Trustee Moran and his counsel.

In addition, Trustee Espinosa also knowingly and fraudulently makes a false declaration as to the financial affairs of the Estate with full knowledge that the 10K

is a non-compliant submission in that the previous 10Ks from 2015 and 2016 are required in order to produce an Unqualified (FASB compliant) opinion by the auditor.

192.    *Under 18 U.S. Code § 154. Adverse interest and conduct of officers-   A person who, being a custodian, trustee, marshal, or other officer of the court— knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge,*

193.    Trustee Espinosa, as has clearly been enumerated by the numerous aforementioned code violations, has demonstrated his adverse interest by his conduct as trustee throughout his tenure. However, his signature on the predatory "Offer to Purchase" [see Exhibit 2] as described above in Trustee Jacobs' participation, bears witness to his adverse intentions to the estate.

194.    By knowingly avoiding the production of the required and FASB compliant 10Ks, 10Qs and the 8Ks from 2015 and 2016, then submitting a non-compliant 10K for 2017, he has intentionally disallowed a reasonable opportunity for the inspection by any interested parties.

195.    This failure of his duties as a trustee of LPHI is unmistakably and knowingly adverse to the interest of the estate.

196. *Under 11 U.S. Code § 704. Duties of trustee (a)(8): (a)(2)(4)(5)(7)(8),* The trustee shall-

    a. (2) be accountable for all property received:

    b. (4) investigate the financial affairs of the debtor:

    c. (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest:

    d. (8) if the business of the debtor is authorized to be operated, file with the court,   with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires;

197. *Bankruptcy Rule 903* states: *The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See Katchen v. Landy,* 382 U.S. 323, 328 (1966): *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 346–47 (1874): *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). The rule also incorporates the wholesome mandate of the last sentence of Rule 1 of the Federal Rules of Civil Procedure. (2 Moore, *Federal Practice* 1.13 (2d ed. 1980); 4 Wright & Miller, *Federal Practice and Procedure-Civil* §1029 (1969)).

198.  *Securities Exchange Act of 1934- Reporting Requirements - "... under Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m, companies with registered publicly held securities and companies of a certain size are called "reporting companies," meaning that **they must make periodic disclosures by filing annual reports (called a Form 10-K) and quarterly reports (called a Form 10-Q). Reporting companies must also promptly disclose certain important events (called a Form 8-K).** Information in these reports includes information about the company's officers and directors, the company's line of business, **audited financial statements**, and the management discussion and analysis section. According to The Exchange Act - "...disclosure materials must be filed with the SEC.". Section 20 (codified in 15 U.S.C. § 78t)** provides for joint and several liability for people who control or abet violators of the Exchange act, thus increasing the chance that an investor will be able to collect any damages that are awarded.*

199.  Trustee Espinosa failed in his duties as Trustee in the LPHI bankruptcy case by not accounting for the $1 Billion in missing property which comprises a substantial portion of the legitimate amount of estate assets originally confiscated from the investors.

200.  Although the tax burden of income produced by the remaining estate assets and paid to the investors was passed along to the note holders, that income not paid to the investors and its various uses still requires the reporting to the IRS.

201.   The court made no declarations relieving the Trustees of the LPHI estate from any of its reporting requirements to either the SEC or the IRS

202.   At no time did Trustee Espinosa ,Trustee Moran or Trustee Jacobs request relief of their reporting duties to the SEC under *17 CFR § 240.12h-3 - Suspension of duty to file reports under section 15(d)* or; *Section 240.15d-6* **-** Suspension of duty to file reports.

203.   Therefore, Trustee Espinosa knowingly and fraudulently failed to file such compliant and required reports.

204.   As stated in both *11 U.S. Code § 704(a)(1)(2), and Bankruptcy Rule 903* Trustee Espinosa failed to close the estate expeditiously or account for all of the property originally confiscated from the investors under Trustee Moran or investigate and report the result of this investigation of the conduct of the bankruptcy and the financial affairs thereof.

205.   Trustee Espinosa knowingly and fraudulently abandoned his duties as Trustee to the LPHI estate.

206.   The reporting requirements of public companies are clearly stated in *Securities Exchange Act of 1934- Reporting Requirements - "... under Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m,* however both Trustee Espinosa and his predecessor Trustee Moran intentionally avoided such

compliance in order to conceal the various criminal activities and breaches of fiduciary activities that have occurred.

207.   Trustee Espinosa's failure to adhere to the fiduciary duties of a trustee as well as all of the aforementioned laws and codes enabled this bankruptcy to continue to be operated not as a legally compliant bankruptcy under Chapter 11, but as an ongoing criminal enterprise beginning at the LaQuinta Inn in Waco, TX.

208.   Under 18 U.S. Code § 242 - **Deprivation of rights under color of law-** states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;

209.   Trustee Espinosa has committed various criminal violations as well having knowingly abandoned his fiduciary duties to the LPHI estate in the ongoing efforts to deprive the rights to the victims of these numerous criminal violations all while doing so under the color of law.

210.   **Michael Quilling, Trustee Position Holders Trust**

*18 U.S. Code § 152(1)(3)(5)(7)(8)(9) Concealment of assets; false oaths and claims; bribery*

*1* - *knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;*

*3* -*knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;*

*7* - *in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;*

*8* - *after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or*

*9* - *after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor,*

*Shall be fined under this title, imprisoned not more than 5 years, or both*

**211.** Under *18 U.S. Code § 157(3)* - *A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*

> *3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,*
>
> *shall be fined under this title, imprisoned not more than 5 years, or both.*

**212.** Under *18 U.S. Code § 1001* *Statements or entries generally: Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—*

> *i.  falsifies, conceals, or covers up by any trick, scheme, or device a material fact;*
>
> *ii.  makes any materially false, fictitious, or fraudulent statement or representation; or*
>
> *iii.  makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; Shall be fined under this title, imprisoned not more than 5 years.*

**213.** Trustee Quilling succeeded Trustee Espinosa upon Espinosa's suspicious departure from the Bankruptcy. Like his predecessor Trustee Quilling was keenly aware of the major deficiencies in the reporting of the

assets of the estate by both Trustee Moran and continued by Trustee Espinosa.

214.   Trustee Quilling neglected to correct and report these deficiencies by his predecessors to the SEC and the court Trustee Quilling *knowingly* and fraudulently concealed the whereabouts of the missing $1 Billion+ from the assets of the estate along with the irregular activities of  Trustees Moran and Espinosa.

215.   Trustee Quilling *knowingly and fraudulently* filed LPHI's second 10K with the SEC following the deficient and non-compliant 10K filed by Trustee Espinosa. The last compliant 10K filings were done by LPHI's original management more than 2 years earlier.

216.   When Trustee Quilling filed the 10K, he *knowingly and fraudulently did so in his attempt to conceal* the missing $1 Billion+ of estate assets stolen by Trustee Moran and his counsel.

217.   By filing this second 10K since the start of bankruptcy Trustee Quilling knowingly and fraudulently makes a false declaration as to the financial affairs of the estate and the assets, both accounted for and unaccounted for including the $1 Billion.

218.   Trustee Quilling also *knowingly and fraudulently* failed to mention the excessive fees paid to Trustee Moran, Trustee Espinosa and their respective counsels.

219.   Trustee Quilling also knowingly and fraudulently made a false declaration as to the financial affairs of the Estate with full knowledge that his 10K submission, as was the previous 10K submitted by Espinosa is a non-compliant submission in that the previous 10Ks from 2015 and 2016 are required to produce an Unqualified opinion by the auditor in a direct attempt to conceal the excessive amount of missing estate assets.

220.   *Under 18 U.S. Code § 154(2)(5). Adverse interest and conduct of officers-*

*A person who, being a custodian, trustee, marshal, or other officer of the court—*

*(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or*

*(5) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge.*

221.   Trustee Quilling, as has clearly been enumerated by the numerous aforementioned code violations, has demonstrated his adverse interest to the estate by his conduct as trustee throughout his tenure.

222. By knowingly avoiding the production of the required and compliant 10Ks and 10Qs from 2015 and 2016, then submitting a non-compliant 10K for 2017, he has intentionally disallowed a reasonable opportunity for the inspection by any interested parties.

223. This failure of his duties as a trustee of LPHI is unmistakably and knowingly adverse to the interest of the estate.

224. *Under 11 U.S. Code § 704. Duties of trustee (a)(8): (a)(2)(4)(5)(7)(8),* The trustee shall-

   a. (2) be accountable for all property received:

   b. (4) investigate the financial affairs of the debtor:

   c. (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest:

   d. (8) if the business of the debtor is authorized to be operated, file with the court,   with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires;

225.   *Bankruptcy Rule 903* states: The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See *Katchen v. Landy*, 382 U.S. 323, 328 (1966): *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47 (1874): *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). The rule also incorporates the wholesome mandate of the last sentence of Rule 1 of the Federal Rules of Civil Procedure. (2 Moore, *Federal Practice* 1.13 (2d ed. 1980); 4 Wright & Miller, *Federal Practice and Procedure-Civil* §1029 (1969)).

226.   *Securities Exchange Act of 1934- Reporting Requirements - "... under Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m, companies with registered publicly held securities and companies of a certain size are called "reporting companies," meaning that **they must make periodic disclosures by filing annual reports (called a Form 10-K) and quarterly reports (called a Form 10-Q). Reporting companies must also promptly disclose certain important events (called a Form 8-K).** Information in these reports includes information about the company's officers and directors, the company's line of business, **audited financial statements,** and the management discussion and analysis section.*

227.   *According to The Exchange Act - "...**disclosure materials must be filed with the SEC.";*** At no time did either Trustee Espinosa, Trustee Moran  or Trustee Jacobs request their relief of reporting duties to the SEC under *17 CFR §*

*240.12h-3 - Suspension of duty to file reports under section 15(d)* or; *Section 240.15d-6 -* Suspension of duty to file reports.

228.    *Section 20 (codified in 15 U.S.C. § 78t) provides for joint and several liability for people who control or abet violators of the Exchange act, thus increasing the chance that an investor will be able to collect any damages that are awarded.*

229.    Trustee Quilling failed in his duties as Trustee in the LPHI bankruptcy case by not accounting for the $1 Billion in missing property comprising the legitimate amount of estate assets originally confiscated from the investors.

230.    Although the tax burden of income produced by the remaining estate assets and paid to the investors was passed along to the note holders, the income not paid to the investors along with its various uses still requires the reporting to the IRS.

231.    The court made no declarations relieving the Trustees of the LPHI estate from any of its reporting requirements to either the SEC or the IRS.

232.    At no time did either Trustee Quilling, his predecessor Trustee Espinosa or his predecessor Trustee Moran request the relief of reporting duties to the SEC under *17 CFR § 240.12h-3 - Suspension of duty to file*

*reports under section 15(d)* or *Section 240.15d-6* - Suspension of duty to file reports.

233. Therefore, Trustee Quilling knowingly and fraudulently failed to file such compliant and required reports.

234. As stated in both *11 U.S. Code § 704(a)(1)(2),* and *Bankruptcy Rule 903* Trustee Quilling failed to close the estate expeditiously or account for all of the property originally confiscated from the investors under Trustee Moran or investigate and report the result of this investigation of the conduct of the bankruptcy and the financial affairs thereof.

235. Trustee Quilling knowingly and fraudulently abandoned his duties as Trustee to the LPHI estate.

236. The reporting requirements of public companies are clearly stated in *Securities Exchange Act of 1934- Reporting Requirements* - "... *under Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m,* however Trustee Quilling and his predecessor, Trustee Espinosa and his predecessor Trustee Moran intentionally avoided such compliance in order to conceal the various criminal activities and breaches of fiduciary activities that have occurred.

237. Trustee Quilling's failure to adhere to the fiduciary duties of a trustee as well as all of the aforementioned laws and codes enabled this

bankruptcy to continue to be operated, not as a legally compliant bankruptcy under Chapter 11, but as an ongoing criminal enterprise beginning at the LaQuinta Inn in Waco, TX.

238.   *U*nder *18 U.S. Code § 242* - Deprivation of rights under color of law- states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the 5th Amendment to the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;

239.   Trustee Quilling, by over-looking his various duties to the estate along with the activities of his predecessor Trustees, has committed various criminal violations as well as having knowingly abandoned his fiduciary duties to the LPHI estate in the ongoing efforts to deprive the rights to the victims of these numerous criminal violations all while doing so under the color of law.

240.   **Dennis Roosien Jr.** shareholder, Munsch Hardt Kopf & Harr, P.C.

   **18 U.S. Code § 157.** Bankruptcy fraud U.S. Code- A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—

   *1-files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;*

*2-files a document in a proceeding under title 11; or*

*3-makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,*

*shall be fined under this title, imprisoned not more than 5 years, or both.*

**241.**   **18 U.S. Code § 152. Concealment of assets; false oaths and claims; bribery;**

*A person who—*

> *1 - knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;*
>
> *2 - knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;*
>
> *4 - knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney;*
>
> *5 - knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;*
>
> *shall be fined under this title, imprisoned not more than 5 years, or both.*

**242.** Mr. Roosien, counsel for Trustee Jacobs has access to both the property and all documents belonging to the LPHI estate. This access information regarding the entire bankruptcy, including the transcripts all activities in the bankruptcy court of Judge Russell Nelms.

**243.** Mr. Roosien has and continues to be aware of the various violations of Bankruptcy code, SEC code and criminal violations throughout this bankruptcy.

**244.** Mr. Roosien has and continues to counsel Trustee Jacobs and in doing so, prepares and reviews documents presented to the court and filed with the SEC on behalf of Trustee Jacobs. In a recent letter to a licensee attorney, originally authored by Mr. Roosien (per the atty Tom Brandon), he still refers to the basis for these actions as an *alleged fraud.* Due to a ongoing lack of sufficient evidence to state otherwise. Additionally, he maintains that the Life Expectancies (LE) provided by Dr. Cassidy were deceptive to the investors yet the LEs provided by 21st Services (the 2nd company engaged to satisfy the demands of the SEC) proved to be substantially less conservative and thus less beneficial to the investors than Dr. Cassidy's. In this same document Mr. Roosien maintains that this alleged fraud was committed without the knowledge of two key employees whose cooperation would have been vital for such a fraud to have existed in the first place.

**245.** Mr. Roosien under 18 U.S. Code § 152 both knowingly and fraudulently prepares documents for filing in the court and for submission to the SEC, that both continues and adapts through artifice the scheme hatched at LaQuinta Inn

in Waco, TX in an ongoing effort to further harm and defraud the estate of substantial assets that can only be accurately enumerated through complaint financial reporting and equally compliant oversight.

246.   **18 U.S. Code § 153. Embezzlement Against Estate**

(a) Offense -A person described in subsection (b) who *knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor shall be fined under this title, imprisoned not more than 5 years, or both.(b)Person to Whom Section Applies.—A person described in this subsection is one who has access to property or documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, marshal, attorney, or other officer of the court or as an agent, employee, or other person engaged by such an officer to perform a service with respect to the estate.*

247.   Mr. Roosien, counsel for Trustee Jacobs has access to both the property and all documents belonging to the LPHI estate. Mr. Roosien has such access to the information regarding the entire bankruptcy, including the transcripts and all activities in the bankruptcy court of Judge Russell Nelms.

248. Due to his unfettered access to this information, Mr. Roosien failed to counsel Trustee Jacobs of his requirement to file notice to the SEC pertaining the various financial improprieties concerning the preservation of the estate, specifically the missing 10Ks and 10Qs from 2015 and 2016 from his predecessor Trustee H. Thomas Moran.

249. Mr. Roosien failed to counsel Trustee Jacobs that a financial investigation into the affairs and oversight of the estate are required of his duties as Trustee. They are also required under bankruptcy code, SEC code and Criminal law under Titles 11 & 18.

250. Mr. Roosien is aware of the $1 Billion in assets missing from original $3.2 Billion originally confiscated from the investors and which comprised the totality of the estate. He is aware of this due to his access to this information.

251. Mr. Roosien's legal billing clearly falls within the scope of deficient reporting and accountability. Mr. Roosien has submitted billing more than that which would be attributable to a Chapter 11 bankruptcy 4 years beyond the court approval of a final Plan of Reorganization.

252. Except for minimal counsel billing, any ongoing legal activities can be attributed to an attempt to inflate billable services at the direct harm to the estate. An independent and detailed audit will reveal this to be true, provided this audit were examined by a person strictly adhering to such oversight rules and in keeping with the best interest of the estate.

253. 18 U.S. Code § 155.Fee agreements in cases under title 11 and receiverships *Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

254. Mr. Roosien also failed to counsel Trustee Jacobs as to the proper compensation awarded to a trustee in a chapter 11 set forth under the guidelines established by the United States Department of Justice -Trustee Program.

255. Mr. Roosien similarly failed to counsel Trustee Jacobs pertaining to Jacobs' responsibility to the oversight of the fees paid to professionals working in connection to the LPHI estate. As such, Mr. Roosien has been able to generate legal billing to the estate far more than what would be allowed under a compliant situation.

256.   The necessity of compliant and transparent reporting and legally compliant oversight of the LPHI estate will demonstrate that losses due to overbilling are in excess $20 Million.

257.   **Jay Ong, shareholder, Munsch Hardt Kopf & Harr, P.C.**

**18 U.S. Code § 157. Bankruptcy fraud U.S. Code** A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—

*files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;*

*2 - files a document in a proceeding under title 11; or*

*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,*

*shall be fined under this title, imprisoned not more than 5 years, or both.*

258.   **18 U.S. Code § 152. Concealment of assets; false oaths and claims; bribery;**
*A person who—*

*1 - knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;*

*2 - knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;*

**4** *- knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney;*

**5** *- knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;*

*shall be fined under this title, imprisoned not more than 5 years, or both.*

259.   Mr. Ong, counsel for Trustee Jacobs has access to both the property and all documents belonging to the LPHI estate. Mr. Ong has access to the information regarding the entire bankruptcy, including the transcripts of all activities in the bankruptcy court of the Honorable Judge Russell Nelms.

260.   Due to his unfettered access to this information, Mr. Ong failed to counsel Trustee Jacobs of his requirement to file notice to the SEC pertaining to the various financial improprieties concerning the preservation of the estate, specifically the missing 10Ks and 10Qs from 2015 and 2016 from his predecessor Trustee H. Thomas Moran.

261.   Mr. Ong failed to counsel Trustee Jacobs that a financial investigation into the affairs and oversight of the estate are required of his duties as Trustee. They are also required under bankruptcy code, SEC code and Criminal law under Titles 11 & 18.

262.    Mr. Ong is aware of the $1 Billion in assets missing from original $3.2 Billion originally confiscated from the investors and which comprised the totality of the estate. He is aware of this due to his access to this information.

263.    Mr. Ong's legal billing clearly falls within the scope of deficient reporting and accountability. Mr. Ong has submitted billing more than that which would be attributable to a Chapter 11 bankruptcy 4 years beyond the court approval of a final Plan of Reorganization.

264.    Except for minimal counsel billing, any ongoing legal activities can be attributed to an attempt to inflate billable services at the direct harm to the estate. An independent and detailed audit will reveal this to be true, provided this audit were examined by a person strictly adhering to such oversight rules and in keeping with the best interest of the estate.

265.    Mr. Ong under **18 U.S. Code § 152**  knowingly and fraudulently prepares documents for filing in the court and submitting to the SEC that continues and adapts through artifice the scheme hatched at LaQuinta Inn in Waco, TX in an ongoing effort to further harm and defraud the estate of substantial assets that can only accurately be enumerated by producing FASB complaint audits for ALL fiscal years including 2015 and 2016 for which no financial statements were filed at all.

**266.** 18 U.S. Code § 153. **Embezzlement Against Estate** (a) Offense -A person described in subsection (b) who *knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor shall be fined under this title, imprisoned not more than 5 years, or both.*

(b)Person to Whom Section Applies.—A person described in this subsection is one who has access to property or documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, marshal, attorney, or other officer of the court or as an agent, employee, or other person engaged by such an officer to perform a service with respect to the estate.

**267.** 18 U.S. Code § 155.**Fee agreements in cases under title 11 and receiverships:**

*Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

**268.** Mr. Ong also failed to counsel Trustee Jacobs as to the proper compensation awarded to a trustee in a chapter 11 set forth under the guidelines established by the United States Department of Justice - Trustee Program.

**269.** Mr. Ong similarly failed to counsel Trustee Jacobs pertaining to Jacobs' responsibility to the oversight of the fees paid to professionals working in connection to the LPHI estate. As such, Mr. Ong has been able to generate legal billing to the estate far more than what would be allowed under a compliant situation.

**270.** The necessity of compliant and transparent reporting and legally compliant oversight of the LPHI estate will demonstrate that losses due to overbilling are in excess $20 Million.

**Munsch Hardt Kopf & Harr, P.C.-** through its shareholders Dennis Roosien and Jay Ong - **18 U.S. Code § 152. Concealment of assets; false oaths and claims; bribery** has knowingly and fraudulently directly benefited from the deceptive and illegal activities including the numerous documents prepared for Trustee Jacobs and other parties for the presentation to the court. Aided by the opaque reporting of billable hours and upon information and belief, Munsch Hardt LLP has benefited from the illegal and unethical billing of attorney hours not applicable to the estate of LPHI. The verification of these hours will be substantiated through the independent forensic audit of the LPHI estate starting from the last audit by MMS advisors who were commissioned

by Trustee Moran. Additionally, under *18 U.S. Code § 3284. Concealment of bankrupt's assets, the receipt of these estate assets under these circumstances provides any additional time that might be necessary to substantiate this excessive billing through the forensic audit.* Munsch Hardt Kopf & Harr, P.C

**270. Robert "Skip" Trimble** *Under 18 U.S. Code § 154(2) -* *Adverse interest and conduct of officers: A person who, being a custodian, trustee, marshal, or other officer of the court—*

> *(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or*
>
> *(3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge, shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant.*

**271.** Mr. Trimble is a member of the LPHI Board of Directors post- bankruptcy. Mr. Trimble as a director of LPHI operating in Chapter 11 has the same responsibilities and obligations as any member of a Board of Directors that any Public corporation would have. These include legal and fiduciary obligations such as their Duty of Loyalty which includes (a)Avoiding conflicts of Interest, (b)Exercising fairness, and (c)Confidentiality.

272. Mr. Trimble, as a Director, should have demanded that all financial reporting be up to date, compliant, accurate and transparent.

273. Mr. Trimble as a director has the responsibility along with the rest of the board, to force the management of LPHI to produce the SEC required and FASB compliant 10Ks, 10Qs and 8Ks for 2015 and 2016.

274. Mr. Trimble's failure to do so as a member of the board of directors was clearly meant to conceal the whereabouts of the $1 Billion+ missing and rightful estate assets.

275. Mr. Trimble's failure to demand that required reporting be produced makes it inevitable that no request from any interested party or a request from the court for such documentation, could be fulfilled.

276. Mr. Trimble did not report these compliance deficiencies to the SEC or the court.

277. Mr. Trimble did not exercise his duties as a director. As such, Mr. Trimble has demonstrated behavior adverse to the preservation of the total assets of the estate.

278. Under *18 U.S. Code § 155* - Fee agreements in cases under title 11 and receiverships:

-Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in *connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

279. Mr. Trimble, acting as a director, failed to question management and question the excessive fees paid to the various parties, most of whom were in breach of various violations of Bankruptcy, SEC and Criminal codes.

280. Mr. Trimble abdicated his duties and fiduciary responsibilities of the LPHI estate assets to the control of Trustee Moran and his counsel David Bennett of Thompson and Knight, LP and the successor trustees and their respective counsels.

281. In doing so, Mr. Trimble as a director remained an interested party to the decisions surrounding the excessive fees paid to the various participants in the LPHI bankruptcy yet failed in his fiduciary duties to object to; and rectify these fee discrepancies for the benefit of the estate.

282. Mr. Trimble is paid $50,000 per year from the assets of the LPHI estate to exercise care and preservation for the same estate that he fails to exercise any fiduciary responsibilities required of him as a director.

283. *Under 18 U.S. Code § 157(3) A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*
*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title.*

284. Mr. Trimble's voluntarily chose to abdicate the duties conferred upon him as a director and his failure to demand the SEC required and FASB compliant 10Ks and 10Qs and 8Ks to be produced by management, as well as his failure to notify the SEC of these reporting deficiencies helped to perpetrate the criminal activities in cooperation with the Trustees and their respective counsel.

285. Mr. Trimble, in his capacity as a director of LPHI, participated in the concealment of the missing estate assets by failing to report the artifice in process. By this failure of his fiduciary duties to the contrary, actively helps to conceal the criminal activities, bankruptcy code and SEC regulation violations that continue to disgorge the estate.

286. *Under 18 U.S. Code § 242 - Deprivation of rights under color of law- states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the 5th Amendment to the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

287. Mr. Trimble, a director for the LPHI, by his failure to perform his fiduciary duties required of his position, and by his failure to force management to produce compliant financial 10Ks, 10Qs and 8Ks for 2015 and 2016 willfully subjects the LPHI estate and thus the victimized investors, forcibly converted to noteholders, to the deprivation of their rights protected by the 5th Amendment to the Constitution.

288. Bert Scalzo *Under 18 U.S. Code § 154(2) - Adverse interest and conduct of officers: A person who, being a custodian, trustee, marshal, or other officer of the court—*

> *(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; (3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge, shall be fined*

*under this title and shall forfeit the person's office, which shall thereupon become vacant.*

*As further evidenced of his adverse interest to the LPHI estate; under Bankruptcy Rule 903 - The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See Katchen v. Landy, 382 U.S. 323, 328 (1966): Bailey v. Glover, 88 U.S. (21 Wall.) 342, 346–47 (1874): Ex parte Christy, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). His failure to demand an exit from the Chapter 11 has continued to cause great harm to the assets of the LPHI estate.*

**289.** Mr. Scalzo is a member of the LPHI Board of Directors post- bankruptcy. Mr. Scalzo as a director of LPHI operating in Chapter 11 has the same responsibilities and obligations as any member of a Board of Directors that any Public corporation would have. These include legal and fiduciary obligations such as their Duty of Loyalty which includes (a)Avoiding conflicts of Interest, (b)Exercising fairness, and (c)Confidentiality.

**290.** Mr. Scalzo, as a Director, should have demanded that all financial reporting be up to date, compliant, accurate and transparent.

Mr. Scalzo as a director has the responsibility along with the rest of the board, to force the management of LPHI to produce the SEC required and FASB compliant 10Ks, 10Qs and 8Ks for 2015 and 2016.

**291.** Mr. Scalzo's failure to do so as a member of the board of directors was clearly meant to conceal the whereabouts of the $1 Billion+ missing and rightful estate assets.

**292.** Mr. Scalzo's failure to demand that required reporting be produced makes it inevitable that no request from any interested party or a request from the court for such documentation, could be fulfilled.

**293.** Mr. Scalzo did not report these compliance deficiencies to the SEC or the court.

**294.** Mr. Scalzo did not exercise his duties as a director. As such, Mr. Scalzo has demonstrated behavior adverse to the preservation of the total assets of the estate.

**295**. Under *18 U.S. Code § 155, Fee agreements in cases under title 11 and receiverships:*

> *Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

**296**. Mr. Scalzo, acting as a director, failed to question management and question the excessive fees paid to the various parties, most of whom were in breach of various violations of Bankruptcy, SEC and Criminal codes.

**297**. Mr. Scalzo abdicated his duties and fiduciary responsibilities of the LPHI estate assets to the control of Trustee Moran and his counsel David Bennett of Thompson and Knight, LP and the successor trustees and their respective counsels.

**292**. In doing so, Mr. Scalzo as a director remained an interested party to the decisions surrounding the excessive fees paid to the various participants in the LPHI bankruptcy, yet failed in his fiduciary duties to object to; and rectify these fee discrepancies for the benefit of the estate.

**293**. Mr. Scalzo is paid $50,000 per year from the assets of the LPHI estate to exercise care and preservation for the same estate that he fails to exercise any fiduciary responsibilities required of him as a director.

*294. Under 18 U.S. Code § 157(3) A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*

*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title.*

**295.** Mr. Scalzo's voluntarily choice to abdicate the duties conferred upon him as a director and his failure to demand the SEC required and FASB compliant 10Ks and 10Qs and 8Ks to be produced by management, as well as his failure to notify the SEC of these reporting deficiencies helped to perpetrate the criminal activities in cooperation with the Trustees and their respective counsel.

**296.** Mr. Scalzo, in his capacity as a director of LPHI, participated in the concealment of the missing estate assets by failing to report the artifice in process. By this failure of his fiduciary duties to the contrary, actively helps to conceal the criminal activities, bankruptcy code and SEC regulation violations that continue to disgorge the estate.

**297.** *Under 18 U.S. Code § 242 - Deprivation of rights under color of law-states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the 5th Amendment to the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

**298.** Mr. Scalzo, a director for the LPHI, by his failure to perform his fiduciary duties required of his position, and by his failure to force management to produce compliant financial 10Ks, 10Qs and 8Ks for 2015 and 2016 willfully subjects the LPHI estate and thus the victimized investors, forcibly converted

to noteholders, to the deprivation of their rights protected by the 5th Amendment to the Constitution.

**299. Nate Evans, director of LPHI post-bankruptcy:** *Under 18 U.S. Code § 154(2) - Adverse interest and conduct of officers: A person who, being a custodian, trustee, marshal, or other officer of the court—*

*(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or*

*(3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge, shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant. As further evidence of his adverse interest to the LPHI estate; under* **Bankruptcy Rule 903 -** The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See *Katchen v. Landy*, 382 U.S. 323, 328 (1966): *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47 (1874): *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). His failure to demand an exit from the Chapter 11 has continued to cause great harm to the assets of the LPHI estate.

**300.** Mr. Evans is a member of the LPHI Board of Directors post- bankruptcy. Mr. Trimble as a director of LPHI operating in Chapter 11 has the same responsibilities and obligations as any member of a Board of Directors that any Public corporation would have. These include legal and fiduciary obligations such as their Duty of

Loyalty which includes (a)Avoiding conflicts of Interest, (b)Exercising fairness, and (c)Confidentiality.

**301.** Mr. Evans, as a Director, should have demanded that all financial reporting be up to date, compliant, accurate and transparent.

**302.** Mr. Evans as a director has the responsibility along with the rest of the board, to force the management of LPHI to produce the SEC required and FASB compliant 10Ks, 10Qs and 8Ks for 2015 and 2016.

**303.** Mr. Evans failure to do so as a member of the board of directors was clearly meant to conceal the whereabouts of the $1 Billion+ missing and rightful estate assets.

**304.** Mr. Evans failure to demand that required reporting be produced makes it inevitable that no request from any interested party or a request from the court for such documentation, could be fulfilled.

**305.** Mr. Evans did not report these compliance deficiencies to the SEC or the court.

**306.** Mr. Evans did not exercise his duties as a director. As such, Mr. Evans has demonstrated behavior adverse to the preservation of the total assets of the estate.

**307.** Under *18 U.S. Code § 155*, Fee agreements in cases under title 11 and receiverships: *Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

**308.** Mr. Evans, acting as a director, failed to question management and question the excessive fees paid to the various parties, most of whom were in breach of various violations of Bankruptcy, SEC and Criminal codes.

**309.** Mr. Evans abdicated his duties and fiduciary responsibilities of the LPHI estate assets to the control of Trustee Moran and his counsel David Bennett of Thompson and Knight, LP and the successor trustees and their respective counsels.

**310.** In doing so, Mr. Evans as a director remained an interested party to the decisions surrounding the excessive fees paid to the various participants in the LPHI bankruptcy, yet failed in his fiduciary duties to object to; and rectify these fee discrepancies for the benefit of the estate.

**311.** Mr. Evans is paid $50,000 per year from the assets of the LPHI estate to exercise care and preservation for the same estate that he fails to exercise any fiduciary responsibilities required of him as a director.

**312.** *Under 18 U.S. Code § 157(3) A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*
*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title.*

**313.** Mr. Evans voluntarily chose to abdicate the duties conferred upon him as a director and his failure to demand the SEC required and FASB compliant 10Ks and 10Qs and 8Ks to be produced by management, as well as his failure to notify the SEC of these reporting deficiencies helped to perpetrate the criminal activities in cooperation with the Trustees and their respective counsel.

**314.** Mr. Evans, in his capacity as a director of LPHI, participated in the concealment of the missing estate assets by failing to report the artifice in process. By this failure of his fiduciary duties to the contrary, actively helps to conceal the criminal activities, bankruptcy code and SEC regulation violations that continue to disgorge the estate.

**315.** *Under 18 U.S. Code § 242 - Deprivation of rights under color of law-states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the 5th Amendment to the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

**316.** Mr. Evans, a director for the LPHI, by his failure to perform his fiduciary duties required of his position, and by his failure to force management to produce compliant financial 10Ks, 10Qs and 8Ks for 2015 and 2016 willfully subjects the LPHI estate and thus the victimized investors, forcibly converted to noteholders, to the deprivation of their rights protected by the 5th Amendment to the Constitution.

**317. Mark Redus Director of LPHI post- bankruptcy:**

*Under 18 U.S. Code § 154(2)- Adverse interest and conduct of officers: A person who, being a custodian, trustee, marshal, or other officer of the court—*
*(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or*
*(3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge, shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant. As further evidence of his*

*adverse interest to the LPHI estate; under **Bankruptcy Rule 903*** - The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See *Katchen v. Landy*, 382 U.S. 323, 328 (1966): *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47 (1874): *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). His failure to demand an exit from the Chapter 11 has continued to cause great harm to the assets of the LPHI estate.

**318.** Mark Redus is a member of the LPHI Board of Directors post- bankruptcy Mark Redus as a director of LPHI operating in Chapter 11 has the same responsibilities and obligations as any member of a Board of Directors that any Public corporation would have. These include legal and fiduciary obligations such as their Duty of Loyalty which includes (a)Avoiding conflicts of Interest, (b)Exercising fairness, and (c)Confidentiality.

**319.** Mark Redus, as a Director, should have demanded that all financial reporting be up to date, compliant, accurate and transparent.

**320.** Mark Redus as a director has the responsibility along with the rest of the board, to force the management of LPHI to produce the SEC required and FASB compliant 10Ks, 10Qs and 8Ks for 2015 and 2016.

**321.** Mark Redus's failure to do so as a member of the board of directors was clearly meant to conceal the whereabouts of the $1 Billion+ missing and rightful estate assets.

**322.** Mark Redus's failure to demand that required reporting be produced makes it inevitable that no request from any interested party or a request from the court for such documentation, could be fulfilled.

**323.** Mark Redus did not report these compliance deficiencies to the SEC or the court.

**324.** Mark Redus did not exercise his duties as a director. As such, Mark Redus has demonstrated behavior adverse to the preservation of the total assets of the estate.

**325.** Under *18 U.S. Code § 155, Fee agreements in cases under title 11 and receiverships: Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

**326.** Mark Redus, acting as a director, failed to question management and question the excessive fees paid to the various parties, most of whom were in breach of various violations of Bankruptcy, SEC and Criminal codes.

**327.** Mark Redus abdicated his duties and fiduciary responsibilities of the LPHI estate assets to the control of Trustee Moran and his counsel David Bennett of Thompson and Knight, LP and the successor trustees and their respective counsels.

**328.** In doing so, Mark Redus as a director remained an interested party to the decisions surrounding the excessive fees paid to the various participants in the LPHI bankruptcy, yet failed in his fiduciary duties to object to; and rectify these fee discrepancies for the benefit of the estate.

**329.** Mark Redus is paid $50,000 per year from the assets of the LPHI estate to exercise care and preservation for the same estate that he fails to exercise any fiduciary responsibilities required of him as a director.

**330.** *Under 18 U.S. Code § 157(3) A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*

*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title.*

**331.** Mark Redus voluntarily chose to abdicate the duties conferred upon him as a director and his failure to demand the SEC required and FASB compliant 10Ks and 10Qs and 8Ks to be produced by management, as well as his failure to notify the SEC of these reporting deficiencies helped to perpetrate the criminal activities in cooperation with the Trustees and their respective counsel.

**332.** Mark Redus, in his capacity as a director of LPHI, participated in the concealment of the missing estate assets by failing to report the artifice in process. By this failure of his fiduciary duties to the contrary, actively helps to conceal the criminal activities, bankruptcy code and SEC regulation violations that continue to disgorge the estate.

**333.** *Under 18 U.S. Code § 242 - Deprivation of rights under color of law- states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the 5th Amendment to the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

**334.** Mr. Trimble, a director for the LPHI, by his failure to perform his fiduciary duties required of his position, and by his failure to force management to produce compliant financial 10Ks, 10Qs and 8Ks for 2015 and 2016 willfully subjects the LPHI estate and thus the victimized investors,

forcibly converted to noteholders, to the deprivation of their rights protected by the 5th Amendment to the Constitution.

**335. Gleda Pirie** Director of LPHI post-bankruptcy:

*Under 18 U.S. Code § 154(2) states- Adverse interest and conduct of officers: A person who, being a custodian, trustee, marshal, or other officer of the court—*
*(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or*
*(3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge, shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant. As further evidence of his adverse interest to the LPHI estate; under* **Bankruptcy Rule 903,** - The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See *Katchen v. Landy*, 382 U.S. 323, 328 (1966): *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47 (1874): *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). Her failure to demand an exit from the Chapter 11 has continued to cause great harm to the assets of the LPHI estate.

**336.** Ms. Pirie is a member of the LPHI Board of Directors post- bankruptcy. Ms. Pirie as a director of LPHI operating in Chapter 11 has the same responsibilities and obligations as any member of a Board of Directors that any Public corporation would have. These include legal and fiduciary obligations such as their Duty of

Loyalty which includes (a)Avoiding conflicts of Interest, (b)Exercising fairness, and (c)Confidentiality.

**337.** Ms. Pirie, as a Director, should have demanded that all financial reporting be up to date, compliant, accurate and transparent.

**338.** Ms. Pirie as a director has the responsibility along with the rest of the board, to force the management of LPHI to produce the SEC required and FASB compliant 10Ks, 10Qs and 8Ks for 2015 and 2016.

**339.** Ms. Pirie's failure to do so as a member of the board of directors was clearly meant to conceal the whereabouts of the $1 Billion+ missing and rightful estate assets.

**340.** Ms. Pirie failure to demand that required reporting be produced makes it inevitable that no request from any interested party or a request from the court for such documentation, could be fulfilled.

**341.** Ms. Pirie did not report these compliance deficiencies to the SEC or the court.

**342.** Ms. Pirie did not exercise her duties as a director. As such, Ms. Pirie has demonstrated behavior adverse to the preservation of the total assets of the estate.

**343.** *Under 18 U.S. Code § 155, Fee agreements in cases under title 11 and receiverships:*

*Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

**344.** Ms. Pirie, acting as a director, failed to question management and question the excessive fees paid to the various parties, most of whom were in breach of various violations of Bankruptcy, SEC and Criminal codes.

**345.** Ms. Pirie abdicated her duties and fiduciary responsibilities of the LPHI estate assets to the control of Trustee Moran and his counsel David Bennett of Thompson and Knight, LP and the successor trustees and their respective counsels.

**346.** In doing so, Ms. Pirie as a director remained an interested party to the decisions surrounding the excessive fees paid to the various participants in the LPHI bankruptcy, yet failed in her fiduciary duties to object to; and rectify these fee discrepancies for the benefit of the estate.

**347.** Ms. Pirie is paid $50,000 per year from the assets of the LPHI estate to exercise care and preservation for the same estate that she fails to exercise any fiduciary responsibilities required of him as a director.

**348.** *Under 18 U.S. Code § 157(3) A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*
*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title.*

**349.** Ms. Pirie voluntarily chose to abdicate the duties conferred upon her as a director and her failure to demand the SEC required and FASB compliant 10Ks and 10Qs and 8Ks to be produced by management, as well as her failure to notify the SEC of these reporting deficiencies was necessary to perpetrate the criminal activities in cooperation with the Trustees and their respective counsel.

**350.** Ms. Pirie, in her capacity as a director of LPHI, participated in the concealment of the missing estate assets by failing to report the artifice in process. By this failure of her fiduciary duties to the contrary, actively helps to conceal the criminal activities, bankruptcy code and SEC regulation violations that continue to disgorge the estate.

**351**. *Under 18 U.S. Code § 242 - Deprivation of rights under color of law-states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the 5th Amendment to the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

**352.** Ms. Pirie, a director for the LPHI, failed to perform her fiduciary duties required of her position, and by her failure to force management to produce compliant financial 10Ks, 10Qs and 8Ks for 2015 and 2016 willfully subjects the LPHI estate and thus the victimized investors, forcibly converted to noteholders, to the deprivation of their rights protected by the 5th Amendment to the Constitution.

**353. Adriana Atchley,** Director of LPHI post-bankruptcy:

*Under 18 U.S. Code § 154(2) - Adverse interest and conduct of officers: A person who, being a custodian, trustee, marshal, or other officer of the court—*

*(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or*

*(3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge, shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant. As further evidence of his*

*adverse interest to the LPHI estate; under **Bankruptcy Rule 903,*** - The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See *Katchen v. Landy*, 382 U.S. 323, 328 (1966): *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47 (1874): *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). Her failure to demand an exit from the Chapter 11 has continued to cause great harm to the assets of the LPHI estate.

**354.** Ms. Atchley is a member of the LPHI Board of Directors post- bankruptcy. Ms. Atchley, as a director of LPHI operating in Chapter 11 has the same responsibilities and obligations as any member of a Board of Directors that any Public corporation would have. These include legal and fiduciary obligations such as their Duty of Loyalty which includes (a)Avoiding conflicts of Interest, (b)Exercising fairness, and (c)Confidentiality.

**355.** Ms. Atchley, as a Director, should have demanded that all financial reporting be up to date, compliant, accurate and transparent.

**356.** Ms. Atchley as a director has the responsibility along with the rest of the board, to force the management of LPHI to produce the SEC required and FASB compliant 10Ks, 10Qs and 8Ks for 2015 and 2016.

**357.** Ms. Atchley's failure to do so as a member of the board of directors was clearly meant to conceal the whereabouts of the $1 Billion+ missing and rightful estate assets.

**358.** Ms. Atchley's failure to demand that required reporting be produced makes it inevitable that no request from any interested party or a request from the court for such documentation, could be fulfilled.

**359.** Ms. Atchley did not report these compliance deficiencies to the SEC or the court.

**360.** Ms. Atchley did not exercise her duties as a director. As such, Ms. Atchley has demonstrated behavior adverse to the preservation of the total assets of the estate.

**361.** Under *18 U.S. Code § 155,* Fee agreements in cases under title 11 and receiverships:

*Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

**362**. Ms. Atchley, acting as a director, failed to question management and question the excessive fees paid to the various parties, most of whom were in breach of various violations of Bankruptcy, SEC and Criminal codes.

**363.** Ms. Atchley abdicated her duties and fiduciary responsibilities of the LPHI estate assets to the control of Trustee Moran and his counsel David Bennett of Thompson and Knight, LP and the successor trustees and their respective counsels.

**364.** In doing so, Ms. Atchley as a director remained an interested party to the decisions surrounding the excessive fees paid to the various participants in the LPHI bankruptcy, yet failed in her fiduciary duties to object to; and rectify these fee discrepancies for the benefit of the estate.

**365.** Ms. Atchley is paid $50,000 per year from the assets of the LPHI estate to exercise care and preservation for the same estate that she fails to exercise any fiduciary responsibilities required of her as a director.

**366.** *Under 18 U.S. Code § 157(3)- A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*
*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title.*

**367**. Ms. Atchley voluntarily chose to abdicate the duties conferred upon her as a director and her failure to demand the SEC required and FASB compliant 10Ks and 10Qs and 8Ks to be produced by management, as well as her failure to notify the SEC of these reporting deficiencies helped to perpetrate the criminal activities in cooperation with the Trustees and their respective counsel.

**368.** Ms. Atchley, in her capacity as a director of LPHI, participated in the concealment of the missing estate assets by failing to report the artifice in process. By this failure of her fiduciary duties to the contrary, actively helps to conceal the criminal activities, bankruptcy code and SEC regulation violations that continue to disgorge the estate.

**369.** *Under 18 U.S. Code § 242 - Deprivation of rights under color of law- states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the 5th Amendment to the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

**370.** Ms. Atchley, a director for the LPHI, by her failure to perform her fidciary duties required of her position, and by her failure to force management to produce compliant financial 10Ks, 10Qs and 8Ks for 2015 and 2016 willfully subjects the LPHI estate and thus the victimized investors, forcibly converted

to noteholders, to the deprivation of their rights protected by the 5th Amendment to the Constitution.

**371. PHILIP LOY** Director of LPHI post-bankruptcy:

*Under 18 U.S. Code § 154(2) - Adverse interest and conduct of officers: A person who, being a custodian, trustee, marshal, or other officer of the court—*

*(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or (3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge, shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant. As further evidence of his adverse interest to the LPHI estate; under **Bankruptcy Rule 903, -** The objective of* "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See *Katchen v. Landy*, 382 U.S. 323, 328 (1966): *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47 (1874): *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). His failure to demand an exit from the Chapter 11 has continued to cause great harm to the assets of the LPHI estate.

**372.** Mr. Loy is a member of the LPHI Board of Directors post- bankruptcy. Mr. Loy, as a director of LPHI operating in Chapter 11 has the same responsibilities and obligations as any member of a Board of Directors that any Public corporation would have. These include legal and fiduciary obligations such as their Duty of

Loyalty which includes (a)Avoiding conflicts of Interest, (b)Exercising fairness, and (c)Confidentiality.

**373.** Mr. Loy, as a Director, should have demanded that all financial reporting be up to date, compliant, accurate and transparent.

**374.** Mr. Loy as a director has the responsibility along with the rest of the board, to force the management of LPHI to produce the SEC required and FASB compliant 10Ks, 10Qs and 8Ks for 2015 and 2016.

**375.** Mr. Loy's failure to do so as a member of the board of directors was clearly meant to conceal the whereabouts of the $1 Billion+ missing and rightful estate assets.

**376.** Mr. Loy's failure to demand that required reporting be produced makes it inevitable that no request from any interested party or a request from the court for such documentation, could be fulfilled.

**377.** Mr. Loy did not report these compliance deficiencies to the SEC or the court.

**378.** Mr. Loy did not exercise his duties as a director. As such, Mr. Loy has demonstrated behavior adverse to the preservation of the total assets of the estate.

**379.** Under *18 U.S. Code § 155*, Fee agreements in cases under title 11 and receiverships:

*Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both.*

**380.** Mr. Loy, acting as a director, failed to question management and question the excessive fees paid to the various parties, most of whom were in breach of various violations of Bankruptcy, SEC and Criminal codes.

**381.** Mr. Loy abdicated his duties and fiduciary responsibilities of the LPHI estate assets to the control of Trustee Moran and his counsel David Bennett of Thompson and Knight, LP and the successor trustees and their respective counsels.

**382.** In doing so, Mr. Loy as a director remained an interested party to the decisions surrounding the excessive fees paid to the various participants in the LPHI bankruptcy, yet failed in his fiduciary duties to object to; and rectify these fee discrepancies for the benefit of the estate.

**383.** Mr. Loy is paid $50,000 per year from the assets of the LPHI estate to exercise care and preservation for the same estate that he fails to exercise any fiduciary responsibilities required of her as a director.

**384.** *Under 18 U.S. Code § 157(3) A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—*
*3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title.*

**385**. Mr. Loy voluntarily chose to abdicate the duties conferred upon his as a director and his failure to demand the SEC required and FASB compliant 10Ks and 10Qs and 8Ks  to be produced by management, as well as his failure to notify the SEC of these reporting deficiencies helped to perpetrate the criminal activities in cooperation with the Trustees and their respective counsel.

**386.** Mr. Loy, in his capacity as a director of LPHI, participated in the concealment of the missing estate assets by failing to report the artifice in process. By this failure of his fiduciary duties to the contrary, actively helps to conceal the criminal activities, bankruptcy code and SEC regulation violations that continue to disgorge the estate.

**387.** *Under 18 U.S. Code § 242 - Deprivation of rights under color of law-states that: Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the 5th Amendment to the Constitution or laws of the United States, ...shall be fined under this title or imprisoned not more than ten years, or both;*

**388.** Mr. Loy, a director for the LPHI, by his failure to perform his fiduciary duties required of her position, and by his failure to force management to produce compliant financial 10Ks, 10Qs and 8Ks for 2015 and 2016 willfully subjects the LPHI estate and thus the victimized investors, forcibly converted to noteholders, to the deprivation of their rights protected by the 5th Amendment to the Constitution.

**389**. JANE C. MORAN *18 U.S. Code § 153 - Embezzlement against estate (a) Offense -A person described in subsection (b) who knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor shall be fined under this title, imprisoned not more than 5 years, or both.*

*(b)Person to Whom Section Applies.—A person described in this subsection is one who has access to property or documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, marshal, attorney, or other officer of the court or as an agent, employee, or other person engaged by such an officer to perform a service with respect to the estate.*

*5 - knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;*

*6 - knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11;*

*shall be fined under this title, imprisoned not more than 5 years, or both.*

**3**. Mrs. Moran, entirely due to her relationship to Trustee H. Thomas Moran, knowingly and fraudulently received a material amount assets from the LPHI estate outside of the prevue of the court and under circumstances indirect violation of *18 U.S. Code § 153(a)(b)(5)(6).* The assets received by ASG, owned by both Trustee Moran and her, are conservatively estimated to be $100 Million. An independent forensic audit of both 2015 and 2016 will enumerate the exact amount.

## Fiduciary Duties

**390.** Because of their positions as officers, directors all the defendants had and continue to have a fiduciary duty of Life Partners and because of their ability to control the business and corporate affairs of LPHI. The Individual Defendants owed and in many cases still owe LPHI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care and remain obligated to use their utmost ability to control and manage Life Partners in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Life Partners and its

shareholders to benefit all shareholders equally and not in furtherance of their own personal interest or benefit.

391. Each officer and director of the Company owes to Life Partners and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's shares would be based on truthful and accurate information.

## Code of Ethics

392. The Company's Code of Ethics for Directors and Executive Officers (the "Code") has been in effect since May 28, 2004.  The Code went well beyond the basic fiduciary duties required by Texas law and applied to all the Individual Defendants.  According to the Code, the Individual Defendants were required to "provide full, fair, accurate, timely, and understandable disclosure to the Company's public communications, including reports and documents that the Company files with, or submits to, the SEC."  Moreover, the Code required the

Individual Defendants to "comply with applicable governmental laws, rules, and regulations."

## Additional Duties of the Audit Committee Defendants:

**393.** In addition to the above duties, under the Company's Charter in effect since June 19, 2009, the Board of Directors, owed specific duties to Life Partners to review legal matters that may have a significant impact on the Company, and review and approve the Company's earnings, press releases, guidance, and quarterly and annual financial statements.  The Audit Committee's Charter provides in relevant part:

## COMPLIANCE

**394.** Cause to be maintained an appropriate regulatory compliance program covering the Company and its subsidiaries to aid compliance with the laws and regulations applicable to senior life settlement companies.

**395.** Review reports of the compliance officer covering the scope and adequacy of the compliance program, the degree of compliance and cooperation, and the implementation of corrective actions (if necessary or appropriate). To date filing for Chapter 11 protection and officers of LPHI have not complied with any regulatory compliance obligations at all.

## INTERNAL CONTROLS and PROCEDURES

396. Review periodically the scope and implications of the Company's internal financial controls and procedures and consider their adequacy. Since filing for protection under Chapter 11 bankruptcy Rules none of the current Directors or Officers of the company have bothered to implement the internal controls and procedures

397. Maintain direct access to the senior staff if useful, require that studies be initiated on subjects of special interest to the Committee. To our knowledge there have not been any compliance with the internal control and procedure requirements.

398. Review the comments on internal control submitted by the outside and internal auditors and ensure that appropriate suggestions for improvement are promptly considered for inclusion into the Company's internal financial procedures.   To our knowledge there has been no compliance at anytime with this provision of internal financial procedures.

## Control, Access, and Authority

399. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Life Partners, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

400. Because of their advisory, executive, managerial, and directorial positions with LPHI, each of the Individual Defendants have access to sensitive, non-public information about the financial condition, operations and growth prospects of LPHI.

## Reasonable and Prudent Supervision

401. To discharge their duties the officers and directors of LPHI are required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Life Partners were required to, among other things:

402. Ensure that the Company complied with its legal obligations and requirements including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public.

403. Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health.

404. Refrain from acting upon material, non-public information to benefit themselves.

(d) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock while operating under Chapter 11 of the U.S. Bankruptcy code.

405. Remain informed as to how Life Partners conducted its operations and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws.

(f) ensure that the Company is operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

## Breaches of Fiduciary Duties

406. Each Individual Defendant by virtue of his or her position as a director and/or officer owe to the Company and to its shareholders, the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of LPHI

concerning the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware of should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants one of which was an officer and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Life Partners's Board members and Trustees and their counsel are culpable herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

407. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design to convert cash and other liquid assets to their benefit. In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

408. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to fail to issue proper financial statements, if any.

409. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual

Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal correct and proper information concerning the Company's operations, financial condition, and future business prospects.

410. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## Summary of the Complaints

411. Mr LaMothe (plaintiff) purchased 652,479 shares of LPHI after this fully solvent company was forced to file Chapter 11 Bankruptcy.  LPHI did so in order to ensure the ongoing operations of the company while developing a strategy to combat the strategically excessive fine (even by the government's own standards) imposed by the SEC for the 2 minor SOX violations committed by LPHI's auditors, Ernst & Young. Ernst & Young's audit partner Peter Cangany disagreed with the 2 minor SOX violations in his deposition.

412. In the weeks leading up to the January 2014, trial in Austin, the Ernst & Young partner in charge of the Life Partners' audit, Peter Cangany, began to express

his displeasure at the way Life Partners was being treated by his company and the SEC, Cangany provided a deposition on behalf of Life Partners and was expected to testify on the company's behalf. However, one week before the trial, he was sent to conduct an offshore audit, thus preventing him from testifying.

413. In January 2015 Life Partners Holdings, Incorporated ("LPHI") filed for Chapter 11 Bankruptcy protection due to an unexpected and grossly excessive $46 Million fine regarding two minor "SOX" violations filed by its auditors, Ernst & Young in LPHI's 2013 SEC Form 10K, and signed off on by senior LPHI officers including Its CEO, CFO and President.

414. The SEC brought the Austin suit asserting egregious "10b5" allegations, allegations of scienter, and allegations of investor fraud and insider trading among others and two minor SOX reporting violations after a contentious three-year investigation. The Ernst & Young "Audit Partner" steadfastly opposed the SEC's allegations.

415. The SEC suit was heard before a jury in the Austin, TX Federal Court, the Honorable Senior Judge Nowlin presiding. After five days of trial the jury retired to deliberate twelve allegations beginning with the more serious allegations and so on down to the two alleged SOX reporting allegations.

416. After two days of deliberation the Jury found for the LPHI parties on the first ten of the twelve questions but found that LPHI and its officers filed a wrongful

SEC Form 10K due to the two SOX violations prepared by its auditors, Ernst & Young.

417. At the beginning of the trial the SEC agreed not to pursue any financial or accounting issues due to time constraints applied to both parties by the Judge at the onset of the trial.

418. Despite the minimal nature of two SOX reporting issues and the pretrial agreement of the SEC, the LPHI attorneys immediately asked the Court to direct the verdict and throw it out as it applied to the two accounting issues.

419. Judge Nowlin declined to take the requested action from the bench but said he would "take care of it". This was in the first few days of February 2014.

420. Neither side heard anything further from the Court until December 2, 2014 when the Judge imposed an unheard of $46 million fine for the minor reporting violations: $38 million against LPHI, $6 million against CEO Pardo and $2 million against In-house attorney and President, Peden. The CFO, Martin settled with the SEC prior to trial for a $36,000 fine and a prohibition against serving as the CFO of any public company for a period of several years.

421. The Court's final order was filed on the last day of service before retirement by Judge Nowlin and his Clerk, Jeb Golinkin. Clerk Golinkin took the unusual step of sending an email on Sunday afternoon (after he was no longer employed by the court) to all parties informing them the Judge had also set the bond.

422. He said the bond was to be $50,000 for the company, $15,000 for Pardo and $10,000 for Peden. *Alerted by the clerk's email*, several SEC lawyers went to a magistrate on that Monday morning and persuaded him to override Judge Nowlin's order – thus successfully preventing any bond from being set. With no bond, the entire $46 million fine was due in full by the end of the week. That same Monday the former Clerk, Golinkin, started work with the Austin, TX office of the large and prestigious law firm of Aiken Gump.

423. Seeing the bond was more appropriate the LPHI parties assumed the fine would certainly be corrected by agreement with the SEC or at the 5th Circuit if necessary(and in fact, the SEC later unilaterally withdrew the $38 million fine against LPHI, but did not remove the excessive fine against Peden and Pardo). However, over the following weeks the Judge's bond order was never entered for unknown reasons. As a result, LPHI was then forced into Chapter 11 Bankruptcy.

424. After receiving the Sunday email from Golinkin LPHI later found out that SEC lead lawyer Jessica Magee and her staff rushed to Austin the following Monday to lobby for a rescission of Judge Nowlin's bond order which was successful. LPHI was unaware of this effort and was patiently waiting in Waco to place the ordered bonds with the Court.

425. Once in Chapter 11 bankruptcy the SEC's Fort Worth Office insisted that a Trustee be appointed to take over the day to day operations of LPHI and its two

operating subsidiaries, Life Partners, Inc and I-PI Financial Services ("LPI" and "LPIF") respectively. The SEC contended this was done not on the grounds LPHI won its case with the SEC, not because it was innocent but rather that the federal jury just didn't understand their case!

426. The management and Board of Directors of LPHI strenuously opposed any change in management. In a five day de facto Section 341 meeting before Bankruptcy Judge Nelms, LPHI's current CFO, Colette Pieper, MMS Advisors, outside investment bankers and others testified that LPHI and its subsidiaries had NO DEBT other than the egregeious SEC imposed fine and had successfully undergone four forensic audits on top of its 15th annual SEC 10K audit!

427. Further, all testified that LPHI was 25 years old at the time with 6,000 shareholders, 32,000 clients, 2,000+ Licensees (sales agents) and had $3.2 Billion under management making it a large and complex company.

428. On April 25, 2016, during a hearing at the Fifth Circuit Court of Appeals, Judge Edith Jones blamed the SEC for causing Life Partners to file for bankruptcy. "What caused LPI to fail? LPI filed bankruptcy shortly after this judgement? Would LPI have gone under otherwise?" she asked. "There is evidence placed in the record by the SEC that the sole reason the bankruptcy was filed was due to the judgement entered by Judge Nowlin in December of 2014," Judge Jones said.

429. "Now let me get to the bottom here," Judge Jones continued. Addressing SEC attorney Benjamin Vetter, she said, *"Because the fact is you tried this to verdict, a gigantic judgement was entered, and they filed Chapter 11.* Would they have gone under as a basis of these <u>alleged</u> misrepresentations?" "We believe the answer to that is yes," said Vetter. "Now again, the Commission did not really have access to,"

430. *"You don't care,"* interrupted Judge Jones. *"You're just charging them a gigantic amount of money so that the people who did have these arrangements are now gonna...lose just about everything either because of the overhead of Chapter 11 or because the company is unable to pursue the investments anymore."* As further evidence to the lack guilt of LPHI Plaintiff has included final orders by both District Court Judges Alia Moses and John McBryde. [*see Exhibits 5 & 6*]

431. The company offered to have a qualified referee oversee the company's operations but pulling management out and inserting someone totally unfamiliar with the company's operations was a recipe for disaster. Ernst & Young's audit partner Cangany spoke to this fact in his deposition. It turned out it was a recipe for the enormous greed driven theft of investment funds from LPHI investors and the literal landslide of negative press driven by Moran and David Bennett with the TK law firm!

432. The Fort Worth Office of the SEC strenuously objected, inferring that there were *potentially* numerous "problems" with management, especially its CEO, Brian Pardo who had become the target of their vicious attacks.

433. Lisa Lambert (a lawyer with the Fort Worth US Trustee's Office) agreed with the SEC and made it known they had the perfect replacement for Pardo already selected - H. Thomas Moran!

434. When the hearing was over Judge Nelms ruled Pardo and others should be removed with a Trustee to be appointed by Lambert. After the hearing Lambert asked for a show of hands of anyone who was a creditor so she could appoint a creditor's committee. No one raised their hand. LPHI had no creditors except the SEC.

435. The SEC explained they could not sit on a creditors committee. Since LPHI had no other creditors Lambert asked for a show of hands of anyone wishing to sit on the creditor's committee even if they were not creditors. Several hands went up and thus the Creditor's Committee was formally empaneled. Litigant is unaware of any historical basis for this move by the US Trustee's Fort Worth Office!

436. Shortly thereafter Judge Nelms approved H. Thomas Moran ("Moran") as the Trustee and Thompson and Knight ("T K") as his lawyers. Moran lied on his SEC Trustee application in that he was not a disinterested party. Far from it, he had been a Licensee (sales agent) in good standing with I-PI for 15 years.

437. After being shown a copy of his signed application Mr. Moran admitted he had signed it and despite *admitting to perjury* Judge Nelms allowed him to continue as Trustee.

438. Shortly after Moran was installed as Trustee for unknown reasons $100 million of insurance policies held in trust were assigned over to Moran with the approval of Judge Nelms! This was nothing more than bold faced theft from the policies in Trust no matter who owned them!

439. Moran was woefully incapable of taking the reins of a $3.2 Billion enterprise, but that did not matter. He had been the trustee of several failed Life Settlement company's which he liquidated, but he had never been engaged in a Chapter 11 proceeding.

440. Within three days of being appointed Trustee Moran shut down the entire operations of LPHI and its subsidiaries. At the same time and thereafter Moran and TK made it known in court filings and public statements that based upon "Information and Belief' there was evidence of a huge scheme orchestrated by Pardo and others that could possibly be the largest, if not one of the largest Ponzi or "Ponzi-Like" or "Ponzi-ish" schemes in the nation.

441. While legally expensive investigations began to get under way by TK and other law firms in March of 2015 (after realizing LPHI was truly a brokerage company patterned after a real-estate brokerage) TK and Moran contended that LPI and LPIF while separate operating companies were actually just more of LPHI and

therefore should be included under the Chapter 11 Bankruptcy blanket. Judge Nelms agreed and it was so ordered.

442. Further, TK and Moran told the court LPHI OWNED the $3.2 Billion of policies in an unrelated Trust. This contention was vigorously opposed by a good many Licensees on behalf of their client's! Judge Nelms agreed to set a hearing to determine ownership based on the Pro Se filing of Peyton Inge who was exceptionally diligent in his motion for a hearing.

443. Inge filed a long very detailed analysis with the Court to substantiate his position. He also analyzed the underwriting success of LPI's senior actuary, Dr. Cassidy which had come under attack by the SEC as being unsubstantiated. When the allegation was first raised by the SEC and in the press in 2010 LPHI hired a second actuarial firm claimed by the SEC to be the "gold standard" of the industry.

444. Peyton Inge proved by an in-depth analysis that LPI's first actuary, Dr. Cassidy was in fact more conservative than the second firm approved by the SEC. At the time of the SEC's insistence that LPN supplant Dr. Cassidy with 21st Services, 21st Services was under investigations for deficiencies in its own actuary estimates. In addition, Mr. Inge concluded in his analysis that Dr. Cassidy's underwriting was more conservative than 21st Services 65% of the time. In fact, although LPI had done as the SEC requested, it continued to utilize the services of Dr. Cassidy as a back-up LE estimate.

445. When the date in early May 2015 for the hearing on ownership approached Judge Nelms abated the hearing. Judge Nelms subsequently reset and abated two additional hearings on the matter and the Trustee Settled with Inge in a sealed, confidential settlement agreement. Judge Nelms never did rule on the ownership issue despite having made clear to a witness in the hearing that LPI DID NOT OWN THE POLICIES.

446. Meanwhile, the Trustee got control of the massive portfolio. This conclusion was reached AFTER, in addition to 15 annual SEC 10K Audits and four forensic Audits of LPHI and the two unrelated Trusts that held client owned polices (one by their own chosen Maryland based audit company) NONE found any problems or irregularities with LPHI's computerized accounting records! For additional key events in the Bankruptcy Court; [see Exhibit 7]

447. The Billions of dollars in assets never showed up on any LPHI accounting documents including all balance sheets and highly detailed assets and liabilities before the bankruptcy. After Moran and TK took control of the company all investor assets were illegally confiscated and approximately two thirds ($2.4 Billion) converted to assets of the Debtor. $1 Billion has yet to be accounted for by the Trustees.

## Conspiracy:

1.   DATE: Early January 2014
2.   PLACE: Waco La Quinta Inn 1-35

3.   PARTIES: Moran with associates, TK (David Bennett & Associates), SEC Lead Attorney Jessica Magee (plus two associates), Lisa Lambert of US Trustee's Fort Worth Office plus several others including MMS Advisors auditors John McPherson and David Hartman, and others!

4.   Purpose: To coordinate the takeover of LPHI immediately after their anticipated ruling of a complete win in the jury trial about to start in Austin and...

5.   To shut the company down once and for all by the SEC action and to siphon as much cash from the portfolio as possible. Estimate: $1 Billion+ missing and/or unaccounted for!

448. While the timing relating to the conversion of hundreds of millions of dollars held in the Client Accounts did not occur as early as the conspirators expected it to it did begin 11 months later and continued unabated for two years thereafter. No substantive financial SEC Form 10K financial statements were ever filed during the first two years and continuing thru to the present, five financial years after entering Bankruptcy.

**Fraudulent Conversion:**

449. Beginning almost immediately after Moran and TK took physical control of the Debtor, Moran and TK began to loot the Debtor. They realized, however that they had to keep the company going to successfully pull out large sums of money.

450. First, they kept two senior financial and operations officers: Collette Pieper continued as Chief Financial Officer and Mark Embry, Chief Operating Officer. There remained many other key employees most of which would have to have been involved in any alleged fraudulent schemes as alleged by Moran and TK.

451. Curiously, Colette Pieper suddenly resigned along with the company's auditors (MMS Advisors) in May of 2016. This was the date the 2015 annual 10K audit was scheduled to be filed with the SEC. It was never filed, nor were audits filed for 2016, 2017, 2018 or 2019!

452. In the first calendar quarter of 2015 Moran and TK used the Debtor to borrow $50 million from a related party at an 11% annual interest rate (in a 2% market).

453. They pledged $2 Billion of investor owned assets (insurance policies held in trust). It is estimated that at least half of the funds borrowed were used to pay exorbitant and self-serving legal fees!

454. Next, Moran and TK "Optimized" the premiums on all the policies in the Trusts. They criticized LPHI for not having done this sooner. However, Optimization is just another word for borrowed! They took out a loan against the portfolio for $200+ million!

**455.** These funds were never properly accounted for and were converted to operating cash to the Trustee and "legal fees"! In addition, this extra layer of debt against the policies caused their value at maturity to drop immensely!

**456.** There has never been an accounting compliant with FASB criteria (if at all) concerning where the $200 million in debt proceeds went. We do know that the pursuit of frivolous lawsuits was partly paid for from undisclosed funds.

**457.** We also know that fraudulent legal billing practices such as adding unearned Legal hours available on various partner time sheets was a common and pervasive practice at TK and other large legal firms. At TK for instance, when an LPHI hearing was scheduled for a certain date David Bennett thru his paralegal checked partners' billing hours for open, available time and added them to the billing for that hearing.

**458.** Other methods of Conversion of the debtor's estate funds varied as widely as one would imagine. Moran literally employed his entire company and his wife's billing for time, travel from Oklahoma, bonuses and topflight accommodations and food for his employees who had no "real" role in the management of the Debtor.

Upon receiving one $5.5 million advance in fees Moran explained it away by saying he did not get the money. Rather, he gave it away as "bonuses" to his wife's employees!

**459.** Conservatively, more than $250 million was drained from LPHI coffers along with hundreds of millions more diverted from operations deposited into one or more of the 14 bank accounts used by the Trustee before disappearing into the void.

## **INTENTIONAL FAILURE TO OPERATE ESTATE AS CHAPTER 11 DEBTOR:**

**460.** All allegations, facts and dicta contained in Count One are hereby reasserted and are reincorporated as part of Count Two!

**461.** "Exchange Act Reporting and Disclosure requirements continue to apply in bankruptcy (specifically a Chapter 11 and turnaround professionals must take them into account in managing a case to a successful conclusion." SEC Form 8K is used not only for disclosure of accounting rules but for any information that may be of importance to securities holders!

**462.** To confirm a plan of reorganization the bankruptcy code requires both creditors (if any) and equity holders to approve the Plan of Reorganization. In this case equity holders were not allowed to participate in the process in any way.

**463.** From the moment Moran/TK took control of LPHI they had every intention of liquidating the company and immediately started along that path. They ignored the fact that LPHI had been a NASDAQ National Market company since

going public in 2000 after operating as a privately held family owned company for 10 years before "going public", a status held for an additional 15 years!

464. In fact, Lisa Lambert (a co-conspirator) ruled without apparent authority under color of law that the shareholders had no equity due to a "negative net worth" while at the same time participating in the scheme to transfer more than $2 Billion worth of net death benefit proceeds to LPHI creating roughly $1.5 Billion of NET WORTH to the debtor vs liabilities of $500 million in 15 year, low interest notes ultimately confirmed by the Plan of Reorganization in December 2016.

465. Yet, Judge Nelms, Trustee Moran and Bennett knew in November of that year a final order dated November 6, 2016 had been entered by Federal Western District Judge Alia Moses clearing via Summary Dismissal a shareholder derivative suit containing all adverse claims against all of the Directors of LPHI, including Pardo and Peden.

466. The claims in that suit were substantially identical to claims asserted by Moran and TK against Pardo, Peden and the Directors of LPHI. Bennett contacted Judge Moses prior to her order claiming the order could not be filed because the company was under the umbrella stay of the bankruptcy.

467. Judge Moses soundly rebuffed Bennett and filed the Order. Yet, the plan, a convoluted 376 pages of legalese, was finally approved on the third attempt under suspicious circumstances one month after the Del Rio Court ruling.

468. Nor, did Judge Nelms or Trustee Moran and Bennett take any aspect of Judge Moses' order under consideration when they continued to file their many Ponzi-like claims they so recklessly asserted against Pardo, Peden and the Directors of LPHI.

469. It was imperative for the co-conspirators to continue their devastating allegations to divert attention away from themselves in order to pull cash out of the Estate without oversight especially when the $1.5 Billion never showed up on LPHI's balance sheet or any other financial reports.

470. Had LPHI (post-bankruptcy filing) been compliant with SEC financial reporting obligations their scheme would never have worked!

471. Currently, LPHI has over $90 million cash on hand! This fact alone would beg the question, "Why has LPHI not been released from Bankruptcy?" Indeed, "legal expenses" have continued at the rate of just over $5 Million per quarter - on what?

472. It is not in the best interests of the shareholders nor anyone else - except the lawyers - to continue to pursue cases they cannot and will not win. Even if they were to win, they still will have to collect.

473. On one occasion the Chairman of the Board of Directors, Bert Scalzo, along with the rest of the board members authorized a $25 million advance to TK for

the purposes of negotiating settlements with many of the 860 licensees they unsuccessfully sued. The ultimate return for this advance according to Scalzo was $32,000!

## 5th & 8th AMENDMENT CIVIL RIGHTS VIOLATIONS

**474.** All allegations, facts and dicta contained in Counts One and Two are hereby reasserted and reincorporated as part of Count Three.

**475.** The Bill of Rights to The United States Constitution was adopted on December 15, 1791 by our Forefathers to more clearly set out the rights of United States Citizens. To this day, thank the Lord, all Americans hold these rights as God given, precious and applicable to each and every citizen of the United States of America.

**476.** The 5th Amendment requires that *"due process of law"* be part of any proceeding that denies a citizen "life, liberty or property". Thus the 5th Amendment *guarantees in part that the Government cannot "take" property (such as land, money and any other things of value) without due process of law in a court of competent jurisdiction.*

**477.** Acting under the color of law Lisa Lambert and thereby the US Trustees' Office violated the civil rights of all shareholders of record when she denied the right of LPHI shareholders to form an Equity Holders Committee to participate in the reorganization of the debtor.

**478.** Even more egregious, Ms. Lambert unilaterally cancelled the share without official notification to the SEC and Without Notice in any form to the shareholders.

**479.** As incredible as it now seems the roughly 6,000 public shareholders of a 25 year old company with no commercial debt files for Chapter 11, Debtor-in-Possession and on the word of one staff attorney (with no formal training in Public Accounting) from the Fort Worth office of the US Trustee's Regional Office boldly says these Shareholders, each and every one of them cannot be represented by an Equity Holders Committee!

**480.** As a participant in the Conspiracy Attorney Lambert acted illegally and fraudulently to protect the conspiracy, she herself was a part of!
Trustee Moran, TK and David Bennett and Judge Russel Nelms aided and abetted this violation of LPHI Shareholders rights to form an Equity Holders Committee!

**481.** Therefore, the above-mentioned abettors are as guilty as Lisa Lambert. Judge Nelms particularly knew or should have known shareholder civil rights were crushed under the heel of an aggressive government pursuit of a company forced into bankruptcy thru a legal sleight of hand due to a desire to prevail when the fact set used to uphold their position could not be supported by the evidence in prior judicial rulings.

**482.** With this in mind, Jessica Magee and her staff under the color of law violated the 8th Amendment rights of LPHI and it Equity holders by seeking and extracting a massive fine of $46 million for a meaningless infraction by LPHI's Auditors which had no monetary effect on the financial statement of LPHI.

**483.** While dropping the fine to the company just prior a US Supreme Court ruling knocking down excessive administrative fines SEC Lead Lawyer Magee however, did not drop the outrageous fines of Pardo ($6 million) and Peden ($2 million) just for signing the financial report placed before them by their auditors: Ernst & Young, the largest audit firm in the world.

**484.** This omission supports scientor on the part of Jessica Magee and her overzealous staff.

**485.** Therefore, SEC attorney Magee and her legal staff should be held legally responsible for their violations of the aforementioned Civil Rights of LPHI Equity holders; and individuals Pardo and Peden.

**486.** Litigant LaMothe's efforts to secure transparency thru legally required reporting rules and regulations as set forth above, has been ridiculed and demeaned as "baseless", "factually frivolous", "non-sensical" and "seek vexatious relief from parties with no authority or ability to act".

**487.** Yet, Litigant LaMothe will show free cash on hand within the 14 separate bank accounts was reported to be approximately $108 million with all maturities and premiums paid current as of 12/31/19!

**488.** Lastly, Trustee Moran, himself ordered a forensic audit of LPHI's 2014 fiscal year. The cost was $370,000. The firm he called upon, MMS Advisors thereafter called upon Audit Partners David Hartman and John McPherson to conduct the audit, which they did finding no fault with LPHI's Audited Annual Financial Statements; SEC Form 10k and four immediately preceding the annual forensic audits LPHI included with its SEC Form 10K filings over the previous four years (2011 - 2014) inclusive.

**489.** The SEC requires the filing of SEC Form 8K's within 10 days of any major financial event or an event that could materially affect the finances of the company. Mr. Moran, as sole Director or Officer of both LPHI and LPI was obligated to file these disclosures!

**490.** Yet, he filed no such disclosure when Judge Nelms, by pre-planned refusal, failed to rule that the $2 Billion of assets transferred to the Debtor increased the company's net worth from $28 million to over $1.5 Billion! ($1 Billion short of the investor assets confiscated)

**491.** Not one of the Board Directors contacted the SEC and reported the obvious disregard for SEC mandated financial reporting requirements or any other

obvious irregularities in the accounting system disregarding Securities laws to do so.

492. Nor did those Board Directors contact the Justice Department to report the obvious criminal activity happening right in front of them. Yet, they knew or should have known allowing themselves to be controlled by Moran and TK would more than likely undercut their role to act as an independent Board of Directors.

## **PRAYER**

493. Therefore, Plaintiff hereby requests that the court thereby orders an immediate forensic audit be undertaken of all the books and financial records of LPHI, LPI and LPIS to be undertaken immediately.

494. In addition, Plaintiff requests a similar forensic audit of the policy portfolio in order to accurately determine the total losses that have occurred to and/or are related to the policy portfolio using the last financial reports produced g prebankruptcy by LPHI as the starting point.

495. The Financial Analysis was performed to provide a credible and reliable set of growth projections. These projections have been calculated based on the financial statements and operating results for LPHI as obtained from the LPHI 10Ks submitted by the former management team at LPHI for the years 2008, 2009 and 2010 prior to the bankruptcy.

## FINANCIAL ANALYSIS

1. Damages sought directly due to the Bankruptcy Corruption - $5,309,347,166

2. Punitive Damages sought - $7,964,020,749

3. Civil Rights Damages sought - $10,618,694,332

Plaintiff hereby requests the court order payment as set out in numbers 1,2 and 3 for the damages imposed individually and severely in the amounts stated herein. Further that this court orders the estate be reimbursed for all funds wrongfully taken from the debtor and used either illegally or absconded with and for any other relief that the court finds equitable in this case. *(see Exhibit 8- Financial Analysis)*

EXHIBITS:

1. Jury finds against SEC on Most Claims..

2. Predatory Offer to Purchase

3. DOJ Officials Protest $28 Million Bill (for Trustee Moran)

4. Final Order- Honorable Judge Alia Moses

5. Final Order- Honorable Judge John McBryde

6. Detailed List of Specific Events in Bankruptcy Court

7. Financial Analysis of performance and losses incurred

8. Matrix of defendant violations

Respectfully Submitted

Michael R. LaMothe, Pro Se

## CERTIFICATE OF SERVICE

The undersigned certifies that he served all related parties requesting notice in this case with a copy of the foregoing response via email on the date of this filing to the court If a party of interest did not receive a copy of this response, I will forward such a copy via email, US. Postal Service or via facsimile upon the receipt of the preferred mode of delivery and corresponding email address, mailing address or facsimile number, to the recipient upon receipt of the request and contact information.

/s/ Michael LaMothe, Pro Se



Home » Jury Finds Against SEC On Most Claims In Financial Fraud Case

# Jury Finds Against SEC On Most Claims In Financial Fraud Case

February 05, 2014 by T. Gorman

The jury in *SEC v. Life Partners Holdings, Inc.,* Civil Action No. 1-12-cv-00033 (W.D. Tx. Verdict Feb. 3, 2014) rejected most of the Commission's claims which centered around an alleged financial fraud. This is one of a series of recent set-backs the SEC has suffered in the courtroom.

ainst Nasdaq traded Life Partners Holdings, Inc. and its chairman ng with president and general counsel, Scott Peden, among others. the defendants misled shareholders by failing to disclose that the company was systematically and materially underestimating the life expectancy estimates it used to price transactions.

Most of the revenue of the company is derived from brokering life settlements which involve the sale of fractional interests of life insurance policies whose value is keyed to the insured's life expectancy. For this purpose the company used life expectancy estimates provided by a doctor with no actuarial training or prior experience in this area, according to the complaint. No meaningful due diligence was conducted to determine if the doctor's methodology and qualifications were appropriate.

The complaint claimed the two officers were aware that the estimates were systematically and materially short. Nevertheless, between February 2007 and January 2009 Messrs. Pardo and

Peden sold, respectively, about $11.5 million and $300,000 of Life Partners common stock based on inside information "that the firm's stock price was dependent on its practice of systematically using materially short . . ." life expectancy estimates, according to the complaint. The Commission also claimed that from fiscal year 2007 through the third quarter of fiscal 2011 the company prematurely recognized revenue and understated impairment expense related to its investment in life settlements. Violations of Exchange Act Section 10(b), 13(a), 13(b)(2)(a) and 13(b)(5) and Securities Act Section 17(a) were alleged. The complaint also demanded the repayment of certain stock sales profits and bonuses under SOX.

Prior to jury deliberations the parties disagreed on the precise scope of the claims being advanced by the SEC. Defendants sought the entry of a judgment in their favor based in part on a contention that the Commission "failed to introduce any evidence at trial to support any of its revenue recognition claims . . ." The Court rejected that motion and presented the then existing claims for consideration by the jury. Those claims were summarized by the Court in the instructions. There jurors were told to consider nine specific claims (grouping the aiding and abetting charges together with the primary claim for purposed of brevity):

1) Securities fraud under Exchange Act Section 10(b) against the three defendants for making material misstatements regarding "a material risk to the Company's business . . . or a material trend impacting the Company's reserves . . ." The jury rejected this claim.

2) Insider trading against the two individual defendants. The jury rejected this claim.

3) Securities fraud under Securities Act Section 17(a) against the three defendants for making misrepresentations or omissions "regarding the company's revenue recognition policy." The jury found in favor of the SEC as to each defendant.

4) Section 13(a) and Rules 12b-20, 13a-1 and 13a-13 against the company (and aiding and abetting violations by the individuals) for filing "Forms 10-Q, 10QSB, 10-K and 10-KSB with the SEC that contained false statements . . ." The jury found in favor of the Commission on these claims.

5) Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) as to the company (and aiding and abetting as to each individual defendant) for failing "to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that . . ." transactions were recorded as necessary and such that the firm could maintain accountability of its assets. The jury found against the SEC on these claims.

6) Exchange Act Section 13(b)(5) as to the two individual defendants for either falsifying the books and records of the company, circumventing its internal controls or failing to implement a system of internal accounting controls. The jury rejected the SEC's claims.

7) *Exchange Act Rule 13b2-1 as to the two individual defendants for falsifying "any book, record or account . . ."* of the firm. The jury rejected these claims.

8) Exchange Act Rule 13b-2 against each individual defendant for making a false or misleading statement "to an accountant in connection with (i) any audit . . . . or (ii) the preparation or filing of any document or report required to be filed with the Commission." The jury found against the SEC on these claims.

9) Exchange Act Rule 13a-14 against Mr. Pardo for certifying a report of the firm filed with the *Commission that contained a misrepresentation or omission. The jury found in favor of the* Commission on this claim.

According, the jury found against the SEC on six of nine claims and in its favor on three. The jury rejected the primary fraud claim against the defendants which was based on alleged misstatements or omissions regarding essentially the business model of the company and the related insider trading charges while concluding that the defendants made a filing with the Commission which misrepresented the revenue recognition policy of the business. *Life Partners* is the fifth case in which the Commission has lost either all or the key claims at trial *since late December 2013 – less than sixty days.*

Posted in SECActions Tagged with: financial fraud, jury, secactions, trial loss

## Twitter

## Search SEC Actions

Go

## About:

Thomas O. Gorman
Dorsey and Whitney LLP
1801 K Street NW, Suite 750
Washington, DC 20006
202-442-3000
gorman.tom@dorsey.com

EXHIBIT 2

2



Life Partners

004556

Provident Trust Group Llc Fbo DavidM Leeman
10010 Silver Creek Rd
DALLAS TX 75243-4614

Plan Managers
Computershare Trust Company, N.A.
PO Box 43011
Providence RI 02940-3011
Within USA, US territories & Canada 800 546 5141
Outside USA, US territories & Canada 781 575 2765
www.us.computershare.com/employee

Holder Account Number

C0000076708

13.3¢/Invested Dollar

Offer Deadline: 5:00 pm EST, on December 17, 2018

LIFE SETTLEMENT LIQUIDITY OPTION, LLC
an entity managed by Anchorage Capital Group, L.L.C.

**Attn: Position Holder Trust and the Life Partners IRA Holder Partnership, LLC Unit Holders ("Unit Holder")**

You are receiving this letter and the enclosed materials because you are a holder of IRA Partnership Interests issued by Life Partners IRA Holder Partnership, LLC. The Partnership, and its affiliate Life Partners Position Holder Trust, were formed under a bankruptcy plan of reorganization to satisfy the claims of creditors holding fractional interests in life insurance policies on third parties marketed by affiliates of Life Partners Holdings.

Life Settlement Liquidity Option, LLC is offering to purchase up to 225,563,910 Partnership Interests for a cash price of $0.133 per Interest. Our tender offer presents an opportunity to holders of Partnership Interests to receive cash for their Interests now, rather than wait for possible distributions from the Partnership in the future. Based upon the records provided to us by the Partnership, if you tendered all of your interests you could receive a cash payment in the amount indicated below.

| Number of Partnership Interests: | 45,311 |
| --- | --- |
| Cash You Could Receive if You Tendered All Your Interests: | $6,026.36 |

Life Settlement Liquidity Option, LLC is a wholly owned subsidiary of Anchorage Illiquid Opportunities Master VI (B), L.P., both of which are managed by Anchorage Capital Group, L.L.C. As of June 30, 2018, Anchorage Capital Group, L.L.C. had approximately $16.5 billion of assets under management, including assets of the Anchorage Illiquid Opportunities VI funds and other investment funds managed by Anchorage Capital Group, L.L.C.

Enclosed with this letter, you will find:

* An Offer to Purchase, which describes the terms and conditions of tender offer, and contains other important information about the offer.
* The Partnership's Solicitation/Recommendation Statement on Schedule 14D-9, which contains the position of

2 L T R                    L P L T

58XV6D

OFFER TO PURCHASE FOR CASH UP
TO 225,563,910
IRA PARTNERSHIP INTERESTS OF
LIFE PARTNERS IRA HOLDER PARTNERSHIP, LLC
$0.133 PER INTEREST IN CASH
BY LIFE SETTLEMENT LIQUIDITY OPTION, LLC

ASSIGNMENT FORM

| IRA Holder Partnership Beneficiary | |
|---|---|
| Name: | Provident Trust Group Llc Fbo DavidM Leeman |
| Title: | |
| *Signature:* | |
| Date: | |
| Tax Identification Number: | |
| Email Address: | |
| Telephone Number: | |
| Co-Owner (if applicable) | |
| Name: | |
| *Signature:* | |
| Date: | |
| Tax Identification Number: | |

| Number of IRA Partnership Interests (Interests) | |
|---|---|
| Number of Interests Held: | 45.311 |
| Number of Interests Being Tendered, Sold and Assigned: | |

*Note: Only an IRA custodian, and not the beneficiary, may sign this Assignment Form on behalf of an individual retirement account.*

*If you execute this Assignment Form, but do not specify the number of Interests to be tendered, sold and assigned, you will be deemed to have elected to tender, sell and assign all of the Interests that you own.*

TO THE HOLDERS OF IRA PARTNERSHIP INTERESTS:

This Assignment Form is to be used to participate in the Offer of Life Settlement Liquidity Option, LLC (referred to as Offeror) to acquire up to 225,563,910 IRA Partnership Interests (referred to as "Interests") of the Life Partners IRA Holder Partnership, LLC (referred to as the "Partnership") for a cash amount of $0.133 per Interest. By signing this Assignment Form in the place(s) provided above, you are agreeing to tender, sell and assign to Offeror the number of Interests that you specify above (or if you do not specify a number of Interests, all of the Interests that you hold) to Offeror. In order to receive payment for your Interests, your executed Assignment Form (and any other required documents) must be received by the Depositary for Offer no later than December 17, 2018. You should also complete a Substitute Form W-9, in the form provided, or other appropriate tax form to prevent backup withholding. See paragraph 6 below.

C0000076708

Scan COY LPLT Corp Actions Vol CC000076708



02XV7G

The Assignment Forms and any other required documents should be sent or delivered by each holders of Interests to the Depositary as follows:

*The Depositary for the Offer is:*

<table>
<tr><td align="center"><u>If delivering by mail:</u><br>Computershare Trust Company, N.A.<br>Attn: Corporate Actions<br>P.O. Box 43011<br>Providence, RI 02940</td><td align="center"><u>If delivering by overnight or courier:</u><br>Computershare Trust Company, N.A.<br>Attn: Corporate Actions<br>250 Royall St — Suite V<br>Canton, MA 02021</td></tr>
</table>

DELIVERY OF THE ASSIGMENT FORMS TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE WILL NOT CONSTITUTE A VALID DELIVERY TO THE DEPOSITARY.

Delivery will be deemed made only when actually received by the Depositary. If you plan to make delivery by mail, we recommend that you deliver by registered mail with return receipt requested and obtain proper insurance. In all cases, sufficient time should be allowed to ensure timely delivery. Holders of Interests have the responsibility to cause the Assignment Forms and any other documents required by us to be delivered in accordance with the Offer.

Questions and requests for assistance or for additional copies of this Offer to Purchase and the Assignment Forms may be directed to the Information Agent at the telephone number and location set forth below.

*The Information Agent for the Offer is:*

Georgeson

1290 Avenue of the Americas, 9th Floor
New York, NY 10104

Call Toll-Free: (866) 767-8986

## Item 1.   Subject Company Information.

The names of the subject companies are (i) Life Partners Position Holder Trust, a trust organized under the laws of the State of Texas (the "Position Holder Trust" or the "Trust") and (ii) Life Partners IRA Holder Partnership, LLC, a Texas limited liability company ("IRA Partnership" or "Partnership"). The principal executive offices of the Trust and the Partnership are located at 2001 Ross Avenue, Suite 3600, Dallas, Texas, and the telephone number at that address is (214) 698-7893. The management and affairs of the Trust are conducted by a trustee, and the management and affairs of the Partnership are conducted by a manager. Mr. Eduardo Espinosa is both the trustee of the Trust and the manager of the Partnership. The class of securities to which this Schedule 14D-9 relates are position holder trust interests (the "Trust Interests") of Life Partners Position Holder Trust and the partnership interests (the "Partnership Interests") of Life Partners IRA Holder Partnership, LLC. The Trust Interests are represented by units of beneficial interest in the Trust. The Partnership Interests are represented by units of the Partnership. The Trust Interests and the Partnership Interests are sometimes together referred to as the "Interests." As of June 30, 2018, there were 1,223,686,156 Trust Interests outstanding and 748,438,237 Partnership Interests outstanding.

## Item 2.   Identity and Background of Filing Person.

The Trust and the Partnership are the persons filing this Schedule 14D-9. This is the response of the Trust and Partnership to the tender offer (the "Offer") submitted to holders of Trust Interests and Partnership Interests by Life Settlement Liquidity Option, LLC, a Delaware limited liability company ("Offeror" or "Purchaser"), to purchase up to 150,375,940 of the outstanding Trust Interests and up to 225,563,910 of the outstanding Partnership Interests, as disclosed in a Tender Offer Statement on Schedule TO filed by Purchaser with the Securities and Exchange Commission ("SEC") on November 13, 2018 (the "Schedule TO").

Offeror was formed for the purpose of acquiring the Interests in this Offer. Offeror is a Delaware limited liability company that serves as an investment vehicle and, to date, has engaged in no activities other than those incident to its formation and the Offer. Anchorage Illiquid Opportunities Master VI (B), L.P., a Cayman Islands exempted limited partnership ("Parent"), is an investment fund and the sole member of Offeror. Anchorage Capital Group, L.L.C. ("ACG"), an investment adviser registered with the SEC, is a Delaware limited liability company and is the investment manager of Parent and Offeror. Anchorage IO GP VI, L.L.C., a Delaware limited liability company ("AIO GP VI"), is the general partner of Parent.

The business address of ACG is 610 Broadway, 6th Floor, New York, New York 10012, and the business address of Offeror and AIO GP VI is c/o Anchorage Capital Group, L.L.C., 610 Broadway, 6th Floor, New York, New York 10012. The telephone number there is (212) 432-4600. The business address of Parent is Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands, and the telephone number there is (345) 814-7600.

## Item 3.   Past Contracts, Transactions, Negotiations and Agreements.

On November 13, 2018, the Trust and Partnership entered into a Notice of Assignment and Assumption, and Indemnity Agreement ("Assignee Agreement") with Life Settlement Liquidity Option, LLC ("Assignee"). The Trust and Partnership agreed to recognize and record the assignment of the tendered Interests accepted by Assignee immediately following the closing date. Also pursuant to the Assignee Agreement, the Assignee agreed to indemnify, defend and hold harmless the Trust, Partnership, the Trust board members, the trustee, the manager, Akerman LLP, Vida Capital, Inc., Magna Servicing LLC and their respective affiliates and the respective attorneys, agents, representatives, contractors and services from and against any and all claims, losses, liabilities, costs, expenses, obligations and damages, including reasonable attorneys' fees and disbursements under certain circumstances. Other than the Assignee Agreement, the Assignment Form for Position Trust Interests and the Assignment Form for IRA Partnership Interests, there are no material agreements, arrangements or understandings between the Trust, the Partnership or their affiliates and Offeror, Parent, ACG or their affiliates.

1

**Item 4.    The Solicitation or Recommendation.**

The Trust and the Partnership express no opinion and are remaining neutral toward the Offer. Neither the Trust Interests nor the Partnership Interests are listed or traded on any exchange or any over-the-counter-trading platform. Accordingly, neither the Trust nor the Partnership are able to provide Interest holders a basis to determine an appropriate market price for their Interests and therefore express no opinion as to whether Interest holders should accept or reject either Offer. Interest holders should read the entire Schedule TO and consult with their financial, tax, legal, and other professional advisors before deciding whether to accept or reject the Offer.

**Item 5.    Persons/Assets, Retained, Employed, Compensated or Used.**

None of the Trust, the Partnership nor any person acting on their behalf have employed, retained or compensated, or intends to employ, retain or compensate, any person to make solicitations or recommendations regarding the Offer.

**Item 6.    Interest in Securities of the Subject Company.**

To the best knowledge of the Trust and Partnership, after due inquiry, neither the Trust nor the Partnership nor any of its directors, affiliates or beneficial owners of 10% or more of either entities' outstanding Interests have engaged in any transaction in either entities' securities during the past 60 days.

**Item 7.    Purposes of the Transaction and Plans or Proposals.**

The Trust and the Partnership express no opinion regarding the purpose of the Offer. The Trust and the Partnership are not, in any manner, altering their plans or proposals in response to the Offer. The Trust and the Partnership have no reason to question the information set forth in Purchasers' Schedule TO.

**Item 8.    Additional Information.**

Not applicable.

**Item 9.    Exhibits.**

| Exhibit No. | Description |
| --- | --- |
| (e)(1) | Assignee's Notice of Assignment and Assumption, and Indemnity Agreement — Tender Offer, dated November 13, 2018, by and among Life Settlement Liquidity Option, LLC and Life Partners Position Holder Trust and Life Partners IRA Holder Partnership, LLC (incorporated by reference to Exhibit (d) to the Schedule TO filed by Life Settlement Liquidity Option, LLC and Anchorage Illiquid Opportunities Master VI (B), L.P., dated November 13, 2018 (the "Schedule TO")) |
| (e)(2) | Assignment Form for Position Holder Trust Interests (incorporated by reference to Exhibit (a)(1)(B) of the Schedule TO) |
| (e)(3) | Assignment Form for IRA Partnership Interests (incorporated by reference to Exhibit (a)(1)(C) of the Schedule TO) |

## SIGNATURE

After due inquiry and to the best of its knowledge and belief, the undersigned certifies that the information set forth in this statement is true, complete and correct.

LIFE PARTNERS POSITION HOLDER TRUST

Dated: November 13, 2018

By:  /s/ Eduardo S. Espinosa
_____
     Eduardo S. Espinosa, Trustee

LIFE PARTNERS IRA HOLDER PARTNERSHIP, LLC

By:  /s/ Eduardo S. Espinosa
_____
     Eduardo S. Espinosa, Manager

3

EXHIBIT 3

# Department of Justice Officials Protest $28 Million Bill From Life Partners Bankruptcy Leader

Officials say H. Thomas Moran II is only entitled $1,338,900 for guiding life-settlements firm through chapter 11

By
*Katy Stech*
Updated March 8, 2017 9:53 p.m. ET

Justice Department officials are protesting the $28 million bill submitted by H. Thomas Moran II, who guided Life Partners Inc. through chapter 11 bankruptcy.

In court papers, officials said Mr. Moran's compensation agreement entitled him to be paid up to $300 an hour for protecting investments for Life Partners' roughly 22,000 customers. Using that rate, his compensation should be $1,338,900 instead, the officials said in an objection in U.S. Bankruptcy Court in Fort Worth, Texas.

Mr. Moran took over Life Partners' operations in Waco, Texas, after the life-settlements firm's parent company filed for bankruptcy in January 2015. He ultimately came up with a plan that enabled Life Partners customers to either cancel or keep their investments in about 3,400 life insurance policies worth a total of $2.4 billion.

Through Life Partners, a life-insurance policyholder sold his or her policy at a discount to an investor for immediate cash. Life Partners brokered the transactions for a fee. Buyers of the policies continued paying the premiums, hoping to profit when the insured person died and the policy paid out.

Mr. Moran and his team spent thousands of hours speaking with customers, many of whom are older and have little expertise in the life-settlement industry. U.S.

Bankruptcy Court Judge Russell Nelms said in June that the Life Partners bankruptcy was "probably the most difficult case that I've worked on in my entire life."

In January, Mr. Moran submitted a bill for more than 4,460 hours worked, proposing to be paid over time from policies that were abandoned before Life Partners' parent company filed for bankruptcy protection. The proposal drew criticism from Justice Department officials who monitor lawyer compensation in federal bankruptcy cases.

Judge Nelms agreed to look over Mr. Moran's request at a hearing this Thursday.

David Bennett, Mr. Moran's lawyer, declined to comment on the objection. However, in earlier court papers, he said the requested pay is "comparable to compensation paid to officers and key executives in other large, complex bankruptcies."

Life Partners was founded by longtime Chief Executive Brian Pardo in 1991. Federal regulators in 2012 accused the firm of using unrealistic life-expectancy projections, which customers relied on to choose policies in which to invest.

Corrections & Amplifications
Judge Russell Nelms agreed to look over H. Thomas Moran II's request at a hearing this Thursday. An earlier version of this article incorrectly stated the day the judge would hear the dispute. (March 8, 2017)
Write to Katy Stech at katherine.stech@wsj.com

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### DEL RIO DIVISION

NOV 0 6 2015

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

| | | |
|---|---|---|
| IN RE LIFE PARTNERS HOLDINGS, | § | Consolidated |
| INC. SHAREHOLDER DERIVATIVE | § | Case No. DR-11-CV-43-AM |
| LITIGATION | § | |
| | § | |
| This document relates to: | § | |
| All actions | § | |

## ORDER

Before the Court is the Defendants' converted motion for summary judgment. (ECF Nos.

41, 43, 47, 229.) For the following reasons, the Defendants' motion is **GRANTED**.

## I.   FACTUAL BACKGROUND

This lawsuit was brought by shareholders of Life Partners Holdings, Inc. (LPHI), a

publicly traded company that conducts its business operations through a subsidiary called Life

Partners, Inc. (LPI, and collectively with LPHI, Life Partners).  LPI facilitates secondary sales of

life insurance policies.  An insured nearing the end of his life expectancy sells his policy to LPI

at a significant discount to its face value in order to realize some of the benefits before he dies

and the policy matures.  LPI then turns around and resells fractional interests in the policy at a

markup to retail investors, who will receive a pro rata share of the death benefits upon maturity.

Future premiums are factored into the cost of the investments, based on LPI's own estimate of

the insured's life expectancy; if the insured outlives LPI's estimate, the retail investors pay the

additional amounts to maintain the policy.  (Report on the Independent Directors' Review of the

Derivative Claims Ex. 8 ¶ 12, ECF No. 42-3.)  Some policies Life Partners holds until maturity

for its own account, but the focus is marketing them to other investors.  At first, LPI sold shares

in policies that covered AIDS patients—investment products called "viatical settlements"; by

The Plaintiffs also take issue with the Committee's treatment of the insider trading claims against Pardo and Peden,[23] which they contend was so superficial "that it is a stretch to call it an investigation at all," pointing out that "[t]he Report dispenses with the allegations against defendant Pardo in a single paragraph." (Pls.' Opp. to Defs.' Mot. to Dismiss at 36–37.) The Plaintiffs alleged that both executives sold shares ahead of the collapse of LPHI's stock price with knowledge that the estimates were indeed short and that the public disclosure of that fact would hurt the company's business. The Outside Directors refuted the claims by pointing to the timing of the stock sales. Pardo last sold shares in January 2009, Peden in June 2007. (Report at 39, 40–41.) Since they did not learn about the short estimates issue until the Stern letter in mid-2010, they could not have traded on the basis of this material, non-public information. (*Id.*) The Plaintiffs object that senior management was on notice of the short estimates issue as early as May 2007, when the Colorado securities suit was initiated. (Pls.' Opp. to Defs.' Mot. to Dismiss at 36–37.) But the Colorado suit challenged the accuracy of estimates on LPI's viaticals, and what matters here is when they first learned that the estimates attached to LPI's life settlements might also be materially and consistently short, that the problem had not been fixed by abandoning viaticals—which was not until mid-2010. The Committee found the essential facts and performed a legal analysis in which the conclusion follows validly from the premises. The inquiry, though brief, was not legally insufficient.

When independent directors are shown to have conducted an inquiry that is reasonably thorough and complete, it is of little use to point to their initial impressions as proof of bad faith. *Borchardt v. King*, No. 1:10CV261, 2015 WL 410408, at *13 (M.D.N.C. Jan. 29, 2015). The Plaintiffs point to the Outside Directors' initial reaction to the Stern letter and December *Journal*

---

[23] The Plaintiffs neglected to challenge the Committee's inquiry into the improper dividends, which found that they were all properly authorized, *id.* at 28–29; so the decision not to pursue that claim is presumed to have been made in good faith after a reasonably inquiry.

article as stone throwing to argue that "the review was tainted by the Outside Directors' skepticism." (Pls.' Opp. to Defs.' Mot. to Dismiss at 18–20, 27, 29.) But skepticism is not bad faith. The Outside Directors were initially skeptical toward the allegations because they believed they lacked adequate supporting evidence and were too speculative. (Dewald Dep. 58:10–23, 60:4–9; Rafuse Dep. 85:2–4; *but cf.* Rafuse Dep. 109:21–25 (testifying that "we wanted to do this as thoroughly, completely, and responsibly as possible . . . . We can't just ignore it because we thought we had answered that question before")).

## V. CONCLUSION

The Court holds that the Plaintiffs have raised no genuine issue of material fact as to the validity of the Committee's decision-making process. The Court further holds that the directors who evaluated LPHI's interests in the derivative claims—Fred Dewald, Harold Rafuse, and Tad Ballantyne—were all independent and disinterested. Therefore, the Court will uphold the board's decision to terminate this case.

It is **ORDERED** that the Defendants' converted motion for summary judgment is **GRANTED.** Judgment is entered in favor of the Defendants, Life Partners Holdings, Inc., Brian Pardo, Scott Peden, David Martin, Todd Ballantyne, Fred Dewald, and Harold Rafuse. A clerk's judgment shall issue immediately, terminating the instant cause of action.

**SIGNED** this 6th day of November, 2015.

ALIA MOSES
UNITED STATES DISTRICT JUDGE

**EXHIBIT 5**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

NOV 17 2017

CLERK, U.S. DISTRICT COURT

By _____
                    Deputy

| | | |
|---|---|---|
| IN RE: | § | |
| LIFE PARTNERS HOLDINGS, INC., | § | Case No. 15-40289-RFN11 |
| | § | Chapter 11 |
| Debtor, | § | |
| | § | |
| | § | |
| LIFE PARTNERS CREDITORS' TRUST | § | Adversary No. 16-04035-rfn |
| AND ALAN M. JACOBS, AS TRUSTEE | § | |
| FOR LIFE PARTNERS CREDITORS' | § | |
| TRUST, | § | |
| | § | |
| Plaintiffs, | § | District Court Case |
| | § | No. 4:16-CV-330-A |
| VS. | § | (Consolidated with |
| | § | No. 4:17-CV-112-A) |
| 72 VEST LEVEL THREE LLC, ET AL., | § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION</u>
and
<u>ORDER</u>

Came on for consideration multiple motions[1] filed by

defendants in the above-captioned action seeking dismissal of

claims made by plaintiffs, Life Partners Creditors' Trust and

Alan M. Jacobs, as Trustee for Life Partners Creditors' Trust, in

---

[1] Several of the motions to dismiss were filed in Adversary Case No. 16-04035-rfn. <u>See</u> Adv. Docs. 468, 469, 470, 471, 472, 491, 492, 494, 497, 497-1, 498, 499, 506, 506-1, 506-2, 507, 508, 531, 532, & 538. Others were filed in this Case No. 4:16-CV-330-A after withdrawal of reference. <u>See</u> Docs. 11, 12, 17, 18, 20, & 21.
  The "Adv. Doc. ___" references are to the numbers assigned to the referenced items on the bankruptcy court docket of Adversary No. 16-04035-rfn.
  The "Doc. ___" references are to the numbers assigned to the referenced items on the docket in this consolidated Case No. 4:16-CV-330-A.

Case 3:20-cv-01028-CSH   Document 1   Filed 07/22/20   Page 165 of 203
Case 16-04035-rfn   Doc 552   Filed 11/17/17   Entered 11/21/17 13:52:26   Page 33 of 34
Case 4:16-cv-00330-A   Document 70   Filed 11/17/17   Page 33 of 34   PageID 926

In <u>Herrmann Holdings, Ltd.</u>, the Fifth Circuit had the

following to say in an action in which the plaintiffs had filed

an original and two amended complaints:

> At some point a court must decide that a plaintiff has
> had fair opportunity to make his case; if, after that
> time, a cause of action has not been established, the
> court should finally dismiss the suit.

302 F.3d at 567 (quoting <u>Jacquez v. Procunier</u>, 801 F.2d 789, 793

(5th Cir. 1986)).  That point has been reached in this action.

The court has decided that plaintiffs have had a fair opportunity

to make their case, and that the time has come for the court to

finally dismiss the suit.

Undoubtedly, plaintiffs know that they have done the best

they can do.  They have not sought leave to file an amended

pleading at any time since defendants started filing their

motions to dismiss; nor have they ever suggested that they would

be able to overcome their pleading deficiencies if given an

opportunity to do so.  Defendants have exhausted enough resources

in response to the inadequately pleaded complaints of plaintiffs,

without being called upon to go another round.  Therefore, the

court is not permitting plaintiffs to replead.

Case 3:20-cv-01028-CSH   Document 1   Filed 07/22/20   Page 166 of 203
Case 16-04035-rfn Doc 552 Filed 11/17/17   Entered 11/21/17 13:32:26   Page 34 of 34
Case 4:16-cv-00330-A   Document 70   Filed 11/17/17   Page 34 of 34   PageID 927

V.

<u>Conclusion and Order</u>

For the reasons stated above, the court concludes that all claims asserted by plaintiffs against the defendants in the above-captioned action should be dismissed with prejudice.

Therefore,

The court ORDERS that all claims and causes of action asserted by plaintiffs against the defendants in the above-captioned action be, and are hereby, dismissed with prejudice.

SIGNED November 17, 2017.

JOHN McBRYDE
United States District Judge

34

# EXHIBIT 6

This group of documents represent a very small portion of the 4,100 filings in the absurd case of SEC vs. Life Partners. The fourth time in seven years the SEC has forced Life Partners to defend itself in court. Unsuccessful in all other attempts, the SEC stooped to new lows this time around. Evidence will be presented over the next few weeks of the SEC tampering in Life Partners' day to day operations. Not just tampering, the SEC strong-armed Life Partners' long time prestigious auditing firm Eide Bailey, forcing the 77 year old, well respected company to drop Life Partners as a client with less than a month before the company's yearly audit was to be conducted and filed in Washington. You will also see evidence of a smear campaign about Life Partners started by the SEC in the Wall Street Journal with no proof whatsoever (see row 23) Another smear campaign in the Bankruptcy Courts was started by Trustee Thomas Moran hand-picked by the SEC and the bankruptcy court. Having been on the job at Life Partners just two days, Moran claimed to have discovered something the SEC had not been able prove after seven years of investigating and intimidating not, three prestigious auditing firms and numerous federal juries audit reported to the court that he had uncovered "wide spread corruption. The likes of which had never seen before in Texas. Moran went on to report that Life Partners had been running a Ponzi scheme and that the company was in violation of the RICCO Act. Strangely, Bankruptcy Court Judge Nelms never asked for any evidence from Moran and made several rulings based on Moran's reports as facts. Like a modern day Joe MaCarthy, Moran continued making his wild and unfounded accusations initiating countless lawsuits where hundreds of innocent people would be forced to prove their innocence. Finally, (Row 24) Moran had his day in court and to the displeasure of the judge he was unable to prove any of his ridiculous claims. U.S. District Judge John McBryde dismissed five lawsuits brought by Moran against 860 Life Partners Licensees. This is just the tip of the iceberg. More evidence will continue to be delivered to you in hopes that you can and this travesty. A travesty every American CEO should be concerned about. Even a small amount of reading will cause the average person great concern over the conduct of the Government and our Justice System. If necessary, I can provide you and/or your investigative team many more court documents that substantiate my position, and that of the thousands of other Share Holders, Investors and Agents that have experienced the corruption of both our regulatory and our Justice System.

## PARTIAL EXIBIT LIST

| EXHIBIT | DOC # | PAGES | DATE | PAGE | LINE REF. | TAB | SPEAKER | NOTES: area of the line has been dedicated to a very small sampling of quotes directly from the documents. Most of the documents I researched yielded far more evidence of the theft that has occurred and those that participated, than I could include in this small collection. However, the ACTUAL EVIDENCE presented by the prosecution amounted to no more than that "of a Mustard Seed." | This |
|---|---|---|---|---|---|---|---|---|---|
| S Dist Ct/Nrt Dist of TX, Ft Worth, CS NO. 15-40289-rfn11 | 115-1-R | 13 | 8/29/16 | 7 | 16 | 1 | PEYTON ING, Agent/Investor - Pro Se | "Mr. Moran's unchecked breach of contract, and altering of the original premium schedules that investors based their purchase decisions on, has pushed the investors entire $2.4 +/- Billion portfolio to the brink of disaster, perhaps accounting for the seeming sense of urgency, if not desperation." | |
| ...us Dist. Ct/Net Dist of TX, Worth, CS NO. 15-40289-rfn11 | 115-1-R | 13 | 8/29/16 | 9 | 25 | 1 | PEYTON ING, Agent/Investor - Pro Se | "I have set forth before the Honorable Judge Nelms, both in testimony, and by sworn affidavit incorporating information taken from LPI's own files and records, that I have witnessed (Trustee) Moran and his counsel (Mr. David Bennett & Thompson Knight) *withhold relevant information, twist or pervert facts and actually lie to him* (NELMS). The Honorable *Judge's response...'It makes no difference if they have lied...the* question is where do we go from here...' Faced with Judge's unabashed attitude towards the victims of this court, Mr. Inge makes a VERY CONCERNING REQUEST OF JUDGE NELMS, '...*Before the Court, I would humbly suggest that the honesty and integrity of the parties charting the debtor, on the back, of it's customers, is of profound importance.*' This simple request is a deplorable statement about this Bankruptcy Court under Judge Russell Nelms. | |
| S Dist Ct/Nrt Dist of TX, Ft Worth, CS NO. 15-40289-rfn11 | 115-1-R | 13 | 8/29/16 | 10 | 26 | 1 | PEYTON ING, Agent/Investor - Pro Se | "The Honorable Judge Nelms, in his 3rd Report and Recommendation to the District Court, does not deny any of the claims set forth in my '...lengthy objection to the settlement' previously filed in the District Court" Instead, Judge Nelms '...simply recommends that you deny same based on a declared lack of standing'" | |

| Court | Exhibit | # | Date | Pg | Pg | # | Party | Description |
|---|---|---|---|---|---|---|---|---|
| US Dist Ct/Nrt Dist of TX, Ft Wrth, CS NO. 15-40289-rfn11 | 115-1-R | 13 | 8/29/16 | 11 | 31 | 1 | PEYTON ING, Agent/Investor - Pro Se | "One of the primary purposes of the Class Action Settlement is to cloak in an appearance of legitimacy, the seizure by judicial fiat of property contractually belonging to parties other than the debtor, while denying them their constitutionally guaranteed right to due process." Mr. Inge astutely and accurately states one of the MANY QUESTIONABLE DECISIONS MADE IN THE BANKRUPTCY COURT. The various dates of initial investments along with the fact that UNQUALIFIED CASH INVESTMENTS vs. QUALIFIED IRA INVESTMENTS are completely dissimilar with the fact that Trustee Moran's ILL-CONCEIVED PLAN was given final approval by Judge Russel Nelms even after MULTIPLE DEFENDANTS OFFERED A SUBSTANTIAL AMOUNT OF FACTUAL EVIDENCE, compared to the COMPLETE LACK OF EVIDENCE PRESENTED BY THE PROSECUTION FOR THE LAST THREE YEARS. |
| US Dist. Ct/Net Dist. of TX, Ft Worth, CS NO. 15-40289-rfn11 | 115-1-R | 13 | 8/29/16 |  | 32 | 1 | PEYTON ING, Agent / handouts." | "...Moran's clouding of title through his claim of ownership in LPI, rather than its customers/investors, there must now be an honest determination of ownership, untainted by extortion or special interest (such as the deal cut with one of the largest agents involved , Penumbra was provided a very favorable "exit deal" in order to forgo any further pursuit of the Trustee. In addition Penumbra was to lend its support, if only on paper to the on going illegal activities of Trustee Moran.) |
| US Dist. Ct/Net Dist. of TX, Ft Worth, CS NO. 15-40289-rfn11 | 115-1-R | 13 | 8/29/16 |  | ALL | 1 | PEYTON ING, Agent / Investor - Pro Se | AMERICAN CITIZENS HAVE HAD THEIR LEGAL ASSETS, ILLEGALLY AND WITHOUT JUST CAUSE, CONFISCATED BY THE COLLUSION AND CORRUPTION OF THE UNITED STATES SEC, THE US TRUSTEE NAD THE US JUSTICE DEPT. This document taken in it's entirety, addresses 27 major & obvious flaws by the SEC, The US Trustees Office, / The Justice Dept.- in particular the US Bankruptcy Court. Among the 27 FACTUALLY BASED REBUTTALS, are fact-based DIRECT VIOLATIONS OF THE 14th AMENDMENT within the information presented, and actions taken by these same Compromised and is some cases, Corrupted Governmental Agencies including the SEC, The US Trustees Office, The Justice Dept.- in particular the US Bankruptcy Court. |
| US Bankruptcy Court, Norther District of Texas Fort Worth Division | 1532 | 91 | 2/17/16 |  | 20 thru 24 | 2 | PEYTON ING, Agent / Investor - Pro Se | "I filed a countersuit against Mr. Bennett personally, against his law firm, and as well as against Mr. Moran. And so they understand, I think, fairly -very well my allegations. And I think they're fairly simple and fairly straightforward and easily proved." Here Mr. Inge takes the limited opportunity to make clear that there are definately conduct issues in this bankruptcy, many illegal, and all being perpetrated in plain sight of this court, so much so, the can clearly point them out himself...like many other so-called defendants. |
| US Bankruptcy Court, Norther District of Texas Fort Worth Division | 1532 | 91 | 2/17/16 |  | 68 | 2 | PEYTON ING, Agent, Investor - Pro Se | "I offered my knowledge and my help early on in this adventure to the Trustee, who had...no interest in talking to me. Because the things I would be about, which are the truth, and many truths that have not been put forth, sir, in this courtroom, have never been heard, that are huge.... one thing that's undeniable is that I am living, breathing proof that these investors own this policy, own these policies and own these assets. And they are not part of the estate." |
| US Bankruptcy Court, Norther District of Texas Fort Worth Division | 1532 | 91 | 2/17/16 |  | 74 | 2 | Mr.Ted Hasson, Investor/Agent - Pro Se | Mr. Hasson, like more than 800 agents, and is one of the many thousands of investors was directly effected because the Trustee Moran and Bennett of Thompson Knight, fabricated some non-existent question of this 20 -year-old LEGAL CONTRACT, without any presentation of fact to the court. Even without any evidence based in law, Judge Russell Nelms allowed the Trustee and Thompson Knight to CONFISCATE ALL OF THE ASSETS (unrelated to the bankruptcy) OF THESE, MOSTLY RETIRED, INVESTORS WITHOUT DUE PROCESS!!! |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| US Bankruptcy Court, Norther District of Texas Fort Worth Division | 1532 | 91 | 2/17/16 | 38 | 4 thru | 2 | Berry D. Spears, LOCKE LORD, LLP BroadRiver Asset MGMT | (1) "Judge, this is not a way to run a railroad. And maybe that's exactly what it is: a railroad.", (2) "Mr. Moran invited us into this process to assist him to provide him with our guidance and our knowledge of the life settlement industry because BroadRiver is one of the leading parties in this sub-industry. And yet when we provided him the information that he requested, we discovered was a series of fatal flaws in a structure that was planning to put together." (3) "...we have identified structural issues with the plan. We have identified problems with the disclosure statement and the adequacy of the information...literally millions and millions of dollars have been spent putting together a disclosure statement, a supplement, that remains on its face inadequate and not yet ready for prime time. It's not ready to be sent out. And in fact, I frankly marvel, Your Honor, by the fact that Mr. Bennett stands here today and tells you, we're not ready to hear -- to have a hearing on the adequacy of the disclosure statement...." (4) "few if any of objections we initially raised have actually been addressed. If anything, we discovered other, more important issues, and those are belied by the fact that Mr. Erler and Ms. Hersh and Mr. Wiley and Mr. Ritter and their clients who originally became plan co-proponents of this process no longer support the plan as it's written, as it's presented, as it's because this Court today. And that, Your Honor, is as significant as it comes". (5) "For example, the class action is fatally flawed. Fatally flawed. There's a reason why those documents aren't part of this disclosure, and it's because it doesn't work." (6) **"as Mr. Bennett described to you earlier today, the month of October was spent in putting together this financing, the $25 million borrowed against policies in this case that represented to the Court at that time would be paid at confirmation, if not before. Well, that's gone by the wayside, of course. It's not to be paid off at confirmation. It's not to be paid off at all."** |
| US Bankruptcy Court, Norther District of Texas Fort Worth Division | 1532 | 91 | 2/17/16 | 41 | 11 thru 50 | 2 | Berry D. Spears, LOCKE LORD, LLP BroadRiver Asset MGMT | (1) On the merits, Your Honor, the class action is a problem. Mr. Erler and Mr. LeForce and Ms. Hersh have all told you that post-petition governance is a problem." (2) "Mr. Moran and his professional signed a term sheet that they would want to be enforced that required that these issues be resolved in a disclosure statement, in a filing, in the plan. Not two days before the plan filed, but now. And it hasn't -- *it's stalled and it's mired, unfortunately, in self-dealing."* (3) "...as part of its process *a plan that doesn't work,* and it doesn't work on its face, and *there is no reason whatsoever to continue this charade."* (4) "There is an answer to these problems and answers to the structural issues which have plagued this case by virtue of Mr. *Moran's self-dealing* and insistence that he take a critical position, *not to mention lucrative,* but critical positions in a post-confirmation Life" (5) "There are other structural issues which plague this case. The status of the servicing company." (6) "There are also open-ended issues concerning the Newco interests which are vital to a successful reorganization and to the ability of investors in these cases to reap any return on their investments." (7) "$25 million that was borrowed in October, will not be repaid, and that's in direct derogation of representations made to this Court when that agreement was reached." (8) "Mr. Moran's attempted self-dealing, his lawyers and professionals' recalcitrance and inability or unwillingness to reach out to other people, to objecting parties, to try to resolve their objections before the day before the hearing at 4:45 p.m. cannot and should not be rewarded." (9) "Mr. Bennett's offer is transparent in so many ways. And frankly, it doesn't pass muster." (10) "how this process has been engineered, how it's been run, and how, unfortunately, it appears to have been run into the ground." |

| Source | Doc # | | Date | Pg | Line | Col | Speaker | Quote |
|---|---|---|---|---|---|---|---|---|
| US Bankruptcy Court, Norther District of Texas Fort Worth Division | 1532 | 91 | 2/17/16 | | | 2 | | "The objections so far have raised not only the structure of the class action settlement, but indeed the Court's very jurisdiction or perhaps constitutional power to approve that type of settlement." *Though the Judge's acknowledged awareness of the MAJOR Structural issues that form the very basis of this half-baked plan, he continued to allow it's progression through his court.* |
| Transcript of Proceedings - Judge Neims Court | 1532 | 91 | 2/17/16 | | | 2 | Judge Russell Neims | |
| Transcript of Proceedings - Judge Neims Court | 1532 | 91 | 2/17/16 | 29 | (1) 9 thru 12 | 2 | PEYTON ING, Agent/Investor - Pro Se | 10 bankruptcy. Most of them were shocked to hear about 11 the breadth and scope of the fraud uncovered by the 12 trustee. |
| Transcript of Proceedings - Judge Neims Court | 1532 | 91 | 2/17/16 | 29 | (1) 9 thru 13 | 2 | PEYTON ING, Agent/Investor - Pro Se | "...THE PLAN IS UNCONSTITUTIONAL..." "...you can't transfer ownership by ...proxy with a hand full of people on behalf of over 20,000. THAT'S NOT DUE PROCESS" |
| Transcript of Proceedings - Judge Neims Court | 1532 | 91 | 2/17/16 | 30-31 | (1) 9 thru 14 | 2 | PEYTON ING, Agent/Investor - Pro Se | |
| Transcript of Proceedings - Judge Neims Court | 1532 | 91 | 2/17/16 | 76 | (1) 9 thru 16 | 2 | Mr.Ted Hasson, Investor/Agent - Pro Se | " Life Partners (while under previous management) did no shenanigans, recognizing that they did not own these policies, that their investors did" |
| Transcript of Proceedings - Judge Neims Court | 1043 | 16 | 9/28/15 | 8 | 6 &7 | 3 | JUDGE Neims states the following | **"In my opinion, the IRA investors may have some different circumstances,** (the judge is referring to the catastrophic results to the IRAs losing as much as 50% to the IRS, before the plan wipes the rest of their IRA out)...but their arguments regarding ownership (brought about by the Trustee and TK unilaterally declaring that *in-order for them to acknowledge that the investor's were the rightfull owners, they (the investors) must forfeit 5% of their assets and 100% control of those assets)* Neims goes on to say "...their arguments regarding ownership...it's really the same issue as the direct fractional (cash) investors." In order for the Judge to go along with this absurd theory, he was vigorously sold by the prosecution, he would either need a complete lack of knowledge pertaining to how IRAs function, or he may have a stronger reason to ignore such an obvious difference. It's very unlikely that a man of his intelligence lacks the basic knowledge of a 40+ year-old retirement investment vehicle...the most popular retirement investment vehicle for the last 40+ years. "...I note that when someone gets upand argues on the behalf of the IRAs, they get just as much applause as people who own direct fractional interests. That seems to me to be a commonality of interests out there." *Of course there is a good commonality out there, both of these groups are getting their assets stolen from them by the same Government sponsored and investor paid US Trustee and his legal partners. A round of applause doesn't eliminate the value of their assets that have just been confiscated.* |

| | | | | | | |
|---|---|---|---|---|---|---|
| Transcript of Proceedings - Judge Nelms Court | 1043 | 16 | 9/28/15 | 8 | | | JUDGE Nelms states the following:<br><br>"…October 5th (2015)… That's the date we will be trying the ownership issue" which never did get hried in Nelms' court. He abated the issue on numerous occasions and the issue was brought up over 1,000 times in his courtroom. Much to the satisfaction of the Trustee and his counsel, Judge Nelms allowed the prosecution to run the show when it came to the pivotal issues in this case. The issue of who owns the interest in the Life Policies has NEVER been in question. By contract, LPI brokered the purchase between buyer and seller, while also offering assets management services as well. However with the assets owned by the investors and neither LPI or LPHI had a substantial assets, the trustee and TK had cast fictional doubt as to who were the owners for the past 20 years, thus allowing Nelms the ability to grant the trustee access to the assets of these investors,…UNRELATED TO THIS BANKRUPTCY! Thus the illegal seizure of citizens' assets WITHOUT DUE PROCESS. |
| Transcript of Proceedings - Judge Nelms Court | 1043 | 16 | 9/28/15 | 10 | 16-21 | 3 | JUDGE Nelms states the following:<br><br>" *You have IRA investors on one side and direct fractional investors, but then the ways people got involved in these investments could be dramatically different."*  Judge Nelms again demonstrates that he posses a basic understanding that a variety of substantial differences exist between the many investors. Even in firm possession of that knowledge, Nelms allows Moran, Bennett and TK to cram all the various classes of investors into one class. This now makes it *impossible for fair representation of the various classes of investors* ….but it's now quite easy for the Trustee and TK to force the rest of thier ill-conceived plan down the investors throat. |
| Transcript of Proceedings - Judge Nelms' Court (Trial 8/30) DOCUMENT AVAILABLE UPON REQUEST | 51 | 8/30/16 | 121 | (1) 9-11 (2) 1-3 | 4 | | JUDGE Nelms states the following:<br><br>(1)We have 22,000 investors. And, Judge, they started out knowing virtually nothing about bankruptcy. Most of them were shocked to hear about the breadth and scope of the fraud uncovered by the trustee. (2)We can't lower our professional2 standards, our ethics, just because the stakes are3 high.  **After espousing these empty claims of a "massive fraud" despite numerous clean INDEPENDENT AUDIT REPORTS, it has become plain to see that self-dealing and legal billing are *the only massive frauds being committed by the PROSECUTION. Not one credible shred of evidence has been produced by the prosecution* |
| Del Rio Case | 244 | 49 | 11/6/15 | 49 | 49 | 5 | Judge Alia Moses-<br><br>"The Court holds that the Plaintiffs have raised no genuine issue of material fact as to the validity of the Committee's decision-making process. The Court further holds that the directors who evaluated LPI's interests in the derivative claims Fred Dewald, Harold Rafuse, and Tad Balantyne were all independent and disinterested. Therefore, the Court will uphold the board's decision to terminate this case. It is ORDERED that the Defendants' converted motion for summary judgment is GRANTED. *Judgment is entered in favor of the Defendants, Life Partners Holdings, Inc., Brian Pardo, Scott Peden, David Martin, Todd Balantyne, Fred Dewald, and Harold Rafuse.*  A clerk's judgment shall be issued immediately, terminating the instant cause of action.",  In this case, LPI and it's management already passed intense scrutiny in this case. *The issues flooted against LPHI/LPI in Nelms' court amount to DOUBLE JEOPARDY* |

| | | | | | |
|---|---|---|---|---|---|
| US District Court, Norther Dist of TX, Fort Worth | 82 | 4 | 1/9/18 | 6 | **"The court is not accepting the recommendations made by the bankruptcy judge to allow the plaintiffs to replead their issues. Plaintiffs cite their voluminous exhibits as providing the necessary facts to support their claims, but the exhibits fall woefully short. Plaintiffs had more than sufficient time in which to investigate alleged fraud claims and plead proper causes of action against defendants. For the reasons stated above, the court concludes that all claims asserted by plaintiffs against the defendants in the above-captioned action should be dismissed with prejudice. Therefore,** *The court ORDERS that all claims and causes of action asserted by plaintiffs against the defendants in the above captioned action be, and are hereby, dismissed with prejudice.* U.S.District Judge John McBryde<br><br>U.S.District Judge John McBryde dismisses 5 government cases in which the SEC alleged fraud and poor management by Life Partners and 826 of its licensees. The 4th time in 7 years the SEC has taken Life Partners to court - the 4th time they have lost. |
| DOCUMENT AVAILABLE UPON REQUEST | 25 | | 2/16/17 | 7 | U.S. Trustee Erin Marie Schmidt<br><br>"Mr. Moran proposes to be compensated in an amount with a present value of assigned to class counsel as a part of any approved fee request) or, if necessary, from the Position Holder Trust; provided, however, that in no event shall the amount paid exceed the amount of .5% of actual maturities in respect of beneficial ownership held by the Position Holder Trust" **Trustee Thomas Moran, along with his council David Bennett of Thompson Knight, systematically disassembled the proven and successful business model of LPHI/LPI's former management, causing detrimental and catastrophic damage to the portfolio once benefiting the thousands of independent owners of the Life Settlement Positions.** Moran and TK manipulated a legal and long-standing contract based on the 1996 ruling in the United States Court of Appeals, District of Columbia Circuit. This ruling affirmed that, contrary to the stiffling and ongoing efforts of legal harassment by the SEC, to this date costing tens of millions of dollars, the specific **Life Settlement positions marketed through LPI DO NOT QUALIFY AS SECURITIES.** More so, **Mr. Moran's request for payment of more than $20 million (FUTURE VALUE) of ILLEGALLY CONFISCATED and UNRELATED INVESTOR ASSETS,** along with the **$48 million** paid to David Bennett and Thompson Knight, out of the same illegally confiscated investor assets, is nothing short of preposterous! Such a massive theft by US Government Agencies may be historic in United States History. |
| Cole & Reed Certified Public Accounts Independent Audit Reports | 2012 | | 1/3/13 | 8 | Independent Accounts Report states; "In our opinion, management's assertions referred to above are fairly stated in all material respects, based on the criteria set forth in the Notes to the Schedules." |
| Cole & Reed Certified Public Accounts Independent Audit Reports | 2013 | | 7/5/05 | 9 | Independent Accounts Report states; "In our opinion, management's assertions referred to above are fairly stated in all material respects, based on the criteria set forth in the Notes to the Schedules." |

| Document | | | Date | | | | Party / Judges | Content |
|---|---|---|---|---|---|---|---|---|
| UNITED STATES COURT OF APPEALS, DISTRICT OF COLUMBIA CIRCUIT 87 F.3d 536 (1996) | | | 7/5/96 | 2 | p | 10 | JUDGES WALD, GINSBURG and HENDERSON | " … we conclude that LPI's contracts are not securities subject to the federal securities laws… " The subject of this long-standing ruling has been challenged in court by the SEC on numerous occasions, each time resulting in defeat by jury trial. Convinced that legal action based on facts would not yield their desired results, the SEC assembled a team of players that included members of the Justice Dept. Thompson Knight, MMS Advisors along with a few others. This group covertly met at a La Quinta Inn, even before bankruptcy had been declared "for reorganization purposes" following a declaration of a $46 million fine by the SEC, which itself followed Judge Nowlin's inexplicable reversal of another victory by jury trial for LPIH/LPI. Judge Nowlin retired immediately after suffering signs of dementia. |
| Transcript of Proceedings | 623 | 245 | 7/16/15 | 11 | 1 | 11 | Mr. Bennett (TX) | *Mr. Moran was appointed by the Office of the U.S. Trustee on March 13th,* and then confirmed by order of this Court on March 19th. He (Mr. Moran) began his work immediately, and *assembled a team of folks, including Thompson & Knight, MMS, Ms., Hinkle, and AGS.* Mr. Bennett(TX) neglected to mention that *"THE TEAM" was already assembled and Mr. Moranhad been chosen MONTHS EARLIER.* |
| Transcript of Proceedings | 623 | 245 | 7/16/15 | 15 | 6 | 11 | Mr. Bennett of Thompson Knight | *"…we're putting the interests of the stakeholders in this case ahead of our own…"* At the same time Mr. Bennett and Thompson Knight were *"putting the interests of the stakeholders ahead of their own"* he and his firm stole nearly $50 million *directly from these very same stakeholders (investors)that may see only a fraction of their original investment* |
| Transcript of Proceedings | 623 | 245 | 7/16/15 | 17 | *1 | 11 | Mr. Bennett of Thompson Knight | (1) Mr. Roper in particular has been appointed as receiver in cases where *the SEC, you know, prompted the* (2) *receivership* Mr. McPherson filed or did awhistleblower claim against LPIH with the SEC that led to thelawsuit and led to the judgment, and he's making that claim **Mr. Bennett (TX)- inadvertently states that the SEC did "prompt" the bankruptcy. They forced their agenda even in the absence of evidence. This signaled their "look the other way" approach, enabling any means necessary for their enrichment at the investors expense |
| Transcript of Proceedings | 623 | 245 | 7/16/15 | 165 | 13 | 11 | Mr. Ritter: Ad Hoc Com of Fractional Ins. Beneficiaries, Mr. Hartman: MMS Advisors | A. Right. We came down to Waco. *We were at La Quinta Inn.* And it was the day that there was a hearing for the judge to, I guess, give the order or what have you to institute Tom as the receiver. So we were prepared to go in, if necessary, to begin to secure the assets and the IT and so on and so forth. Q. And that meeting was in January, correct? A. Yes. As I recall, it's mid-January. Again, it was right around the time of the filing of the bankruptcy. Q. *It was before the filing of the bankruptcy, right?* A. You tell me. Q-- Or -- okay. A. *think so, yes* |
| Transcript of Proceedings | 623 | 245 | 7/16/15 | 145 | 14 | 11 | Mr. Ritter: Ad Hoc Com of Fractional Ins. Beneficiaries, Mr. Hartman: MMS Advisors | MMS Advisors is purported to have provided services totaling $285,000 or $280,000. *All of this happened basically without anyone having any knowledge that MMS Advisors was even in the picture.* |

| Description | Doc/Bates | Pages | Date | Pg | Ln | Ex. | Speaker | Excerpt |
|---|---|---|---|---|---|---|---|---|
| Transcript of Proceedings - Judge Nelms Court | 3218 | 84 | 8/28/16 | 47 | | 12 | MR. SAM STRICKLIN, ATTY Grubner Elrod Johansen Hall Shank, LLP | " ...the last thing in the words we want to have happen in this case is to find out...that the IRS has audited this and decided that it (the approved Bankruptcy Plan backed by the aforementioned governmental groups in question) disqualifies (the) IRAs... That's potentially interest and penalties and major, major harm to people that have already been harmed enough", |
| United States Security & Exchange Commission *** WELLS SUBMISSION ON BEHALF OF LPHI | FW-3501 | 40 | 7/27/11 | 39 | | 13 | | "LPHI's financial statements were accurate." " LPHI's revenue recognition policy complied with GAAP." "Jim Johnson's (CPA, BDO USA, LLP) expert report concluding that LPHI's revenue recognition policy and impairment analysis complied with GAAP undermines any claim of fraud or negligence" |
| EXPERT REPORT OF JIM JOHNSON, CPA BDO USA, LLP | EXHIBIT 2 | 25 + 7 exhibits | 7/16/13 | | | 14 | JIM JOHNSON, CPA, PARTNER BDO USA, LLP | In summation, this report emphasizes LPHI/LPI's COMPLIANCE WITH GAAP PRINCIPLES and that any restatement of either financial statements or revenues do not result in material changes, nor departures from the GAAP principles. |
| LPHI correspondence with Whitley Penn, LLP | 97-3 | 11 | 9/10/13 | VI. | | 15 | LPHI Management | This correspondence demonstrates LPHI/LPI's ongoing efforts of compliance throughout the many years of SEC harassement. |
| CONFIRMATION HEARING US BANKRUPTCY COURT, NORTHERN DISTRICT OF TEXAS, FORT WORTH DIV | 3360 | 65 | 8/29/16 | 30 | 14 | 16 | MR. SAM STRICKLIN, ATTY GRUBER ELROD JOHANSEN HALL SHANK, LLP | " ..this is not spirited competition.... This is playing off an adversary with estate dollars and agreeing to *pay them or support paying them $1.5 million*," as he continues to point out to the court, *"Your Honor,* instead of competition, this-*this looks more akin to collusion* than competition to us." |
| CONFIRMATION HEARING US BANKRUPTCY COURT, NORTHERN DISTRICT OF TEXAS, FORT WORTH DIV | 3360 | 65 | 8/29/16 | 31 | 11 | 16 | MR. SAM STRICKLIN, ATTY GRUBER ELROD JOHANSEN HALL SHANK, LLP | *"It just—it just seems like this estate is being carved up, and the people that are losing are the investors."* No doubt about it! Mr. Striclin hit the nail on the head. THE ONLY PEOPLE THAT ARE GETTING DISGORGED ARE INVESTORS AND SHAREHOLDERS! For what, after 3 years since the start of this last version of the SEC/JUSTICE DEPT slow down show, their vendictiveness is no longer limited to former LPHI/LPI mgmt. They've now set their sights on the investors and shareholders themselves. |
| CONFIRMATION HEARING US BANKRUPTCY COURT, NORTHERN DISTRICT OF TEXAS, FORT WORTH DIV | 3360 | 65 | 8/29/16 | 32 | 19 | 16 | MR. SAM STRICKLIN, ATTY GRUBER ELROD JOHANSEN HALL SHANK, LLP | *"What's happened here...they've decided...who get's to make a whole lot of money off the Position Holder Trust"* by charging something that's probably over market. *That's what this deal is about"* |
| CONFIRMATION HEARING US BANKRUPTCY COURT, NORTHERN DISTRICT OF TEXAS, FORT WORTH DIV | 3360 | 65 | 8/29/16 | 35 | 18 | 16 | MR. J LEFORCE ATTY, LEFORCE LAW, PLLC | " I would echo what Mr. Stricklan raised here...*there was no attempt to negotiate with his clients.* They represent probably the single largest group of investors in this entire case,...3- $400 million at face. My client has $40 million. Other people have lots of numbers involved here." "...*we've not seen any-any discussion [with] the people who have the most economic interest at stake other than administrative (legal and other minor fees) expenses.* And you know, my clients see...piling administrative expenses..." |
| CONFIRMATION HEARING US BANKRUPTCY COURT, NORTHERN DISTRICT OF TEXAS, FORT WORTH DIV | 3360 | 65 | 8/29/16 | 59 | 15 | 16 | JUDGE RUSSELL NELMS states, | "...I will have to say, I think on behalf of all of the investors...and probably some of the lawyers as well, the optics of this are not good. *The optics of this are-more than they're just not good. They're-they're questionable."* At least we knew that Nelms saw what we were seeing. |

| CONFIRMATION HEARING US BANKRUPTCY COURT, NORTHERN DISTRICT OF TEXAS, FORT WORTH DIV | 3360 | 65 | 8/29/16 | 60 | 2 | 16 | JUDGE RUSSELL NELMS states; | " ...the objections were that this plan was not just in bad faith, which was one of the objections, but that it just wasn't feasible, that the joint plan wasn't feasible."The Judge goes on to say that " *Everybody in the courtroom is saying that the joint plan proponents (Plaintiff Trustee supported) bought off transparency...whether it turns out there is any substance to that concern, …today it's got the smell of a rotting fish.* It could get better. But it doesn't— it doesn't smell very good today"  After Judge Nelms has clearly acknowledged, as he has done on numerous occasions, there are significant short-comings of this latest (3rd) proposed plan, he proceeds to confirm it. No surprise here. Judge Nelms has had plenty of opportunity to put an end to this massive theft based on the information presented by the defense on behalf of the investors and shareholders. |

EXHIBIT 7

## SECTION 1 - LPHI NET INCOME GROWTH- (A) ACTUAL AND (B) PROJECTIONS

| | 2007 | 2008 | 2009 | *2010 | *2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(A) ACTUAL LPHI FINANCIAL DATA FROM SEC COMPLIANT 10Ks** | | | | SEC assault | | | | Moran/Bennet t Corruption | | | | | |
| INCOME BEFORE TAXES - ACTUAL | 4,707,252 | 28,691,758 | 43,274,482 | 36,212,382 | (4,553,399) | (4,089,388) | (3,556,417) | | | | | | |
| NET INCOME AFTER TAX (62%) - ACTUAL | 3,360,230 | 28,630,851 | 39,648,893 | 26,077,214 | 23,425,749 | (2,877,025) | (2,454,105) | 0 | 0 | | | | |
| NET INCOME GROWTH- YEAR - ACTUAL | 113% | 18,756,271 | 27,159,116 | -4% | -10% | -113% | -8% | -15% | | | | | |
| | | 558% | 145% | | | | | | | | | | |
| **(B) GROWTH PROJECTIONS BASED ON THE FIRST 3 YEARS OF UNASSAILED LPHI BUSINESS OPERATIONS** | | | | | | | | | | | | | |
| PROJECTED AFTER TAX INCOME GROWTH 2010-2019 (we used 20% as a conservative example however the 40% would've been far more likely based on existing factors) | 40% | 40% | 40% | 38,022,762 | 53,231,867 | 74,524,614 | 104,334,460 | 146,068,244 | 204,495,542 | 286,293,758 | 400,811,262 | 561,135,766 | 785,590,073 |
| | 30% | 30% | 30% | 45,888,906 | 59,668,578 | 77,569,151 | 100,839,897 | 131,091,866 | 170,419,425 | 221,545,253 | 288,008,829 | 374,411,477 | |
| | 20% | 20% | 20% | 32,590,939 | 39,109,127 | 46,930,952 | 56,317,143 | 67,580,572 | 81,096,686 | 97,316,023 | 116,779,228 | 140,135,073 | 168,162,088 |
| **(C) ACTUAL EARNINGS PER SHARE** | | | | | | | | | | | | | |
| Avg Common Shares Outstanding | 14,887,740 | 14,909,940 | 18,573,770 | 18,756,271 | 18,647,468 | 18,647,468 | 18,647,468 | 18,647,468 | 18,647,468 | 18,647,468 | 18,647,468 | 18,647,468 | 18,647,468 |
| ACTUAL Earnings (Loss) Per Share AFTER TAX | 0.23 | 1.25 | 1.83 | 1.40 | 1.26 | (0.17) | (0.15) | (0.13) | | | | | |
| ACTUAL EPS Growth - YEAR over YEAR | 113% | 543% | 146% | -23% | -10% | -743% | -188% | -87% | | | | | |
| **PROJECTED EARNINGS PER SHARE BASED ON GROWTH ESTIMATES 40%, 30%, 20%- 2010 THROUGH** | 40% | 40% | 40% | 2.56 | 3.59 | 5.02 | 7.03 | 9.84 | 13.78 | 19.29 | 27.01 | 37.81 | 52.93 |
| | 30% | 30% | 30% | 2.38 | 3.09 | 4.02 | 5.23 | 6.79 | 8.83 | 11.48 | 14.93 | 19.41 | 25.23 |
| **(D) PROJECTED EPS GROWTH w/ CONSERVATIVE ESTIMATES** | 20% | 20% | 20% | 2.20 | 2.64 | 3.16 | 3.79 | 4.55 | 5.46 | 6.56 | 7.87 | 9.44 | 11.33 |

## SECTION 2 - REVENUE PROJECTIONS

| | 2007 | 2008 | 2009 | *2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| For Fiscal Years Ended February 28, 20xx | | | | | | | | | | | | | |
| ACTUAL Total Revenues | 29,795,323 | 72,609,255 | 103,614,440 | 108,792,359 | 101,979,213 | 32,922,189 | 18,904,837 | 15,686,239 | | | | | |
| Year to Year Revenue Increase | | 42,813,932 | 31,005,185 | 5,178,119 | (7,213,346) | (68,657,024) | (14,037,352) | (3,218,598) | | | | | |
| *(actual growth for years 2007~ | 143% | 44% | 4% | -7% | -743% | -43% | -17% | | | | | | |
| Increase in Revenue Growth (%) | 0.6867 | | | | | | | | | | | | |
| **REVENUE GROWTH PROJECTIONS:** | 40% | 40% | 40% | 145,060,216 | 203,084,302 | 284,318,023 | 398,045,233 | 557,263,326 | 780,168,656 | 1,092,236,119 | | | |
| | 30% | 30% | 30% | 134,698,772 | 175,108,404 | 227,640,925 | 295,933,202 | 384,713,163 | 500,127,112 | 650,165,245 | 845,214,818 | | |
| | 20% | 20% | 20% | 124,337,328 | 149,204,794 | 179,045,752 | 214,854,903 | 257,825,883 | 309,391,060 | 371,269,272 | 445,523,126 | 534,627,752 | 641,553,302 |

### MARKET CAPITALIZATION

| | 18,756,271 OUTSTANDING SHARE | | 10 MULTIPLIER | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All of the following examples are based on THE PROJECTED EPS GROWTH CHART ABOVE | 40% | 480,535,663 | 672,749,928 | 941,849,900 | | | | | | | | | |
| | | 2.56 | 3.59 | 5.02 | 7.03 | 9.84 | 13.78 | 19.29 | 27.01 | 37.81 | 52.93 | | |
| Today's Share Value times (x) Number of Shares owned by LaMothe et al (652,479 + 9,378,136 = 10,030,615) | 30% | 446,211,687 | 580,075,193 | 754,097,751 | 980,327,077 | | | | | | | | |
| | | 2.38 | 3.09 | 4.02 | 5.23 | 6.79 | 8.83 | 11.48 | 14.93 | 19.41 | 25.23 | | |
| equals 52.48% of total shares | 20% | 248,218,687 | 494,265,753 | 593,118,304 | 711,741,965 | 854,090,358 | 1,024,908,429 | 1,229,890,115 | | | | | |
| | | 5,309,347,166 | 480,535,663 | | | | | | | | | | |
| | | 2,530,533,859 | 411,887,711 | | | | | | | | | | |
| | | 1,136,556,657 | 2.20 | 2.64 | 3.16 | 3.79 | 4.55 | 5.46 | 6.56 | 7.87 | 9.44 | 11.33 | |

# EXHIBIT 7

## SUMMARY OF LPHI FINANCIAL ANALYSIS INCLUDING INCOME, REVENUE AND MARKET GROWTH PROJECTIONS

This Analysis was performed in order to provide a reliable set of growth projections. These projections have been calculated based on the financial statements and operating results for LPHI as obtained from the LPHI 10Ks submitted by the former management team at LPHI for the years 2008, 2009 and 2010. Although 2010 resulted in a net decrease in growth from 2009, those results are directly correlated to the commencement of aggressive activities by the SEC including the release of the suspect Wall Street Journal article announcing that *LPHI was under investigation.* [1]

The first portion of each of the three analysis sections (Section 1, Section 2 and Section 3) is based on the ACTUAL NUMBERS taken from the 10K reports submitted to the SEC and deemed compliant.

[2] The second portion of each Section is presented as a carry forward of the projections based primarily on history and performance but also Wall St. Market conditions and forecasts as well as Life Settlement industry conditions and forecasts.

* The results of this analysis have been independently reviewed .

### SECTION 1 - LPHI NET INCOME GROWTH- (A) ACTUAL AND  (B) PROJECTIONS

*This section gives a straight forward analysis of the *Actual Earnings* up to and including the fiscal years before Trustee Moran's take-over. The first three years including 2008, 2009 & 2010 saw a vigorous growth rate for LPHI. The effects of the SEC's actions began having an effect by the later part of 2010. This is demonstrated within the Analysis in sections 1, 2, and 3. The

*Projection* portion of this Analysis Sheet uses the actual numbers from the previous 3 years. The  but it does account for the pending expansion of LPHI aswell as the ongoing sluggishness in the Wall Street markets.

### SECTION 2 - REVENUE PROJECTIONS

*This section is an analysis of *After Tax Income*  both before and after the SEC's aggressions began 2010. As the Projections show, were LPHI allowed to continue operating without harrassment the future growth planning was already established. The Projections are entirely based on audited financials, court records and knowledge of LPHI's upcoming entry into the institutional market. None the less the growth is staggering at any of the three (3) *Projected Growth* percentage options

### SECTION 3 - MARKET CAPITALIZATION

*The growth projections in this section have been previously calculated in Section 1(D). Using the Earnings Per Share (EPS), the multiplier of Only 10, the total number of outstanding shares, the 2019 Market Capitalization figures can be determined. Depending on the determination, the amounts below give a fair indication of the Market Cap attributable to the LPHI Shareholders' Assets.

2019 SHARE PRICE OF LPHI SHARES

| Projected Growth Rate | LaMothe | et al. | Market Capitalization |
|---|---|---|---|
|  | 6.957% | 93.043% | 100% |
| 40% | 369,395,105 | 4,939,952,061 | 5,309,347,166 |
| 30% | 176,060,595 | 2,354,473,264 | 2,530,533,859 |
| 20% | 79,075,346 | 1,057,481,311 | 1,136,556,657 |

EXHIBIT 8

| AUTHORITIES AND DEFENDANTS | Jessica Mcgee (TK)- SEC Atty | Lisa Lambert U.S.Trustee | H. Thomas Moran-Trustee | David Bennett (TK)- Atty for Trustee | Thompson & Knight |
|---|---|---|---|---|---|
| **A-2** 28 U.S.C. §§ 351-36, RULES GOVERNING JUDICIAL CONDUCT AND DISABILITY PROCEEDINGS UNDERTAKEN PURSUANT TO 28 U.S.C. §§ 351-36 | X | X | X | | |
| **A-3** A substantive Due Process violation occurs when government conduct violates "fundamental fairness" and is "shocking to the universal sense of justice." Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 4 L. Ed. 2d 268 , 80 S. Ct. 297 (1960) (citations and internal quotation marks omitted). | X | X | X | | |
| **A-4** *18 U.S. Code § 242 - Deprivation of rights under color of law-* | X | X | X | X | |
| **A-5** *Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States , ...shall be fined under this title or imprisoned not more than ten years, or both;* | X | X | X | X | |
| **A-6** (June 25, 1948, ch. 645, 62 Stat. 696; Pub. L. 90–284, title I, § 103(b), Apr. 11, 1968, 82 Stat. 75; Pub. L. 100–690, title VII, § 7019, Nov. 18, 1988, 102 Stat. 4396; Pub. L. 103–322, title VI, §60006(b), title XXXII, §§ 320103(b), 320201(b), title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 1970, 2109, 2113, 2147; Pub. L. 104–294, title VI, §§ 604(b)(14)(B), 607(a), Oct. 11, 1996, 110 Stat. 3507, 3511.) | | | | | |
| **A-7** *11 U.S.C. § 341.* | | X | X | | |
| **A-8** 1. "The U.S. trustee and creditors may question the debtor under oath at the section 341 meeting concerning the debtor's acts, conduct, property, and the administration of the case." | X | X | X | | |
| **A-9** Under 28 U.S.C. § 1930(a)(6), | | X | X | | |

| Ref | Provision | | | | |
|-----|-----------|---|---|---|---|
| A-10 | a quarterly fee shall be paid to the United States Trustee System Fund at Treasury in each case under chapter 11 (except small business cases under Subchapter V of chapter 11) for each calendar quarter, or portion thereof, between the date a bankruptcy petition is filed and the date the court enters a final decree closing the case, dismisses the case, or converts the case to another chapter in bankruptcy. (see schedule). | | X | | |
| A-11 | **869- Statutes of Limitations- 18 USC §3284, provides for a Special Statute of Limitations which applies to Concealment of Asset cases** | | X | X | X |
| A-12 | 18 U.S. Code § 1001. Statements or entries generally | X | X | X | X |
| A-13 | (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully— | X | X | X | X |
| A-14 | 1- falsifies, conceals, or covers up by any trick, scheme, or device a material fact; | X | X | X | X |
| A-15 | 2- makes any materially false, fictitious, or fraudulent statement or representation; or | X | X | X | X |
| A-16 | 3- makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; | X | X | X | X |
| A-17 | (5) knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11; | | | X | X |
| A-18 | (6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11; | X | X | X | X |

| ID | Provision | | | | | |
|---|---|---|---|---|---|---|
| A-19 | (7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;<br>(8) after the filing of a case under the 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, | | X | | X | | X |
| A-20 | mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a | | X | X | X | X | X |
| A-21 | (9) after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor, shall be fined under this title, imprisoned not more than 5 years, or both. (WITHHELD BY EACH PREVIOUS) | | X | X | X | X | X |
| A-22 | (June 25, 1948, ch. 645, 62 Stat. 689; Pub. L. 86–519, § 2, June 12, 1960, 74 Stat. 217; Pub. L. 86–701, Sept. 2, 1960, 74 Stat. 753; Pub. L. 94–550, § 4, Oct. 18, 1976, 90 Stat 2535; Pub. L. 95–598, title III, § 314(a), (c), Nov. 6, 1978, 92 Stat. 2676, 2677; Pub. L. 100–690, title VII, § 7017, Nov. 18, 1988, 102 Stat. 4395; Pub. L. 103–322, title XXXIII, § 330016(1)(K), Sept. 13, 1994, 108 Stat. 2147; Pub. L. 103–394, title III, § 312(a)(1)(A), Oct. 22, 1994, 108 Stat. 4138; Pub. L. 104–294, title VI, § 601(a)(1), Oct. 11, 1996, 110 Stat. 3497.) | | | | | | |
| A-23 | **11 U.S.C. § 1102** | | X | | | | |
| A-24 | The Committee is appointed by the U.S. trustee and ordinarily consists of unsecured creditors who hold the seven largest unsecured claims against the debtor. | | X | | | | |
| A-25 | **11 U.S.C. § 1104(e)** | | X | | | | X |

| | | | | |
|---|---|---|---|---|
| A-26 | U.S. trustee is required to move for appointment of a trustee if there are reasonable grounds to believe that any of the parties in control of the debtor "participated in actual fraud, dishonesty or criminal conduct in the management of the debtor or the debtor's financial reporting." | X | | |
| A-27 | **11 U.S.C. §§ 1106, 1107; Fed. R. Bankr. P. 2015(a)-** | X | | |
| A-28 | These duties, set forth in the Bankruptcy Code and Federal Rules of Bankruptcy Procedure, include accounting for property, examining and objecting to claims, and filing informational reports as required by the court and the U.S. trustee or bankruptcy administrator (discussed below), such as monthly operating reports. Also, as many of the other powers and duties of a trustee, including the right with the court's approval, to employ attorneys, accountants, appraisers, auctioneers, or other professional persons to assist the debtor during its bankruptcy case. Other responsibilities include filing tax returns and reports which are either necessary or ordered by the court after confirmation such as a final accounting. The U.S. trustee is responsible for monitoring the compliance of the debtor in possession with the reporting requirements | X | | |
| A-29 | **18 U.S. Code § 152. Concealment of assets; false oaths and claims; bribery** | | X | X |
| A-30 | A person who— | | X | X |
| A-31 | 1 - knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor; | | X | X |
| A-32 | 2 - knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11; | | X | X |

| | | | | | | |
|---|---|---|---|---|---|---|
| A-33 | 3 - knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11; | | | | X | X |
| A-34 | 4 - knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney; | | | | X | |
| A-35 | 5 - knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11; | X | X | X | X | X |
| A-36 | 6 - knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11; | | | X | X | X |
| A-37 | 7 - in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation; | X | | X | X | |
| A-38 | 8 - after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or | | | X | X | X |
| A-39 | 9 - after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor, | | | X | X | X |

| Ref | Text | | | | | |
|---|---|---|---|---|---|---|
| A-40 | shall be fined under this title, imprisoned not more than 5 years, or both.<br>(June 25, 1948, ch. 645, 62 Stat. 689; Pub. L. 86–519, § 2, June 12, 1960, 74 Stat. 217; Pub. L. 86–701, Sept. 2, 1960, 74 Stat. 753; Pub. L. 94–550, § 4, Oct. 18, 1976, 90 Stat. 2535; Pub. L. 95–598, title III, § 314(a), (c), Nov. 6, 1978, 92 Stat. 2676, 2677; | X | | | X | X |
| A-41 | Pub. L. 100–690, title VII, § 7017, Nov. 18, 1988, 102 Stat. 4395; Pub. L. 103–322, title XXXIII, § 330016(1)(K), Sept. 13, 1994, 108 Stat. 2147; Pub. L. 103–394, title III, § 312(a)(1)(A), Oct. 22, 1994, 108 Stat. 4138; Pub. L. 104–294, title VI, § 601(a)(1), Oct. 11, 1996, 110 Stat. 3497.) | | | | X | X |
| A-42 | (Added Pub. L. 103–394, title III, § 312(a)(1)(B), Oct. 22, 1994, 108 Stat. 4140; amended Pub. L. 109–8, title XII, § 1220, Apr. 20, 2005, 119 Stat. 195.) | | | | | |
| A-43 | 18 U.S. Code § 153.Embezzlement against estate<br>(a) Offense -A person described in subsection (b) who knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor shall be fined under this title, imprisoned not more than 5 years, or both. | | | X | X | X |
| A-44 | (b)Person to Whom Section Applies.—A person described in this subsection is one who has access to property or documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, | | | X | X | X |
| A-45 | marshal, attorney, or other officer of the court or as an agent, employee, or other person engaged by such an officer to perform a service with respect to the estate. | | | X | X | X |
| A-46 | 18 U.S. Code § 154.Adverse interest and conduct of officers | | | X | X | X |

| Ref | Content | | | |
|---|---|---|---|---|
| A-47 | A person who, being a custodian, trustee, marshal, or other officer of the court—<br>(1) knowingly purchases, directly or indirectly, any property of the estate of which the person is such an officer in a case under title 11;<br>(2) knowingly refuses to permit a reasonable opportunity for the inspection by parties in interest of the documents and accounts relating to the affairs of estates in the person's charge by parties when directed by the court to do so; or<br>(3) knowingly refuses to permit a reasonable opportunity for the inspection by the United States Trustee of the documents and accounts relating to the affairs of an estate in the person's charge, shall be fined under this title and shall forfeit the person's office, which shall thereupon become vacant. | | | |
| A-48 | (June 25, 1948, ch. 645, 62 Stat. 690; Pub. L. 95–598, title III, § 314(a)(2), (e)(1), (2), Nov. 6, 1978, 92 Stat. 2676, 2677; Pub. L. 103–322, title XXXIII, § 330016(1)(G), Sept. 13, 1994, 108 Stat. 2147; Pub. L. 103–394, title III, § 312(a)(1)(A), Oct. 22, 1994, 108 Stat. 4139; Pub. L. 104–294, title VI, § 601(a)(1), Oct. 11, 1996, 110 Stat. 3497.) | X | X | X |
| A-49 | 18 U.S. Code § 155.Fee agreements in cases under title 11 and receiverships | X | X | X |

| | | | | | |
|---|---|---|---|---|---|
| A-50 | Whoever, being a party in interest, whether as a debtor, creditor, receiver, trustee or representative of any of them, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, knowingly and fraudulently enters into any agreement, express or implied, with another such party in interest or attorney for another such party in interest, for the purpose of fixing the fees or other compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate, shall be fined under this title or imprisoned not more than one year, or both. | | | X | |
| A-51 | (June 25, 1948, ch. 645, 62 Stat. 690; May 24, 1949, ch. 139, § 4, 63 Stat. 90; Pub. L. 95–598, title III, § 314(f)(1), (2), Nov. 6, 1978, 92 Stat. 2677.; Pub. L. 103–322, title XXXIII, § 330016(1)(K), Sept. 13, 1994, 108 Stat. 2147.) | | | | X |
| A-52 | 11 U.S. Code § 326. | | X | | |

| | | | |
|---|---|---|---|
| **1.** Limitation on compensation of trustee(a) In a case under chapter 7 or 11, other than a case under subchapter V of chapter 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims. | | | |
| (b) In a case under subchapter V of chapter 11 or chapter 12 or 13 of this title, the court may not allow compensation for services or reimbursement of expenses of the United Sta insular, subject to the jurisdiction of the United States. | X | | |
| (d)A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose. | | | |
| (e)A "commercial activity carried | | | |
| (d) The court may deny allowance of compensation for services or reimbursement of expenses of the trustee if the trustee failed to make diligent inquiry into facts that would permit denial of allowance under section 328(c) of this title or, with knowledge of such facts, employed a professional person under section 327 of this title. | | X | |

A-53

A-54

| | | | | | |
|---|---|---|---|---|---|
| A-55 | (a)Definitions.—In this section—<br>(1)the term "bankruptcy petition preparer" means a person, other than the debtor's attorney or an employee of such an attorney, who prepares for compensation a document for filing; and<br>(2)the term "document for filing" means a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under title 11.<br>(b)Offense.—If a bankruptcy case or related proceeding is dismissed because of a knowing attempt by a bankruptcy petition preparer in any manner to disregard the requirements of title 11, United States Code, or the Federal Rules of Bankruptcy Procedure, the bankruptcy petition preparer shall be fined under this title, imprisoned not more than 1 year, or both. | | | X | | |
| A-56 | (Added Pub. L. 103–394, title III, § 312(a)(1)(B), Oct. 22, 1994, 108 Stat. 4140; amended Pub. L. 109–8, title XII, § 1220, Apr. 20, 2005, 119 Stat. 195.) | | | | | |
| A-57 | **18 U.S. Code § 157. Bankruptcy fraud  U.S. Code** | X | X | X | X | X |
| A-58 | A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so— | | | X | X | X |
| A-59 | 1 - files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title; | X | | X | X | X |
| A-60 | 2 - files a document in a proceeding under title 11; or | X | | X | X | X |
| A-61 | 3 - makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under | X | X | X | X | X |
| A-62 | shall be fined under this title, imprisoned not more than 5 years, or both. | | | | X | X |

| Ref | Text | | | | |
|---|---|---|---|---|---|
| A-63 | (Added Pub. L. 103–394, title III, § 312(a)(1)(B), Oct. 22, 1994, 108 Stat. 4140; amended Pub. L. 109–8, title III, § 332(c), Apr. 20, 2005, 119 Stat. 103; Pub. L. 111–327, § 2(b), Dec. 22, 2010, 124 Stat. 3562.) | | | | X |
| A-64 | **17 CFR § 240.12h-3 - Suspension of duty to file reports under section 15(d)** | | X | | |
| A-65 | (a) Subject to paragraphs (c) and (d) of this section, the duty under section 15(d) to file reports required by section 13(a) of the Act with respect to a class of securities specified in paragraph (b) of this section shall be suspended for such class of securities immediately upon filing with the Commission a certification on Form 15 (17 CFR 249.323) if the issuer of such class has filed all reports required by section 13(a), without regard to Rule 12b-25 (17 CFR 249.322), for the shorter of its most recent three fiscal years and the portion of the current year preceding the date of filing Form 15, or the period since the issuer became subject to such reporting obligation. If the certification on Form 15 is subsequently withdrawn or denied, the issuer shall, within 60 days, file with the Commission all reports which would have been required if such certification had not been filed. | | X | | |
| A-66 | **Section 240.15d-6 - Suspension of duty to file reports.** | | X | | |
| A-67 | If the duty of an issuer to file reports pursuant to section 15(d) of the Act as to any fiscal year is suspended as provided in section 15(d) of the Act, such issuer shall, within 30 days after the beginning of the first fiscal year, file a notice on Form 15 informing the Commission of such suspension unless Form 15 has already been filed pursuant to Rule 12h-3. If the suspension resulted from the issuer's merger into, or consolidation with, another issuer or issuers, the notice shall be filed by the successor issuer. | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **A-68** (Secs. 12(g)(4), 12(h), 13(a), 15(a), 23(a), 48 Stat. 892, 894, 895, 901; sec. 203(a), 49 Stat. 704; secs. 3, 8, 49 Stat. 1377, 1379; secs. 3, 4, 6, 78 Stat. 565-568, 569, 570-574; sec. 18, 89 Stat. 155; sec. 204, 91 Stat. 1500; 15 U.S.C. 78l(g)(4), 78l(h), 78m(a), 78o(d), 78w(a)) | X | | | | |
| **A-69** [49 FR 12690, Mar. 30, 1984] | | | | | |
| **A-70** \*\*\***Exchange Act reporting and disclosure requirements continue to apply in bankruptcy**, and turnaround professionals *must take them into account in managing a case to a successful conclusion.* | X | | | | |
| **A-71** 11 U.S.C. § 548 - U.S. Code - Unannotated Title 11. Bankruptcy § 548. Fraudulent Transfers and Obligations | X | X | X | | |
| **A-72** (a)Trustees, receivers or managers of any property, including debtors in possession, **may be sued, without leave of the court** appointing them, **with respect to any of their acts or transactions in carrying on business connected with such** property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, **but this shall not deprive a litigant of his right to trial by jury.** | | X | X | X | |
| **A-73** (b)Except as provided in section 1166 of title 11, **a trustee,** receiver or manager appointed in any cause pending in any court of the United States, **including a debtor in possession,** shall manage and operate the property in his possession as such trustee, receiver or manager according to the **requirements of the valid laws of the State** in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession | | | X | X | X |
| **A-74** (June 25, 1948, ch. 646, 62 Stat. 926; Pub. L. 95-598, title II, § 235, Nov. 6, 1978, 92 Stat. 2667.) | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| A-68 | (Secs. 12(g)(4), 12(h), 13(a), 15(d), 23(a), 48 Stat. 892, 894, 895, 901; sec. 203(a), 49 Stat. 704; secs. 3, 8, 49 Stat. 1377, 1379; secs. 3, 4, 6, 78 Stat. 565-568, 569, 570-574; sec. 18, 89 Stat. 155; sec. 204, 91 Stat. 1500; 15 U.S.C. 78l(g)(4), 78l(h), 78m(a), 78o(d), 78w(a)) | | | | X | |
| A-69 | [49 FR 12690, Mar. 30, 1984] | | | | | |
| A-70 | ***Exchange Act reporting and disclosure requirements continue to apply in bankruptcy, and turnaround professionals must take them into account in managing a case to a successful conclusion. | | | | X | |
| A-71 | 11 U.S.C. § 548 - U.S. Code - Unannotated Title 11. Bankruptcy § 548. Fraudulent Transfers and Obligations | | | | X | X | X |
| A-72 | (a)Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury. | | | | X | X | X |
| A-73 | (b)Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. | | | | X | X | X |
| A-74 | (June 25, 1948, ch. 646, 62 Stat. 926; Pub. L. 95-598, title II, § 235, Nov. 6, 1978, 92 Stat. 2667.) | | | | | X | |

| | | | | | |
|---|---|---|---|---|---|
| A-75 | (A)  any violation of the securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47) )), any State securities laws, or any regulation or order issued under Federal securities laws or State securities laws (B)  fraud, deceit, or manipulation in a fiduciary capacity or in connection with  the purchase or sale of any security | | | X | X |
| A-76 | registered under section 12 or 15(d) of the  Securities Exchange Act of 1934 ( 15 U.S.C. 78l and 78o(d)) or under section 6 of the Securities Act of 1933 ( 15 U.S.C. 77f). | | X | X | X |
| A-77 | **(D) 28 U.S.C. Code § 959. Trustees and receivers suable; management; State laws** | | X | X | X |
| A-78 | (a)      Trustees, receivers or managers of any **property, including debtors in possession, may be sued**, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such **actions shall be subject to the general equity power of such court** so far as the same may be necessary to the ends of justice, **but this shall not deprive a litigant of his right to trial by jury.** | | X | X | X |
| A-79 | (b)      Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, **shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State** in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. | | X | X | X |
| A-80 | (June 25, 1948, ch. 646, 62 Stat. 926; Pub. L. 95–598, title II, § 235, Nov. 6, 1978, 92 Stat. 2667.) | | | | |
| A-81 | **11 U.S. Code § 704. Duties of trustee (a)(8):** | X | X | X | X |
| A-82 | (a) The trustee shall— | X | X | X | X |

| | | | | |
|---|---|---|---|---|
| A-83 | (1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties | X | | |
| A-84 | (2) be accountable for all property received; | X | | |
| A-85 | (4) investigate the financial affairs of the debtor; | X | | |
| A-86 | (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest; | X | | |
| A-87 | (8) if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires; | X | | |
| A-88 | **Bankruptcy Rule 903** | X | | |
| A-89 | The objective of "expeditious and economical administration" of cases under the Code has frequently been recognized by the courts to be "a chief purpose of the bankruptcy laws." See *Katchen v. Landy*, 382 U.S. 323, 328 (1966); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346–47 (1874); *Ex parte Christy*, 44 U.S. (3 How.) 292, 312–14, 320–22 (1845). | X | | |
| A-90 | **11 U.S.C. § 327(a) (1994):** | X | X | X |
| A-91 | (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this | X | X | X |

| Item | Text | | | | | |
|---|---|---|---|---|---|---|
| A-92 | (e) The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed. | | | X | | X |
| A-93 | (f) The trustee may not employ a person that has served as an examiner in the case. | | | | | |
| A-94 | (Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2563; Pub. L. 98–353, title III, § 430(c), July 10, 1984, 98 Stat. 370; Pub. L. 99–554, title II, §§ 210, 257(e), Oct. 27, 1986, 100 Stat. 3099, 3114.) | | | | | |
| A-95 | 11 U.S.C. § 701(a)(1) (1994) | | X | | | |
| A-96 | (a)(1) Promptly after the order for relief under this chapter, the United States trustee shall appoint one disinterested person that is a member of the panel of private trustees established under section 586(a)(1) of title 28 or that is serving as trustee in the case immediately before the order for relief under this chapter to serve as interim trustee in the case. | | | X | | |
| A-97 | (b) The service of an interim trustee under this section terminates when a trustee elected or designated under section 702 of this title to serve as trustee in the case qualifies under section 322 of this title. | | | X | X | |
| A-98 | Securities Exchange Act of 1934 | | | X | X | |

| | | | | | |
|---|---|---|---|---|---|
| **Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m,** companies with registered publicly held securities and companies of a certain size are called "reporting companies," meaning that they must make periodic disclosures by filing | | | | | |
| A-99 | annual reports (called a Form 10-K) and quarterly reports (called a Form 10-Q). Reporting companies must also promptly disclose certain important events (called a Form 8-K). Information in these reports includes information about the company's officers and directors, the company's line of business, audited financial statements, and the management discussion and analysis section. | X | X | | |
| | *The Exchange Act* - "...disclosure materials must be filed with the SEC." | | | | |
| A-100 | Section 20 (codified in 15 U.S.C. § 78t) provides for joint and several liability for people who control or abet violators of the Exchange act, thus increasing the chance that an investor will be able to collect any damages that are awarded. | | X | X | |
| A-101 | **18 U.S. Code § 242. Deprivation of rights under color of law** | X | X | X | X |

*Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both;*

**A-102** *and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.*

**A-103** *(June 25, 1948, ch. 645, 62 Stat. 696; Pub. L. 90–284, title I, § 103(b), Apr. 11, 1968, 82 Stat. 75; Pub. L. 100–690, title VII, § 7019, Nov. 18, 1988, 102 Stat. 4396; Pub. L. 103–322, title VI, § 60006(b), title XXXII, §§ 320103(b), 320201(b), title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 1970, 2109, 2113, 2147; Pub. L. 104–294, title VI, §§ 604(b)(14)(B), 607(a), Oct. 11, 1996, 110 Stat. 3507, 3511.)*

**A-104** **28 U.S.C. §1332(a)(2) - Diversity of citizenship; amount in controversy; costs**

| | Col 1 | Col 2 | Col 3 | Col 4 |
|---|---|---|---|---|
| A-102 | X | | | |
| A-103 | | X | | |
| A-104 | | | X | X |

| A-105 | (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between— (1)citizens of different States; (2)citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State; (3)citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4)a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States. | | | |
|---|---|---|---|---|
| A-106 | 28 U.S. Code § 1603. Definitions For the purposes of this chapter- | | | |

**A-107**

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).(b)An "agency or instrumentality of a foreign state" means any entity—
(1)which is a separate legal person, corporate or otherwise, and
(2)which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
(3)which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.
(c)The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.
(d)A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
(e)A "commercial activity carried on in the United States by a foreign state" means commercial

**A-108** 18 U.S. Code § 3284.Concealment of bankrupt's assets

The concealment of assets of a debtor in a case under title 11 shall be deemed to be a continuing offense until the debtor

**A-109**

shall have been finally discharged or a discharge denied, and the period of limitations shall not begin to run until such final discharge or denial of discharge.

**A-110**

(June 25, 1948, ch. 645, 62 Stat. 828, Pub. L. 95–598, title III, § 314(k), Nov. 6, 1978, 92 Stat. 2678.)

**A-111** Securities Exchange Act of 1934

| | | | | |
|---|---|---|---|---|
| **Overview-** The Securities and Exchange Act of 1934 ("1934 Act," or "Exchange Act") primarily regulates transactions of securities in the secondary market. As such, the 1934 Act typically governs transactions which take place between parties which are not the original issuer, such as trades that retail investors execute through brokerage companies.<br><br>**Disclosures-General-**"To protect investors, Congress crafted a mandatory disclosure process designed to force companies to disclose information that investors would find pertinent to making investment decisions.".<br><br>**Reporting** | | | | |
| **A-112** | **Requirements -** "... under Section 13(a) of the Exchange Act (codified in 15 U.S.C. § 78m), companies with registered publicly held securities and companies of a certain size are called "reporting companies," meaning that they must make periodic disclosures by filing annual reports (called a Form 10-K) and quarterly reports (called a Form 10-Q). Reporting companies must also promptly disclose certain important events (called a Form 8-K). Information in these reports includes information about the company's officers and directors, the company's line of business, audited financial statements, and the management discussion and analysis section. **The** | | X | |
| **A-113** | 28 U.S. Code § 959.Trustees and receivers suable; management; State laws | | X | X |

| A-114 | | | | | |
|---|---|---|---|---|---|
| (a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury. **(b)**Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. | | | | X | |

| A-115 | | | | | |
|---|---|---|---|---|---|
| (June 25, 1948, ch. 646, 62 Stat. 926; Pub. L. 95–598, title II, § 235, Nov. 6, 1978, 92 Stat. 2667.) | | | | | |

| AUTHORITIES | Alan Jacobs-Trustee | Eduardo Espinosa-Trustee | Michael Quilling-Trustee | Jessica Mcgee (TK)- SEC Atty | Lisa Lambert U.S.Trustee | H. Thomas Moran-Trustee | David Bennett (TK)- Atty for Trustee | Thompson & Knight |
|---|---|---|---|---|---|---|---|---|
| A-2 | X | X | X | X | X | X | | |
| A-3 | X | X | X | X | X | X | | |
| A-4 | X | X | X | X | X | | | |
| A-5 | X | X | X | X | X | X | X | |
| A-6 | | | | | | | | |
| A-7 | | | | | X | X | | |
| A-8 | | | | | X | X | | |
| A-9 | X | X | X | | X | X | | |
| A-10 | X | X | X | | X | X | | |
| A-11 | X | X | X | X | | X | X | X |
| A-12 | X | X | X | X | X | X | X | X |
| A-13 | X | X | X | X | X | X | X | |
| A-14 | X | | | X | X | X | X | X |
| A-15 | X | X | X | X | X | X | X | X |
| A-16 | X | X | X | X | X | X | X | X |
| A-17 | | | | | | | | X |
| A-18 | | | | X | | | | |
| A-19 | X | X | X | | X | X | X | X |
| A-20 | X | X | X | | X | X | X | X |
| A-21 | X | X | X | | X | X | X | X |
| A-22 | | | | | | | | |
| A-23 | | | | | X | | | |
| A-24 | | | | | X | | | |
| A-25 | | | | | X | | | |

| A-55 | A-54 | A-53 | A-52 | A-51 | A-50 | A-49 | A-48 | A-47 | A-46 | A-45 | A-44 | A-43 | A-42 | A-41 | A-40 | A-39 | A-38 | A-37 | A-36 | A-35 | A-34 | A-33 | A-32 | A-31 | A-30 | A-29 | A-28 | A-27 | A-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  | X | X |  | X | X | X | X | X |  | X | X | X | X | X |  | X | X | X |  | X | X | X |  |  |  |
|  |  |  |  |  | X | X |  | X | X | X | X | X |  | X | X | X | X | X |  | X | X | X |  | X | X | X |  |  |  |
|  |  |  |  |  | X | X |  | X | X | X | X | X |  | X | X | X | X | X |  | X | X | X |  | X | X | X |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | X |  |  | X |  | X |  |  |  |  |  |  |  |  |  |
|  |  | X | X |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | X |  |  |  |  |  |  | X | X | X |
| X | X |  |  |  | X | X |  | X | X | X | X | X |  | X | X | X | X | X |  | X |  | X | X | X | X | X |  |  |  |
|  |  |  |  |  | X | X |  | X | X | X | X | X |  | X | X | X | X | X |  | X | X | X |  | X | X | X |  |  |  |
|  |  |  |  |  | X | X |  | X | X | X |  | X |  | X | X | X | X |  |  | X |  |  |  | X | X | X |  |  |  |

| A-85 | A-84 | A-83 | A-82 | A-81 | A-80 | A-79 | A-78 | A-77 | A-76 | A-75 | A-74 | A-73 | A-72 | A-71 | A-70 | A-69 | A-68 | A-67 | A-66 | A-65 | A-64 | A-63 | A-62 | A-61 | A-60 | A-59 | A-58 | A-57 | A-56 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| × | × | × | × | × |  | × | × | × | × | × |  | × | × | × | × | × |  | × | × | × | × | × | × | × | × | × | × | × |  |
| × | × | × | × | × |  | × | × | × | × | × |  | × | × | × | × | × |  | × | × | × | × | × | × | × | × | × | × | × |  |
| × | × | × | × | × |  | × | × | × | × | × |  | × | × | × | × | × |  | × | × | × | × | × | × | × | × | × | × | × |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | × | × | × |  | × |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | × |  |  |  | × |  |
| × | × | × | × | × |  | × | × | × | × | × |  | × | × | × | × | × |  |  | × | × | × |  |  | × | × | × | × | × |  |
|  |  |  |  |  |  | × | × | × | × | × |  | × | × | × |  |  |  |  |  |  |  |  |  | × | × | × | × | × | × |
|  |  |  |  |  |  | × | × | × | × | × |  | × | × | × |  |  |  |  |  |  |  | × | × | × | × | × |  |  | × |

| A-115 | A-114 | A-113 | A-112 | A-111 | A-110 | A-109 | A-108 | A-107 | A-106 | A-105 | A-104 | A-103 | A-102 | A-101 | A-100 | A-99 | A-98 | A-97 | A-96 | A-95 | A-94 | A-93 | A-92 | A-91 | A-90 | A-89 | A-88 | A-87 | A-86 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | × | × | × | × |  |  |  |  |  |  |  |  | × | × | × | × | × |  |  |  |  |  | × | × | × | × | × | × | × |
|  | × | × | × | × |  |  |  |  |  |  |  |  | × | × | × | × | × |  |  |  |  |  | × | × | × | × | × | × | × |
|  | × | × | × | × |  |  |  |  |  |  |  |  | × | × | × | × | × |  |  |  |  |  | × | × | × | × | × | × | × |
|  |  |  |  |  |  |  |  |  |  |  |  |  | × | × |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  | × | × | × | × | × | × | × | × |  |  |  |  |  |  |  |  |  |
|  | × | × | × | × |  |  |  |  |  |  |  |  | × | × | × | × | × |  |  |  |  |  | × | × | × | × | × | × | × |
|  |  |  |  |  |  |  |  |  |  |  |  |  | × | × |  |  |  |  |  |  |  |  |  | × | × | × |  |  |  |  |
|  |  |  | × | × |  |  |  |  |  |  |  |  | × | × |  |  |  |  |  |  |  |  |  | × | × | × |  |  |  |  |